UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| United States of America | : | |
| | : | |
| v. | : | Case No. 3:07cr134 (JBA) |
| | : | |
| Ionia Management S.A., et al. | : | |

**RULING ON DEFENDANT IONIA MANAGEMENT S.A.'S PRE-TRIAL MOTIONS
[DOCS. ## 15-16, 23-26]**

The Indictment in this case charges defendant Ionia
Management S.A. ("Ionia"), the ship management company that
operated the tanker vessel M/T Kriton, and its Second Assistant
Engineer, defendant Edgardo Mercurio, with criminal violations
involving the falsification of and failure to maintain an Oil
Record Book for the M/T Kriton in which "all disposals of oil
residue and discharges overboard and disposals otherwise of oil,
oil sludge, oil residues, oily mixtures, bilge slops, and bilge
water that had accumulated in machinery spaces and elsewhere
aboard the M/T Kriton were fully recorded."  Indictment [Doc. #
1] ¶ 2.

Specifically, Count Two charges that defendant Ionia, aided
and abetted by defendant Mercurio, "knowingly fail[ed] and
cause[d] the failure to maintain an Oil Record Book for the M/T
Kriton in which all disposals of oil residue and discharges
overboard and disposals otherwise of oil, oil sludge, oil
residues, oily mixtures, bilge slops, and bilge water that had
accumulated in machinery spaces and elsewhere aboard the M/T

1

Kriton were fully recorded, during a U.S. Coast Guard inspection
to determine the compliance of the M/T Kriton with United States
law, by failing to disclose exceptional discharges of oil-
contaminated waste made through a bypass hose and without the use
of a properly functioning oily water separator and oil content
monitor," in violation of the Act to Prevent Pollution from Ships
(the "APPS"), 33 U.S.C. § 1908(a), and the regulations
promulgated thereunder, specifically, 33 U.S.C. § 151.25.  See
Indictment, Count Two ¶ 2.

    Count Three charges Ionia and Mercurio with falsification of
records in a federal investigation in violation of 18 U.S.C. §
1519, by "knowingly alter[ing], conceal[ing], cover[ing] up,
falsify[ing], and mak[ing] false entries in a record and document
with the intent to impede, obstruct, and influence the
investigation and proper administration of a matter within the
jurisdiction of a department or agency of the United States,"
specifically, "an inspection by the U.S. Coast Guard and
Department of Homeland Security," by presenting Oil Record Books
on or about March 20, 2007 which "omitted entries required to be
recorded of overboard discharges of oil, oil sludge, oil residue,
oily mixtures, bilge slops, and bilge water that had accumulated
in machinery spaces and elsewhere aboard the M/T Kriton, without
processing through required pollution prevention equipment," and
by "falsely represent[ing] that all discharges and disposals had

been made using either an incinerator or properly-functioning Oily Water Separator and Oil Content Monitor, when the defendant well knew that oil, oil sludge, oil residues, oily mixtures, bilge slops, and bilge water that had accumulated in machinery spaces and elsewhere aboard the M/T Kriton had been discharged directly overboard through a bypass house." See Indictment, Count Three ¶ 2.

Counts Four and Five charge defendant Mercurio and defendant Ionia, respectively, with obstruction of justice in violation of 18 U.S.C. § 1505 in relation to the investigation by the U.S. Coast Guard and the Department of Homeland Security as to the M/T Kriton's compliance with the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (the "MARPOL Protocol") and United States law.

Count One charges both defendants with conspiracy "to defraud the United States, that is to hamper, hinder, impede, impair and obstruct by craft, trickery, deceit, and dishonest means, the lawful and legitimate functions of the Department of Homeland Security and Department of Justice in enforcing MARPOL and United States law, and the terms of Ionia's probation and Environmental Compliance Program, and to commit offenses against the United States," including the violations charged in Counts Two through Five. See Indictment, Count One ¶ 11.

Ionia has now filed several pre-trial motions, including:

(1) a Motion to Dismiss [Doc. # 15] Counts 2, 3, and those parts
of Count 1 which speak to the alleged failure to maintain an Oil
Record Book for lack of jurisdiction; (2) a Motion to Dismiss
[Doc. # 16] Counts 2, 3, and those parts of Count 1 which speak
to the alleged Oil Record Book omissions as crimes, on the basis
that the Paperwork Reduction Act (44 U.S.C. § 3501 et seq.) bars
criminal prosecution therefor; (3) a Motion for a Bill of
Particulars [Doc. # 23]; (4) a Motion for Early Disclosure of
Jencks Material and Prompt Disclosure of Brady/Giglio Material
[Doc. # 24]; (5) a Motion for Leave [Doc. # 25] to file motions
after July 11, 2007, on the basis of the Government's failure to
produce complete disclosure; and (6) a Motion to Compel Election
[Doc. # 26] between claimed multiplicitous Counts Two and Three
of the Indictment, both concerning Ionia's presentation of an
allegedly false Oil Record Book.  For the reasons that follow,
Ionia's Motions to Dismiss will be denied, as will be its other
motions, except for its Motion for Leave, which will be granted
in part and denied in part, as set out infra.

**I.   Motion to Dismiss – Jurisdiction**

   A.   Introduction

      Defendant Ionia moves to dismiss Counts Two, Three, and
those parts of Count One of the Indictment that allege crimes
arising out of the failure to maintain an Oil Record Book for
lack of jurisdiction.  Ionia contends that, as "there is no

4

evidence, and the Government does not contend, that an act of pollution occurred in United States waters," and "[a]s the courts that have studied these issues have repeatedly and consistently concluded, the relevant international treaties; the U.S. statutes and implementing regulations upon which these charges rely; together with long-settled principles of international law, all make clear that the United States has no jurisdiction over these matters and that the alleged events do not constitute criminal violations of United States law." Def. Juris. Mot. at 2 (emphasis in original) (citing cases).

Specifically, Ionia claims that the crimes charged in these counts "do not charge an offense against the laws of the United States," id. at 11 (citing 18 U.S.C. § 3231), as they do not concern discharges occurring within the United States, and Ionia contends that the APPS cannot criminalize failure to maintain an accurate oil record book outside of the United States. Ionia also argues that the APPS's mandates, by its provision that "any action taken under this chapter shall be taken in accordance with international law," 33 U.S.C. § 1912, and the regulations promulgated thereunder, "integrate and are circumscribed by principles of customary international law,"[1] such as those Ionia

---

[1] "Customary international law is comprised of those practices and customs that States view as obligatory and that are engaged in or otherwise acceded to by a preponderance of States in a uniform and consistent fashion."  United States v. Yousef, 327 F.3d 56, 91 n. 24 (2d Cir. 2003).

claims were codified by the United Nations Convention of the Law of the Sea ("UNCLOS")[2] including that only monetary penalties are permitted "for violations of foreign-flagged vessels (such as the M/T Kriton) of national laws and regulations (such as the APPS) and applicable international rules and standards (such as MARPOL) that address the prevention, reduction, and control of pollution in the marine environment. The only exception to the rule is when a willful and serious act of pollution is committed <u>within</u> the territorial sea of the coastal state." Def. Juris. Mot. at 8 (emphasis added). Ionia cites an Eastern District of Texas decision in <u>United States v. Kun Yun Jho</u>, in support of its position, which decision will be discussed <u>infra</u>.

Ionia also argues that the Indictment fails to charge a crime, claiming that "the Government has alleged that it is a crime under U.S. law for a foreign flagged ship to sail into United States waters with an [o]il [r]ecord [b]ook which fails, by omission, to record discharges or other operations that may have occurred somewhere else in the world at some prior time," and that the APPS's implementing regulations confirm "that a record keeping omission under the APPS was <u>not</u> intended to be

_____

[2] UNCLOS was signed by the President but has not yet been ratified by the Senate, although Ionia contends lack of ratification is not relevant because "[t]he United States has no authority or jurisdiction to unilaterally change or ignore the terms and conditions of an international treaty to which it is a signatory party." Def. Juris. Mot. at 6-7 n.8 (citing cases).

subject to <u>criminal</u> sanctions under Section 1908(a) . . . except in the case of a willful and serious act of pollution in [the prosecuting country's] territorial sea."  Def. Juris. Mot. at 17 (emphasis in original) (internal case and statute citations omitted).  Ionia further argues that to the extent that the APPS statute or regulations are ambiguous in their application of penalties for record-keeping violations, the rule of lenity should be applied.  <u>Id</u>. at 18-19.

The Government opposes Ionia's Motion by arguing that "international law is not relevant to the actual charges in this case, which focus on conduct occurring in a port of the United States, and because there is no ambiguity such that the rule of lenity demands dismissal."  Gov't Opp. [Doc. # 42] at 1. Specifically, the Government observes that "[the] APPS makes it unlawful to knowingly violate MARPOL, [the] APPS, and federal regulations promulgated thereunder. . . . [The] APPS provides criminal sanctions for knowing violations," and contends that "[b]ecause the APPS Oil Record Book regulations are a requirement of domestic law – and because the APPS related counts charged a violation while the ship was within the internal waters of the United States – international law does not apply."  <u>Id</u>. at 5, 7 (citing cases for the proposition that international law does not limit the jurisdiction of the United States to bring a criminal prosecution under the APPS for the failure to maintain an oil

record book while in port, even where the false entries concern discharges made outside the jurisdiction of the United States). The Government argues that the APPS regulations' oil record book requirements "effectively establish a condition for entry into United States ports and waters," and such an offense is committed "when a person knowingly causes a vessel to enter United States ports with a false (by omission or commission) [o]il [r]ecord [b]ook." Id. at 10. The Government claims that as "[t]he United States has unfettered jurisdiction to prosecute violations of its national laws that occur within its borders, including the internal waters and ports of the United States," there is jurisdiction in this case. Id. at 11.[3] Additionally, the Government claims that Ionia cannot raise treaty or customary international law defenses because treaties do not generally create rights that are privately enforceable in federal courts and, similarly, customary international law "belongs to sovereigns, not individuals," and thus "Ionia lacks standing to assert any rights purportedly granted by customary international law." Id. at 20-22 & nn. 23-24 (citing cases).[4]

---

[3] The Government also observes that MARPOL provides concurrent jurisdiction to port nations, such as the United States in this case, and that nothing in MARPOL or the APPS suggests that the United States gave up any of its sovereignty to proscribe or prosecute conduct occurring within its internal waters and ports. Id. at 15.

[4] As discussed infra note 10, the Court does not reach these standing arguments.

The Government also argues that the Indictment properly charges an APPS crime, including knowing violation of 33 C.F.R. § 151.25 for failure to maintain (i.e., "to keep in a state of . . . validity") a record of all discharges in the oil record book for inspection upon entry into United States waters and ports. The Government observes that Ionia's arguments to the contrary were rejected in both Jho, cited by Ionia, and United States v. Petraia Maritime, Inc., 483 F. Supp. 2d 34 (D. Me. 2007).

B.   Analysis

In its Motion, Ionia relies in large part on United States v. Jho, 465 F. Supp. 2d 618 (E.D. Tex. 2006).  As Ionia contends, the counts subject to a motion to dismiss in Jho are substantially similar to those at issue here, that is, violations of the APPS for failure to comply with 33 C.F.R. § 151.25 where the indictment did not charge any act of pollution occurring in United States waters.

Jho observed that "[v]iolation of the MARPOL Protocol, [the] APPS, or the Coast Guard regulations issued thereunder is made unlawful by [the] APPS," and "[w]hile it is true that the enforcement provision found in [the] APPS contemplates both criminal and civil penalties, the scope of enforcement practices is not as broad as that provision reads on its face.  That is because section 1908 must be read in light of section 1912, which provides that 'any action taken under [Chapter 33] shall be taken

in accordance with international law.'  In this way, the civil and criminal enforcement scheme created by [the] APPS integrates and is circumscribed by principles of customary international law."  Id. at 624.  Jho thus relied on UNCLOS, which it viewed as including "a codification of the long-standing international maritime rule known as 'the law of the flag,'" under which principle "a ship is considered part of the territory of the sovereignty whose flag it flies, and the ship does not lose that character when in the territorial limits of another sovereignty," and which also provides non-flag states may seek redress for marine pollution in limited circumstances only – "when the foreign vessel dumps pollution within the coastal state's territorial sea, exclusive economic zone or continental shelf" – and may impose only monetary penalties for violations of marine pollution laws "except in the case of a wilful and serious act of pollution in the territorial sea."  Id. at 625.  Jho thus concluded that "long-standing principles of international law made specifically applicable to [the] APPS by section 1912 require dismissal of the criminal charges alleging violation of Coast Guard regulations," finding that "[b]ecause the government [did] not charge[] defendants with an act of pollution in U.S. waters, the government may only pursue civil penalties for violations of Coast Guard regulations by foreign-flag ship personnel that occurred aboard [the vessel]," stating

"[m]aintenance of a criminal prosecution on these facts runs afoul of well-established law of the flag principles which seek to ensure uniformity, comity and reciprocity among sea-faring nations." <u>Id</u>. at 625-26.[5]

Jho, however, never addressed head-on the argument advanced by the Government here that the APPS violation alleged was a matter of domestic law because it concerned presentation of a false record book at a United States port to a United States officer, rather than one implicating international law principles. The decisions by other district courts in <u>United States v. Petraia Maritime, Ltd.</u>, 483 F. Supp. 2d 34 (D. Me. 2007), and <u>United States v. Royal Caribbean Cruises, Ltd.</u>, 11 F. Supp. 2d 1358 (S.D. Fla. 1998), more explicitly consider the issue, and come to the opposition conclusion as <u>Jho</u>.[6]

_____

[5] The defendant also cites to the sentencing transcript in <u>United States v. Ntais</u>, No. CR06-5661RBL (W.D. Wa. Dec. 12, 2006) (Def. Ex. C), in which similar issues were raised and the court stated "[i]t seems to me that Jho represents a significant threat to the enforcement of the obligations to keep records accurately, and so forth," and that it "was not persuaded that Jho [wa]s wrongly decided" and was "persuaded that its reasoning should be applied here." <u>Id</u>. at 19, 23.

[6] Additionally, in <u>United States v. Abrogar</u>, 459 F.3d 430 (3d Cir. 2006) (cited by both parties), where a defendant successfully challenged enhancement of his sentence based on purportedly relevant conduct consisting of discharges occurring outside United States waters where he had pled guilty to the same charges as here, <u>i.e.</u>, failure to keep an accurate oil record book as required by 33 C.F.R. § 151.25, in violation of 33 U.S.C. § 1908(a), where the improper discharges and false notations in the oil record book occurred outside of United States waters, the Third Circuit implicitly recognized the distinction between the

As background, "[p]ollution discharges from ships are
regulated by both U.S. and international law" and the APPS
"implements two related treaties to which the United States is a
signatory.  The first is the 1973 International Convention for
the Prevention of Pollution from Ships, referred to as the MARPOL
Protocol.  The second is the Protocol of 1978 Relating to the
International Convention for the Prevention of Pollution from
Ships.  Together, the two treaties are generally referred to as
MARPOL 73/78 ("MARPOL")."  Abrogar, 459 F.3d at 431-32.  "Annex I
to MARPOL sets forth regulations for the prevention of pollution
by oil from ships. [The] APPS authorizes the U.S. Coast Guard to
issue regulations implementing the requirements of these two
treaties [and] [t]he Coast Guard has issued such regulations
incorporating MARPOL requirements."  Id. at 432.  "In addition to
prohibition on oily waste discharges, the treaties require each
oil tanker over a given weight to maintain a record known as an
oil record book. . . . The Coast Guard has the authority to board
and examine the oil record book of any vessel while that vessel
is in U.S. waters or at a U.S. port."  Id.  Thus, as the Third
Circuit in Abrogar recognized, "[f]ailure of a ship to comply
with MARPOL requirements can form the basis for U.S. action to

_____

domestic law violation of maintenance/presentation of a false oil
record book in a U.S. port and the extraterritorial conduct
(e.g., dumping) reflected (by false statement or omission) in the
book, by holding that the latter did not constitute "relevant
conduct" for enhancement purposes in sentencing defendant for the
former violation.

refuse to allow that ship to enter port, to prohibit the ship from leaving port without remedial action, to refer the matter to the flag state of the vessel, or where appropriate, to prosecute the violation in the United States." Id. (citing 33 U.S.C. § 1908). On review of other cases upholding such prosecutions, and considering the statutory and regulatory scheme at issue,[7] the Court finds the rationale of these cases more compelling than that in Jho.

Specifically, the court in United States v. Petraia Maritime, Inc., 483 F. Supp. 2d 34 (D. Me. 2007), confronted with nearly identical arguments as those raised by Ionia here,[8] and relying on United States v. Royal Caribbean Cruises, Ltd., 11 F. Supp. 2d 1358 (S.D. Fla. 1998), which concerned a prosecution under the federal False Statements Act (not the APPS), rejected the Jho rationale that domestic criminal prosecutions of Chapter 33 violations are "circumscribed" by international law and held

---

[7] Section 1908(a) provides for criminal penalties for any person who knowingly violates, inter alia, Chapter 33 of the APPS or the regulations thereunder; 33 C.F.R. § 151.25 in turn provides that "[e]ach oil tanker of 150 gross tons and above," which the Indictment alleges M/T Kriton was, "shall maintain an Oil Record Book Part I."

[8] "The defendant's argument is essentially that, because the alleged inaccuracies in the vessel's oil record book involve a discharge on the high seas outside the territorial jurisdiction of the United States, the action constituting the crimes alleged in the indictment occurred outside the jurisdiction of the United States, which may not bring such charges under MARPOL and UNCLOS." Petraia, 483 F. Supp. 2d at 36-37.

13

that "[t]he discharge itself and the contemporaneous failure to record it in the Oil Record Book are acts that are separate and distinct from the acts that form the basis of the pending criminal charges," citing Royal Caribbean for the proposition that "[p]resentation of a false Oil Record Book seems more appropriately characterized as an essentially domestic law violation over which the United States properly has jurisdiction."  483 F. Supp. 2d at 39 (emphasis in original).

Petraia also joined the observation in Royal Caribbean that "[t]o the extent that the presentation of the materially false Oil Record Book to the Coast Guard 'can be interpreted as somehow falling under the rubric of MARPOL and the law of the seas,' . . . the concurrent jurisdiction provision of MARPOL allowed the United States to prosecute what was clearly a crime in and of itself: the presentation of a false Oil Record Book to the Coast Guard."  Id. at 38-39 (citing Royal Caribbean, 11 F. Supp. 2d at 1368).  Petraia thus rejected the defendant's argument that MARPOL and UNCLOS (purportedly codifying the "law of the sea" and "law of the flag" doctrines of customary international law) precluded criminal prosecution for the type of crimes at issue in Petraia and here.  See also United States v. Kassian Maritime Navigation Agency, Ltd., No. 07cr48-J-25 (MCR) [Doc. # 57, Attach. A], at 11 (M. D. Fla. July 19, 2007) (denying motion to dismiss for lack of jurisdiction, "agree[ing] with the Royal

<u>Caribbean</u> and <u>Petraia</u> courts that even if the [d]efendant has standing under the relevant international law principles, [d]efendants are charged only for conduct that occurred within the United States territory in violation of United States law"); <u>accord</u> <u>United States v. Kiselyov</u>, No. 07cr9-F3 [Doc. # 57, Attach. B & C].

This Court finds the rationale of <u>Petraia</u> and <u>Royal Caribbean</u> instructive and persuasive. The court in <u>Royal Caribbean</u> acknowledged that "[u]nder MARPOL . . . the United States, via the U.S. Coast Guard, has the duty and the obligation to board and inspect ships while in port and to pursue appropriate measures to address any violations thereof," and distinguished between "[w]hether or not the United States had the authority to regulate either the alleged [] unauthorized discharge [outside of United States waters] or any attendant Oil Record Book violations at that time," and "whether the United States has jurisdiction to enforce its laws in port of Miami, Florida regarding the commission of false statements made to a United States agency performing its regular and proper duties," which latter question the court answered in the affirmative. 11 F. Supp. 2d at 1364.[9] <u>Royal Caribbean</u> addressed defendant's

_____

[9] The <u>Royal Caribbean</u> court also noted, as the Government does here, that an alternative basis for jurisdiction – "the extraterritoriality doctrine providing jurisdiction over certain extraterritorial offenses whose extraterritorial acts are intended to have an effect within the sovereign territory" – "seem[ed] applicable." <u>Id</u>.; <u>see</u> <u>also</u> Gov't Opp at 17-18 n.19 and

arguments concerning MARPOL and customary international law principles, including the argument (also raised by the Government here) that the defendant did not have standing to raise such defenses. While <u>Royal Caribbean</u> did not definitively decide whether the defendant had standing to litigate its rights under MARPOL, it did note that MARPOL is not a self-executing treaty (suggesting that an individual defendant may not have such standing), and concluded that in any event, "[t]o the extent that the presentation of the materially false Oil Record Book to the Coast Guard constitutes a separate, actionable crime under United States law, MARPOL does not bar that prosecution," also noting "that the careful international regulatory balance created by MARPOL must be respected," but finding "[e]qually compelling" "the right of the United States to enforce its laws within its borders." <u>Id</u>. at 1367-68. With respect to UNCLOS/customary international law principles, the <u>Royal Caribbean</u> court was "not convinced that UNCLOS, a treaty which all parties agree applies to protect navigational freedoms and the law of the sea, has any bearing on this domestic prosecution," noting "[t]he alleged crime occurred in port in Miami, Florida, and involved presentation of a materially false writing to the United States Coast Guard," concluding "[p]resentation of a false Oil Record Book seems more appropriately characterized . . . as an

---

cases cited therein.

essentially domestic law violation over which the United States properly has jurisdiction." Id. at 1370-71.

Although Royal Caribbean concerned a prosecution under the False Statements Act, not the APPS, its rationale is nevertheless applicable here as the case also involved "knowing use or presentation of a false writing, specifically an Oil Record Book," see 11 F. Supp. 2d at 1361, related to an improper discharge and omitted entry in the oil record book both of which took place outside of United States waters, and as the opinion also considered the interplay between international law (MARPOL/UNCLOS/customary international law) and federal law. As the court in Royal Caribbean observed, "the gravamen of this action is not the pollution itself, or even the Oil Record Book violation occurring at that time, but the misrepresentation in port," 11 F. Supp. 2d at 1371, and thus there is jurisdiction to criminally prosecute in the United States.[10]

Ionia also contends that the alleged events do not constitute criminal violations of United States law, again referencing the "Law of the Sea," which it contends "has long provided that Port States may prescribe only civil penalties for

_____

[10] On the basis of this rationale, incorporating the reasoning from Petraia and Royal Caribbean, that MARPOL, UNCLOS, and customary international law principles do not bar prosecution here for the alleged crimes, the Court need not resolve the Government's contention that Ionia lacks standing to raise defenses pursuant to MARPOL, UNCLOS, and customary international law, nor need it address the Government's alternative argument grounded in the extraterritoriality doctrine, see supra n.9.

violations of international pollution laws, 'except in the case
of a willful and serious act of pollution in [the prosecuting
country's] territorial sea." Def. Mot. at 17 (citing cases).
The language of Section 1908(a), however, clearly provides for
criminal prosecution of knowingly violations of, inter alia,
Chapter 33 of the APPS and the regulations adopted thereunder,
including 33 C.F.R. § 151.25, violation of which is charged here.
See also Petraia, 483 F. Supp. 2d at 39.  As Section 1908 is not
ambiguous with respect to the criminal (in subsection (a)) and
civil (in subsection (b)) penalties it imposes, the rule of
lenity, urged by Ionia, is not applicable.

Ionia's Motion to Dismiss on grounds of jurisdiction and
failure to charge a criminal violation of federal law will thus
be denied.

## II.  Motion to Dismiss – The Paperwork Reduction Act

Ionia also moves to dismiss Counts Two, Three, and those
parts of Count One that allege oil record book violations arising
from alleged failures to record exceptional discharges of oil, on
the basis that "the Paperwork Reduction Act of 1995, 44 U.S.C. §
3501 et seq., bars 'any penalty,' including criminal prosecution,
for the [d]efendants' alleged failure(s) to complete an
'information collection request' or 'collection of information,'
such as the Coast Guard's request for an [oil record book], which
lacks the required Office of Management and Budget (OMB) approval

number."  Def. Mot. at 1.

"The Paperwork Reduction Act [("PRA")] was enacted in response to one of the less auspicious aspects of the enormous growth of our federal bureaucracy: its seemingly insatiable appetite for data.  Outcries from small businesses, individuals, and state and local governments, that they were being buried under demands for paperwork, led Congress to institute controls." Dole v. United Steelworkers of America, 494 U.S. 26, 32 (1990). Accordingly, "[t]he Act prohibits any federal agency from adopting regulations which impose paperwork requirements on the public unless the information is not available to the agency from another source within the Federal Government, and the agency must formulate a plan for tabulating the information in a useful manner.  Agencies are also required to minimize the burden on the public to the extent practicable. . . . In addition, the Act institutes a second layer of review by OMB for new paperwork requirements.  After an agency has satisfied itself that an instrument for collecting information – termed an 'information collection request' – is needed, the agency must submit the request to OMB for approval. . . . If OMB disapproves the request, the agency may not collect the information."  Id. at 32-33; accord 44 U.S.C. § 3507(a).  Thus, if an information request "does not receive OMB approval, it is not issued a control number and the agency is prohibited from collecting the information;"

pursuant to 44 U.S.C. § 3512, "if the agency nevertheless promulgates the paperwork requirement, members of the public may ignore it without risk of penalty."  Dole, 494 U.S. at 40.

Here, Ionia contends that because the oil record book which it is accused of improperly maintaining did not contain an OMB approval number, see [Doc. # 16 Ex. A], it cannot be penalized. The Government does not appear to dispute that the oil record book at issue constitutes an "information request," but the focus of the parties' dispute is whether the "public protection" provision of the PRA applies in this case, on the basis of whether the reporting requirement is provided by statute or mandated by agency regulation only.  The parties appear to be in agreement that the public protection provision of the PRA does not apply in the case of a person who fails to comply with a statutory mandate, but that it does apply in the context of a person who fails to comply with an agency regulation containing an obligation to provide certain information, where that agency did not obtain OMB approval and a related OMB control number. See also Controlling Paperwork Burdens on the Public; Regulatory Changes Reflecting Recodification of the Paperwork Reduction Act, 60 Fed. Reg. 30438, 30441 (1995) ("[W]here Congress imposes a collection of information directly on persons, by statute . . ., then the public protection provided by proposed § 1320.6(a) would not preclude the imposition of penalties for a person's failure

to comply with the statutory mandate.  This principle, however, does not extend to situations in which a statute authorizes, or directs, an agency to impose a collection of information on persons, and the agency does so.").

The issue is thus whether the requirement that a vessel such as the M/T Kriton maintain an oil record book is one of statutory, or agency, mandate.  Ionia claims it is the latter, distinguishing this case from those in the tax context, where courts have held that the obligation to file a tax return is a matter of statutory mandate, <u>see</u>, <u>e.g.</u>, <u>United States v. Hicks</u>, 947 F.2d 1356 (9th Cir. 1991); <u>United States v. Kerwin</u>, 945 F.2d 92 (5th Cir. 1991); <u>United States v. Wunder</u>, 919 F.2d 34 (6th Cir. 1990), and analogizing this case to the Ninth Circuit decisions in <u>United States v. Hatch</u>, 919 F.2d 1394 (9th Cir. 1990), and <u>United States v. Smith</u>, 866 F.2d 1092 (9th Cir. 1987), which held that the PRA prohibited prosecutions for failure to file a Plan of Operations pursuant to a Forest Service regulation where the information request at issue lacked an OMB control number.

These two sets of cases, however, are at the extreme opposite ends of the spectrum, and the instant case probably falls somewhere in the middle – in the tax cases, the statute itself (26 U.S.C. § 7203) explicitly mandates the tax return filing requirement and the penalties for failing to comply; in

the Forest Service cases, the statute (16 U.S.C. § 551) was only a general empowering statute reference to reporting appeared only in the regulation. There are two cases directly on point: Jho, supra, and Kassian, supra. The courts in both cases concluded that the PRA did not bar imposition of criminal penalties. Jho determined that the public protection provision of the PRA was inapplicable to a prosecution under the APPS for failure to maintain an oil record book on the basis that the obligation to maintain the book "originated in MARPOL which was incorporated into United States law by [the] APPS," and thus was mandated by federal law, as well as federal regulations. Jho, 465 F. Supp. 2d at 642. Similarly, Kassian rejected any PRA bar, finding that the defendant cited "no case law to support the assertion that a statute that explicitly incorporates a protocol [as the APPS does with MARPOL] is the equivalent of a mere regulation for PRA purposes." Kassian [Doc. # 57, Attach. A] at 6.

These decisions are in keeping with the rationale behind the public protection provision, as articulated in United States v. Neff, 954 F.2d 698 (11th Cir. 1992) (tax return case), that "Congress did not enact the PRA's public protection provision to allow OMB to abrogate any duty imposed by Congress." Id. at 699 (citing Dole, 494 U.S. at 32-33). As the courts in Jho and Gossner Foods, Inc. v. EPA, 918 F. Supp. 359, 362 (D. Ut. 1996), observed, even where Congress delegates the administration of

reporting requirement specifics to an agency, where the
requirement "originates" with Congress, as it does here in the
APPS, which incorporated the provisions of MARPOL (including
reporting requirements) into federal law, the public protection
provision of the PRA cannot apply to bar penalties specifically
provided by Congress (as in the APPS, under § 1908(a), the
provision under which Ionia is charged). Ionia's Motion to
Dismiss will therefore be denied.

The Government's further argument – that the M/T Kriton is
registered in the Bahamas and its oil record book was therefore
issued there, and not by a United States agency, and thus the
public protection provision of the PRA, which mandates OMB
approval of reporting requirements imposed by <u>United States</u>
agencies, is not available as a defense here – could be an
alternative ground for denying defendant's Motion, and
defendant's reply memorandum offers no response to this point.
However, given the Court's conclusion that the public protection
provision is inapplicable in any event because the oil record
book reporting requirement originated with Congress – in
implementing MARPOL – it need not resolve this issue.[11]

---

[11] The Court also need not address the Government's other
arguments that the PRA is inapplicable in circumstances involving
the provision of false information, as opposed to the failure to
provide any information at all (citing <u>United States v. Weiss</u>,
914 F.2d 1514 (2d Cir. 1990), and that the PRA is generally
inapplicable in the context of criminal charges (citing, <u>inter
alia</u> <u>United States v. Burdett</u>, 768 F. Supp. 409, 413 (E.D.N.Y.
1991) ("Congress never intended the [PRA] to apply to criminal

## III. Motion Regarding __Jencks__, __Brady__, and __Giglio__ Material

In addition to its Motions to Dismiss, Ionia also moves for early disclosure of __Jencks__ material and prompt disclosure of __Brady/Giglio__ material. This Motion will be denied on the Government's representation that it has already provided to Ionia all of the information sought of which the Government is aware, with a few justified exceptions, as follows.

The Government represents that on Ionia's arraignment date of June 18, 2007, it provided defense counsel with 7 compact discs of discovery materials "including bates-stamp numbered documents, photographs, video footage, recordings of audio files, diagrams, and the results of the government-conducted searches of the defendants' computer files from the M/T Kriton's shipboard computers." Gov't Opp. at 3. At the same time, the Government provided Ionia's counsel with a letter communicating the Connecticut United States Attorney Office's "open file" policy, __i.e.__, that "the Government ha[d] agreed to make available to [defense counsel] any books, papers, documents, photographs, tangible objects, buildings or places, which are within the possession, custody, or control of the Government and which are material to the preparation of the defense or are intended for use by the Government as evidence in chief at trial, or were obtained from or belong to the defendant." __Id__. at 3 & Ex. A. ¶

proceedings in general.").

5.  This letter reflected that this "open file" included the
proffer agreements and immunity orders relating to several crew-
member witnesses who were interviewed by the United States
Attorney's Office and who testified before the grand jury, <u>id</u>. at
3-4 & Ex. A ¶ 10, as well as "[a]ny information known to the
Government which may be favorable to the defendant on the issues
of guilt or punishment within the scope of <u>Brady v. Maryland</u>,"
<u>id</u>. Ex. A ¶ 9.  Since June 18, the Government represents that it
has provided additional materials "in accordance with its
continuing discovery obligations," <u>id</u>. at 4.  At the July 13,
2007 scheduling conference with the Court, defense counsel
appeared unaware of the Government's "open file" policy and since
then (and, thus, subsequent to the filing of Ionia's motions)
arrangements have been made to provide hard copies of certain
materials in the Government's file to defense counsel.  <u>Id</u>. at 5.
As discussed at the July 26, 2007 telephonic conference, all
copies will be provided to defense counsel no later than August
1, 2007.

Thus, the only materials not yet produced but in the
Government's possession are apparently two memoranda of
interviews memorializing statements made to the Government by co-
defendant Edgardo Mercurio, which memoranda the Government
represented would be made available to defense counsel following

entry of Mercurio's guilty plea,[12] and grand jury transcripts of the testimony of investigating Government agents, which have not been provided because the Government has not decided which of these agents, if any, will testify at trial. The Government represents that "[a]t such time as the Government is required to produce a witness list and confirm the identity of investigating agents that will testify, the Government will provide the transcripts, if any, of the testimony of those agents before the grand jury." Id. at 6. The Court directs the Government to disclose its witness list and make all related disclosures no later than 9 a.m. on August 1, 2007, when jury selection will be commenced.

## IV. Motion for Bill of Particulars

Ionia also moves for a bill of particulars, contending that "each count of the Indictment (pertaining to Ionia) alleges that unspecified ship board staff was acting within the scope of their agency and employment, and for the benefit of defendant Ionia when they allegedly violated the law," but that such allegations are "overly broad" and "fatally vague." See Mot. for Bill at 3-4, 6. Ionia's requested bill would include, inter alia, such information as who the "agents and employees" referenced are, how they were "acting with the scope of their employment," and how

---

[12] That proceeding took place on July 24, 2007 and accordingly the Court expects this information to have now been provided to defense counsel.

their alleged acts "benefitted" Ionia.  See id. at 6-8.

"It has long been settled that an indictment is adequate so long as it contains the elements of the offense, sufficiently apprises the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy." United States v. Salazar, 485 F.2d 1272, 1277 (2d. Cir. 1973). Accordingly, Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  Courts have "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms," Salazar, 485 F.2d at 1277, and thus "[a] bill of particulars is required 'only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" United States v. Ojeikere, 299 F. Supp. 2d 254, 260 (S.D.N.Y. 2004) (quoting United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)).  "The decision to grant or deny a bill of particulars is within the sound discretion of the district court." United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).

"Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." Bortnovsky, 820 F.2d at 574. Additionally, "[i]t is repeated over and over again in the cases that a bill of particulars may not call for an evidentiary matter. Other cases say the government will not be required to disclose its legal theory on a bill of particulars." United States v. Ganim, 225 F. Supp. 2d 145, 156 (D. Conn. 2002) (citing Wright & Miller, Fed. Practice & Procedure 3d, § 129 at 659-60); accord Davidoff, 845 F.2d at 1154 ("The prosecution need not particularize all of its evidence."); Ojeikere, 299 F. Supp. 2d at 260 ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories."). Further, "[t]he crucial question is whether the information sought is necessary, not whether it is helpful." United States v. Love, 859 F. Supp. 725, 738 (S.D.N.Y. 1994), aff'd sub. nom. United States v. Roberts, 41 F.3d 1501 (2d Cir. 1994).

The Court finds the Indictment here sufficient for the purposes outlined supra (i.e. it contains the elements of the offenses, sufficiently apprises Ionia of what it must be prepared to meet, and is detailed enough to assure against double

jeopardy). The 15-page Indictment specifies 25 overt acts charged in connection with Count One's conspiracy allegation (including in many cases specific dates, locations, and actors), the remaining counts also provide specific dates for the alleged violations and substantial detail of the crimes charged. Moreover, the materials already provided/made available to defense counsel also obviate the need for a bill of particulars as defense counsel now has (and/or has access to) witness statements/grand jury testimony, materials seized during the search of the M/T Kriton and inventory thereof, as well as 7 CDs of materials including photographs, video footage, and the results of the government-conducted searches of the defendants' computer files from the M/T Kriton's shipboard computers. Ionia has not addressed how/whether these materials fail to provide it with the details of the charges crimes necessary to their defense such that a bill of particulars is necessary. Accordingly, Ionia's Motion for a Bill of Particulars will be denied.

## V.    Motion for Leave

Ionia also moves for leave to file motions after July 11, 2007, on the basis of the Government's purported failure to produce complete disclosure. This Motion will be granted in part, on agreement by the Government, with respect to motions that could not have been filed prior to the July 11, 2007 deadline (including any motion challenging the April 3, 2007

search of the M/T Kriton that could not have been prepared
without the benefit of the search warrant affidavit, as that
affidavit was not provided to defense counsel until July 13,
2007).  All other discovery referenced in Ionia's Motion –
including materials seized from the M/T Kriton, the search
warrant itself, and the inventory from the search – have been
available to defense counsel since June 18, 2007, except for the
federal agents' rough notes, which, if they exist, are not in the
Government's possession, although the Government has provided
"reports of all interviews with shipboard staff, and the witness
statements of Coast Guard personnel or investigative agents who
participated in either inspections or the search of the M/T
Kirton."  Gov't Resp. [Doc. # 46] at 2.  Accordingly, to the
extent defendant's Motion is based on the purported non-
disclosure of these documents, it is without basis.

## VI.  Motion to Compel Election

Lastly, Ionia moves to compel the Government to elect
between Counts Two and Three, contending that these counts are
multiplicitous and thereby defective pursuant to the Double
Jeopardy Clause of the Fifth Amendment to the United States
Constitution.

"An indictment is multiplicitous when it charges a single
offense as an offense multiple times, in separate counts, when,
in law and fact, only one crime has been committed. . . . This

violates the Double Jeopardy Clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once." United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999); accord United States v. Ansaldi, 372 F.3d 118, 124 (2d Cir. 2004) ("An indictment is multiplicitous if it charges the same crime in two counts. . . . The primary problem is that the jury can convict on both counts, resulting in two punishments for the same crime in violation of the Double Jeopardy Clause of the Fifth Amendment."). Determining whether Counts Two and Three are "really one offense charged twice," we use the "same elements" or "Blockburger" test, which "examines whether each charged offense contains an element not contained in the other charged offense. . . . If there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted." Chacko, 169 F.3d at 146 (citing, inter alia, Blockburger v. United States, 284 U.S. 299 (1932); United States v. Dixon, 509 U.S. 688 (1993) (affirming application of the Blockburger test)).

Ionia argues that Counts Two and Three are multiplicitous as they both allege "crimes borne from the presentation of the very same [oil record book]; on the very same day; with the very same contents and very same alleged deficiencies . . . specifically, that the presentation of the [oil record book] was criminal because it failed to contain records of alleged exception

discharges of oil and oily wastes." Mot. to Compel Election at 4. Defendant argues that Counts Two and Three "encompass virtually identical affirmative acts," and that the allegations in each are "mere permutations of the same allegation that Ionia acted unlawfully when it allegedly knowingly presented the same [oil record book], containing the same information, (or conversely, omitting the same information), on the same date (on or about March 20, 2007) at New Haven." Id. The Government asserts that each count contains at least one element not contained in the other count, and thus they are not multiplicitous.

As summarized above, Count Two charges knowingly failing and causing the failure to maintain an oil record book for the M/T Kriton on March 20, 2007 in violation of the APPS, 33 U.S.C. § 1908(a), and 33 C.F.R. § 151.25, whereas Count Three charges knowingly falsifying the oil record books for the M/T Kriton with intent to impede, obstruct, and influence the inspection by the Coast Guard and Department of Homeland Security of the Kriton on March 20, 2007, in violation of 18 U.S.C. § 1519.

33 U.S.C. § 1908(a) provides: "A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder commits a class D felony." 33 C.F.R. § 151.25(a), in turn, provides that "[e]ach oil tanker of 150 gross tons and above . . . shall

maintain an oil record book Part I." 18 U.S.C. § 1519

criminalizes, <u>inter</u> <u>alia</u>, knowing falsification of any record,

document, or tangible object with the intent to impede, obstruct,

or influence the investigation or proper administration of any

matter within the jurisdiction of any department or agency of the

United States. Therefore, Count Two, charging violation of 33

U.S.C. § 1908(a) and 33 C.F.R. § 151.25(a), requires proof that,

<u>inter</u> <u>alia</u>, the M/T Kriton was an oil tanker of 150 gross tons or

more, which Count Three does not require.[13] Count Three requires

proof that defendants acted with the intent to impede, obstruct,

or influence a Government agency investigation, whereas Count Two

requires that the statutory violation be committed "knowingly."

Thus, applying the <u>Blockburger</u> test, there is at least one

element in each of Count Two and Count Three that is not

contained in the other, and accordingly, the two counts are not

multiplicitous. Ionia's Motion to Compel will accordingly be

denied.[14]

_____

[13] The Government also claims that a violation of 33 U.S.C. §
1908(a), by violation of 33 C.F.R. § 151.25, requires proof that
the oil tanker was registered in a country other than the United
States, but the Court does not find this requirement explicitly
stated in either § 1908(a) or the related regulation.

[14] Additionally, Ionia's contention that where claims <u>are</u>
found to be multiplicitous the appropriate remedy is election by
the Government and dismissal of the remaining count is not
persuasive. Even if the Court had found Counts Two and Three
multiplicitous, dismissal would have been "premature" because
"'if, upon the trial, [a] district judge is satisfied that there
is sufficient proof to go to the jury on both counts, [the judge]
should instruct the jury as to the elements of each offense.' If

33

**VII. Conclusion**

For the foregoing reasons, Ionia's Motion to Dismiss for Lack of Jurisdiction [Doc. # 15] is DENIED, as is its Motion to Dismiss under the Paperwork Reduction Act [Doc. # 16]. Its Motions for Early/Prompt Disclosure [Doc. # 24], for a Bill of Particulars [Doc. # 23], and to Compel Election [Doc. # 26] are also DENIED. Its Motion for Leave [Doc. # 25] is GRANTED in part and DENIED in part, as set out above.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut this 30th day of July, 2007.**

---

the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy for he will suffer no more than one punishment. If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." See United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006) (vacating district court's pre-trial dismissal of counts believed to be multiplicitous as "premature").