UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO. 03:07CR134 (JBA) |
| IONIA MANAGEMENT S.A. | : | |

RULING ON DEFENDANT'S PENDING MOTIONS **[DOC.## 79, 85, 90**]

Oral argument was held on August 7, 2007, on defendant Ionia Management S.A.'s Motion for an Order Directing the Parties to Take Rule 15 Depositions of the Eight (8) Crewmembers who are Presently in Connecticut **[Doc. #79]**, Emergency Application for an Order Deeming the Eight (8) Crew Members Who Are Presently in Connecticut as "Material Witnesses" and for an Order Directing the Parties to Take Rule 15 Depositions of the Eight (8) Foreign National Crewmember Witnesses **[Doc. #85]** and Motion for an Order Directing the Parties to Take Rule 15 Depositions of the Three (3) Former Crewmembers Who are Presently in Greece and the Philippines and Renewed Motion for Continuance of Trial. **[Doc. #90].**[1]

---

[1]Judge Arterton referred these motions for determination by a Magistrate Judge on August 3, 2007. [Doc. ##98; 103]. The Court notes that defendant's Motion for Continuance of Trial [Doc. #93] is the same as the Motion for an Order Directing the Parties to Take Rule 15 Depositions of the Three (3) Former Crewmembers Who are Presently in Greece and the Philippines and Renewed Motion for Continuance of Trial. [Doc. #90].

Also participating at the hearing were Attorney Michael
Twersky for crew members Nelson Alegrado (3/E), Romeo Arquio
(Fitter), Elmer Senolay (Wiper), Benido Matugas (Oiler) and
Ronald Balena (Oiler), who participated by telephone; and
Attorneys Jonathan Einhorn and Michael Dolan for crew members
Alexander Gueverra (Electrician) and Dario Culabag (Cadet
Engineer), respectively. Attorney Trebiasacci, for crew member
Ricky Lalu (Oiler), contacted the Court to say he was unavailable
and could not attend the hearing.

BACKGROUND

Ionia Management, S.A. ("Ionia"), is a company incorporated
in Liberia and headquartered in Piraeus, Greece. [Doc. #1,
Indict. ¶1]. The indictment in this case charges defendant
Ionia, the ship management company that operated the tanker
vessel M/T Kriton, and its Second Assistant Engineer, defendant
Edgardo Mercurio, with criminal violations involving the failure
to maintain and falsification of an Oil Record Book for the M/T
Kriton in which "all disposals of oil residue and discharges
overboard and disposals otherwise of oil, oil sludge, oil
residues, oily mixtures, bilge slops, and bilge water that had
accumulated in machinery spaces and elsewhere aboard the M/T
Kriton were fully recorded." [Indict. ¶2].

The M/T Kriton was boarded by the United States Coast Guard
in New Haven on March 20, 2007, based upon allegations by the
ship's Electrician, Alexander Gueverra, that the ship had engaged
in illegal discharges of oily water. The Kriton remained in port

2

in New Haven until April 5, 2007, when it departed pursuant to a surety agreement between the Coast Guard and the Defendant company. The agreement also specified that Defendant would provide wages and lodging in Connecticut for all crew member witnesses determined by the Coast Guard to be material to the government's investigation for one hundred twenty (120) days, with the possibility of a thirty (30) day extension.

Ionia has now moved for an order deeming eight (8) Ionia employees still in Connecticut to be "material witnesses" pursuant to 18 U.S.C. §3144 and for an order directing the parties to take Rule 15(a)(1) depositions of the eight (8) Ionia employees in Connecticut and three (3) former Ionia employees who are now located in the Philippines or Greece.

STANDARD OF LAW

Section 3144 of Title 18 provides for the arrest of a material witness.

> If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with [the Bail Reform Act]. No material witness may be detained . . . if the testimony of such witness can adequately be secured by deposition and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition . . . can be taken . . . .

Depositions are called for under section 3144 where an inability to comply with a condition of release would otherwise require continued detention.  See 18 U.S.C. §3144.  Nothing in section 3144 allows a party to obtain a court order for the taking of a deposition of a material witness without first satisfying the conditions of Rule 15(a)(1).  Only a detained material witness may request to be deposed to facilitate his or her release without making the showings required in Rule 15(a)(1).  See Fed. R. Crim. P. 15(a)(2) ("A witness who is detained under 18 U.S.C. § 3144 may request to be deposed by filing a written motion and giving notice to the parties.  The court may then order that the deposition be taken and may discharge the witness after the witness has signed under oath the deposition transcript.").  Both the plain language of Rule 15(a)(2) and the reference in section 3144 to section 3142 suggest that once a material witness is released from detention, even with conditions, he may no longer request to be deposed.

Under Rule 15(a)(1), a party may move that a prospective witness be deposed in order to preserve testimony for trial.  The trial court may grant the motion "because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1).  The "exceptional circumstances" requirement of Rule 15 is met "if [the] witness' testimony is material to the case and if the witness is unavailable to appear at trial."  United States v. Johnpoll, 739 F.2d 702, 708 (2d Cir. 1984).  "Unavailability is to be determined according to the practical standard of

whether under the circumstances the [party seeking to take the deposition] has made a good-faith effort to produce the person to testify at trial." Johnpoll, 739 F.2d at 709; see United States v. Oudovenko, No. 00-CR-1014, 2001 WL 253027, at *1 (E.D.N.Y. Mar. 7, 2001). "The burden is on the moving party to demonstrate both the materiality of the testimony and the unavailability of the witness." Oudovenko, 2001 WL 253027, *1 (citing United States v. Whiting, 308 F.2d 537, 541 (2d Cir. 1962), cert. denied, 372 U.S. 919 (1963)).

The district court must "review these motions on a case-by-case basis, examining whether the particular characteristics of each case constitute 'exceptional circumstances.'" United States v. Stein, 482 F. Supp. 2d 360, 363 (S.D.N.Y. 2007) (citation and quotation marks omitted). The decision to permit a deposition under Rule 15 "rests within the sound discretion of the trial court, and will not be disturbed absent clear abuse of discretion." Johnpoll, 739 F.2d at 708 (citations omitted).

"The party seeking the deposition must show that, "(1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001) (citing United States v. Singleton, 460 F.2d 1148, 1154 (2d Cir. 1972)).

1.  <u>Eight (8) Ionia Crew Members Who Are Presently in Connecticut</u>

Defendant Ionia Management, S.A. moves for an order deeming eight (8) Connecticut crew members to be "material witnesses" pursuant to 18 U.S.C. §3144 and for an order permitting pretrial depositions of these eight (8) witnesses pursuant to Rule 15(a)(1) of the Federal Rules of Criminal Procedure.

Title 18, of United States Code, section 3144 provides for the arrest and detention of material witnesses.  A material witness warrant must be based on probable cause. Probable cause is established by showing "(1) that the testimony of a person is material and (2) that it may become impracticable to secure his presence by subpoena." <u>United States v. Feingold</u>, 416 F. Supp. 627, 628 (E.D.N.Y. 1976) (internal quotation marks and citation omitted).

Attorney Chalos filed an affidavit to demonstrate materiality for these eight (8) witnesses, [Doc. #86], and it is undisputed that the testimony from the eight (8) Connecticut crew members is material.[2]  However, Ionia has not demonstrated that it is "impracticable" to secure the presence of the eight (8) Connecticut witnesses at trial under the current schedule. Both the Government and the material fact witnesses agree that the fact witnesses are foreign nationals who would be outside the subpoena power of this Court if they left the United States.

---

[2]"The United States concedes that the witnesses are material to its case." [Doc. #95 at 2].

However, trial is scheduled to begin on August 21, and all eight (8) witnesses are present in Connecticut and have agreed to remain here under the subpoenas already issued to them. Counsel for the crew members Nelson Alegrado, Romeo Arquio, Elmer Senolay, Benido Matugas, Ronald Balena, Alexander Gueverra and Dario Culabag represented at the hearing that the witnesses' availability through the end of August is unchanged.[3] Based on this representation, arrest of the eight Connecticut Ionia employees as material witnesses under 3144 is not warranted, because the second requirement for probable cause to arrest and detain under 18 U.S.C. §3144 has not been established by defendant.

On this record, defendant's Motion for an Order Directing the Parties to Take Rule 15 Depositions of the Eight (8) Crewmembers who are Presently in Connecticut **[Doc. #79]** and Emergency Application for an Order Deeming the Eight (8) Crew Members Who Are Presently in Connecticut as "Material Witnesses"

---

[3]Attorney Twersky represented during the hearing that the witnesses' wages and housing expenses are being paid by Ionia through August 31, 2007, after which his clients will seek immediate return to their home countries. Ionia explained that its agreement to pay for wages and housing through August 31, 2007, was carefully negotiated with the Government, with defendant seeking a shorter period of time to house the witnesses and the Government seeking a longer time frame. The agreement by Attorney Twersky's clients to remain voluntarily in the United States to testify was induced, at least in part, by the United States Attorney's agreement not to seek to hold them as material witnesses under 18 U.S.C. §3144. The other three crew members have not indicated that they wish to leave the country when Ionia's payments for wages and housing cease under the surety agreement.

and for an Order Directing the Parties to Take Rule 15
Depositions of the Eight (8) Foreign National Crewmember
Witnesses **[Doc. #85]** are **DENIED.**


2.   Three (3) Former Ionia Crew Members Who are Presently in
Greece and the Philippines **[Doc. #90]**

     Defendant Ionia also seeks Rule 15 depositions of three (3)
former crew members who are currently located outside the United
States and represented to be unavailable for trial.  Nikolaos
Katsaneris is in Greece and Hugene Arriesgado and Edwin Rivera
are in the Philippines.

     The following facts asserted by the government were not
contested by Ionia.  On March 20, 2007, the M/T Kriton was
boarded by the United States Coast Guard in New Haven.[4]
"Representatives and individuals representing themselves as
attorneys of the Defendant boarded the ship and began speaking to
crewmembers as early as March 20, 2007." [Doc. #95 at 6].[5]


          Beginning on March 26, 2007, Defendant began
          requesting that the witnesses be released. On
          June 7, 2007, the federal Grand Jury in the
          District of Connecticut indicted the
          Defendant on four counts; conspiracy,
          violation of the Act to Prevent Pollution
          from Ships, obstruction of a federal
          proceeding, and falsification of records in a

_____

     [4]The ship departed New Haven on April 5, 2007.

     [5]"Cadet Engineer Dario Calubag recalled speaking to a
'company lawyer' on two different occasions on or about March 20,
2007." [Doc. #95 at 6 n. 2].

federal investigation. On June 18, 2007, the
United States produced a discovery package to
the defendant containing reports and
memoranda of interview of the Kriton crew
members.[6] The discovery package also included
the written statements of the Coast Guard
personnel who boarded the shop and CDs of
photographs taken and/or obtained as part of
the investigation.

On July 20, 2007, AUSA Taryn Merkel of the
Eastern District of New York filed a letter
by ECF suggesting that Defendant may wish to
speak to Edwin Rivera at the time, a fitter
on M/T Akritas, but formerly a fitter on the
Kriton. This was followed by a letter faxed
on July 25, 2007, [] by Environmental Crimes
Trial Attorney Malinda Lawrence echoing AUSA
Merkel's statement.

. . . .

On July 26, 2007, the Government filed an
emergency motion with the Court seeking to
determine the appropriate action with respect
to Rivera's plans to depart the United
States. In a teleconference that day, the
Court instructed counsel for Defendant to
speak to Rivera prior to Rivera's departure
that night, if so desired.

. . . .

On July 30, 2007, during a teleconference
with the Court and just over a day prior to
the previously scheduled jury selection,
Defendant for the first time indicated that
it had located two former chief engineers
from the M/T Kriton, Nicolaos Katsaneris and
Efstratios Tsigonakis, that it wanted to
depose in Greece. At that time, Defendant
made only general representations that the
two men had material information and that
they were not willing to come to the United

---

[6]"[T]he government produced the first group of discovery,
including interview reports of Alexander Gueverra, Dario Culabag,
Ricky Lalu, Elmer Senolay, Romeo Arquino, Edgardo Mercurio,
Vasilos Kotis, Ronaldo Balena and Benido Matugas." [Doc. #95 at
6].

States. Defendant then requested a
continuance and suggested that the eight
crewmembers present in Connecticut as
government witnesses be deposed pursuant to
Rule 15 in anticipation of a continuance.
The Court directed defendant to file a
written motion to state and explain his
positon. Defendant filed a motion on July
31, 2007, that instead sought an order
directing depositions of eight government
witnesses and providing no further detail
with regard to Katsaneris and Tsigonakis.
That motion was denied by the Court at a
teleconference on July 31, 2007, consistent
with a memorandum in opposition filed by the
government.

[Doc. #101 at 2-4].

In support of its pending motions, Ionia submitted the

declarations of Nikolaos Katsaneris and Hugene Arriesgado and

affidavit of Edwin Rivera's Attorney, Daniel Smith, which do not

appear to have been available to Judge Arterton on July 31, 2007.

Nikolaos Katsaneris

Katsaneris is a former employee of Ionia who served as Chief

Engineer on the M/T Kriton from November 2, 2005 to June 27,

2006. [Doc. #86, Ex. L and Doc. #91, Ex. K, Katsaneris Decl. ¶4].

Katsaneris, a citizen of Greece, states that he is now retired

from the sea and living in Kamalata, Greece.[7] [Katsaneris Decl.

¶¶2,5]. He states that he is unwilling to leave Greece to

testify at trial but would appear for a Rule 15 deposition in

Athens. [Katsaneris Decl. ¶¶11].

Katsaneris was one of three chief engineers who have been

_____

[7]It appears that the spelling of this location may be
incorrect. Counsel represented that Mr. Katsaneris is in
Kalamata, Greece.

identified as serving on the Kriton during the time frame covered
by the indictment, January 1, 2006 to March 20, 2007. In a
declaration, Katsaneris states that he served onboard the Kriton
as Chief Engineer from November 3, 2005 to June 27, 2006.
[Katsaneris Decl. ¶4]

Defense counsel represented at the hearing that he only
focused on Katsaneris as a witness when he received memoranda of
interviews with the company's co-defendant, Edgardo Mercurio,
after Mercurio's guilty plea on July 24, 2007. Mercurio was the
second assistant engineer.

Katsaneris' name appears in one of the memos in parentheses
after the designation "2nd engineer." Dated June 29, the
memorandum provides, in pertinent part,

> . . . Mercurio stated his second and current
> contract with Ionia Management was for 8
> months when he boarded on 17 May 2006 while
> at drydock in Greece. Mercurio stated when he
> arrived on the M/T Kriton, the previous 2nd
> Engineer (Katsaneris) briefed him on many
> issues, including the overboard separator.
> During this briefing, Mercurio stated he
> questioned why the over-board separator was
> not completely assembled which is when he was
> informed about the hose used to discharge oil
> . . . . . Mercurio stated the 2nd engineer
> said the spool piece was ordered removed and
> the discharge hose was tied to the overboard
> connection with a wire to dispose of the oil.
> Mercurio stated he was informed the Cadet
> Engineer and the Wiper were aware of the
> discharge hose and they were the individuals
> who put it together. Mercurio stated
> approximately 15 days after boarding the M/T
> Kriton, a new Chief Engineer, Tsigonakis
> Efstrateous, boarded. Mercurio stated shortly
> after Tsigonakis arrived, he (Mercurio)
> questioned him about the missing spool piece
> and was told to ask the 2nd Engineer whom he

> was replacing because he is "the one who
> knows about it.

[Doc. 91, Ex. N at 3].

Katsaneris states that, if called to testify, he "would categorically deny that [he] directed, was aware of, or would ever condone any alleged illegal conduct by any member of the engine room crew" and "[a]t no time was it reported to [him] that any member of the engine room crew was engaged in any illegal activity" while [he] was Chief Engineer, and he would testify that "[a]ny violation of MARPOL, or the laws of any jurisdiction in which the vessel sailed was strictly against company policy and [his] standing orders. . . ." [Katsaneris Decl. ¶¶12-14].

Katsaneris also declares, "I further understand that some of the crewmembers who served onboard during the period I was Chief Engineer are alleging such illegal conduct took place during the period I was onboard." [Katsaneris Decl. ¶7]

Defense counsel contends that exceptional circumstances exist to justify a deposition of Katsaneris in Greece, because the witness is unwilling to come to the United States to testify, and his testimony is exculpatory because he will contradict the testimony of Mercurio. Counsel for the government disagrees that the testimony is exculpatory, suggesting that the parenthetical reference to Katsaneris may, in fact, be an error by the writer of the memorandum; she points out that the defendant has had notice since the return of the indictment in June that the charged conduct included a portion of Katsaneris' service on the

Kriton.

The Court has carefully reviewed the indictment and the witness statements and affidavits that are appended as exhibits to the motion papers.  In Count One, the indictment alleges a conspiracy "beginning on an unknown date, but including from at least on or about January 1, 2006, and continuing through on or about April 5, 2007" [Indict. ¶11]. The overt acts include maintaining "a false and misleading Oil Record Book for the M/T Kriton" on 15 diverse dates, including two in early 2006, January 20 at Port Everglades, FL, and March 7 at Brooklyn, NY. Overt Acts 16 and 19 allege that the defendant company acted "through senior engineers in the engine department of the M/T Kriton" between January 1, 2006 and March 20, 2007. [Indict. ¶20].  Count Three charges that between "January 1, 2006 and . . . March 20, 2007, . . . defendant IONIA, acting through its agents and employees . . . did knowingly alter . . . falsify and make false entries in a record . . . to wit: Oil Record Books for the M/T Kriton during the period of January 1, 2006 through March 20, 2007 . . . ." [Indict. Count 3, ¶¶ 1-2].

Several of the crew member witnesses whose statements were provided to defense counsel at the time of indictment identified the Chief Engineer (by title) as a person responsible for recording information in the Oil Record Book.  To the extent that Katsaneris was responsible for the Oil Record Book entries during his service, his testimony would be relevant to the issues raised at trial.  However, if Katsaneris' subordinates provided him with

false information which he unknowingly transferred to the Record
Book, his lack of knowledge would not necessarily be exculpatory
of the company, if the subordinates were acting as employees and
for the benefit of the company.

In light of the allegations of the indictment, and the
company's familiarity with the Chief Engineer's responsibilities,
it is difficult to understand why the company waited until
receiving the Mercurio memoranda to locate and interview
Katsaneris, if his general testimony about his knowledge or
involvement in the alleged illegal conduct is to be deemed
important.  The defendant's delay is of concern because,
notwithstanding its assessment that Katsaneris is not a material
witness, the government would have consented to a deposition in
Athens while government counsel are conducting the depositions of
two other Ionia witnesses by agreement. However, defense counsel
represents that Katsaneris has refused to appear in Athens in
August because he is vacationing, so that taking his deposition
would necessitate a delay in the trial. The Court is not inclined
to find exceptional circumstances warranting a deposition, based
on general denials by Katsaneris of any knowledge of or
involvement in illegal activity.[8]  The crux of the government's

_____

[8]Only three of the crew member witnesses (besides Mercurio)
admitted to serving on the Kriton before Katsaneris departed,
Alegrado [Doc. #91 Ex. C],  the 3rd Engineer, who boarded in
October 2005;  Calubag, the Cadet Engineer, who boarded in
November 2005 [Doc. #91, Ex. I];  and Arquio, a Fitter, who came
onboard May 17, 2006, the same day as Mercurio. Another crew
member, Senolay, discussed a prior voyage on the Kriton in 2004,
prior to Katsaneris' service. None of these witnesses offered

case is not any claims about Katsaneris, but the actions of the crew during the time that the crew member witnesses served. Mercurio was already the 2nd engineer when most of the crew came on board, and the crew members corroborate Mercurio's involvement in discharging oil through the "magic pipe."

Thus the question presented is whether the allegations by Mercurio, once disclosed by the government, gave rise to any heightened need for the defendant to call Katsaneris as an exculpatory witness. Katsaneris' affidavit does not refer to Mercurio by name or position, or make specific reference to the conversation reported in the June 29 Memorandum of Interview.

Based upon careful reading of the Mercurio interviews and the statements attributed to the other crew members, it appears that the parenthetical attribution to Katsaneris was probably an error; that Mercurio was implicating his predecessor, the "2nd Engineer," when he described the briefing he received on joining the ship. He reiterated in his July 12 interview that "the previous 2nd engineer informed him about the discharge hose." Of the other witnesses who served with Katsaneris, Alegrado named the previous second engineer, Galofin (spelled phonetically in the memo of his interview), as someone who properly discharged waste by using the oily water separator. Calubag initially referred to the 2nd engineer (without naming him) as instructing

incriminating information about Katsaneris by name or were able to testify to his knowledge of the oil pipe they were discussing.

him to connect and disconnect the hose. Subsequently, he gave a more detailed statement identifying Mercurio. Arquio also referred to orders given by the "2nd engineer." Several other witnesses speculated on whether the Chief Engineer (not named but almost certainly not Katsaneris, based on the timing) knew about the "magic pipe," but no crew witness except Mercurio attributes direct knowledge to a chief engineer (and Mercurio's statements name the chief engineers of whom he is speaking; they are not Katsaneris).

Having read all of the memoranda and listened carefully to the extensive arguments made by counsel, the Court cannot find that exceptional circumstances exist to warrant the taking of Chief Engineer Katsaneris' deposition, and the trial delay it would necessitate. The inability to depose Katsaneris does not, on this record, call into question the fundamental fairness of the trial, or work an injustice on the defendant.

<u>Hugene Arriesgado</u>

Arriesgado was employed by defendant as Kriton's Chief Officer when it was boarded by the Coast Guard in New Haven on March 20, 2007; and he remained on board while the ship remained in port in New Haven until April 5, 2007. Arriesgado was Chief Officer of the Kriton from December 1, 2006, through August 1, 2007, the date of his declaration. [Doc. #86, Ex. M and Doc #91 Ex. L, Arriesgado Decl. ¶¶2-3]. When Arriesgado's contract with Ionia expired on August 1, 2007, he returned to his home country, the Philippines, to be with his family. He stated he was

unwilling to travel to the United States to testify at the trial because his wife was to undergo an operation and he wanted to be with her. He also has plans to attend a family reunion. He stated he would be willing to appear for a Rule 15 deposition in the Philippines. [Arriesgado Decl. ¶¶12].

During his time on the Kriton in New Haven in March/April, Arriesgado was interviewed by the Coast Guard, and stated he never saw oily wastes being discharged into the sea and never saw or heard anything about a by-pass hose or "magic pipe." [Arriesgado Decl. ¶14, 16, 17]. If called to testify, Arriesgado would testify to those facts; he also stated that if he saw a discharge of oil, he would "inform the Master, follow the procedures set out in the VRP, [and] make all necessary notifications. . . ." [Arriesgado Decl. ¶15].

In support of its contention that Arriesgado will provide exculpatory testimony, defendant states that Arriesgado will testify that he "heard an argument between Chief Engineer Renieris and Electrician [Alexander] Gueverra, before we arrived in St. Croix, and heard the Electrician say, . . . 'I will send you to jail," and that "the Engine Cadet [Dario Culabag] was very upset with Ionia, because he was not promoted to the rank of Wiper. It is my understanding that he was recommended for that promotion, but it was not approved by Ionia, . . ." [Arriesgado Decl. ¶¶18, 19].

Although defense counsel contends that Arriesgado's testimony "directly refutes" the government's claims, the

affidavit does not support this conclusion. As Chief Officer, Arriesgado is not alleged to have had any duties in the engine room of the Kriton. None of the witnesses identify him in their statements. To the extent that Arriesgado could testify to company policy and practices, Ionia is not limited to this one witness and may offer this testimony through another company representative.

As to the argument overheard by Arriesgado between Chief Engineer Renieris and Electrician Gueverra, the government states that Gueverra will admit to this argument and to telling the Chief Engineer, "I will send you to jail." [Doc. #101 at 13; Arriesgado Decl. ¶18]. This testimony is only relevant to impeach Gueverra for bias; Gueverra's admission would preclude any need for extrinsic evidence. Gueverra may be adequately cross-examined on this issue on the basis of his own statements and prior testimony. Finally, the allegation in Arriesgado's declaration that he "understands" that the unidentified Cadet Engineer was recommended for a promotion to the rank of Wiper but that the promotion "was not approved by Ionia" is hearsay. [Arriesgado Decl. ¶19]. Arriesgado does not claim to have been involved in that decision making process. This is a subject for cross-examination, not independent testimony.

<u>Attorney of Daniel Smith on behalf of Edwin Rivera</u>

Defendant provided the affidavit of Edwin Rivera's attorney, Daniel Smith, dated August 1, 2007, stating that Rivera was "presently bedridden with chicken pox and unable to submit an

affidavit."[9] [Doc. #86, Ex. N and Doc. #91, Ex. M, Smith Aff. ¶2]. Smith stated that, due to being diagnosed with chicken pox, Rivera was unable to travel to the United States to testify at trial. [Smith Aff. ¶4d]. Smith stated that Rivera was willing to appear for a Rule 15 deposition in the Philippines.

Attorney Smith stated that Rivera served on the M/T Kriton as a fitter between May 2005 and May 2006. [Smith Aff. ¶4a]. Rivera's duties on the Kriton included a daily shift in the engine room. [Smith Aff. ¶4b]. Smith stated that if called to testify, Rivera will state that he "did not observe illegal discharge of oily water, bypassing of the Oily Water Separator, or a so-called "magic pipe" during his service on the Kriton . . . ." [Smith Aff. ¶4c]

However, the testimony described in Attorney Smith's affidavit, that Edwin Rivera did not "observe" any illegal discharge, bypassing of the Oily Water Separator or a "magic pipe" addresses Rivera's personal knowledge, is not the knowledge of Ionia. None of the witnesses identify Rivera as present or knowledgeable about the discharge, so his testimony would not refute or contradict incriminating testimony by others.

---

[9]Attorney Smith stated that he was retained to represent Rivera and several crew members who served aboard the M/T Akritas, in connection with grand jury subpoenas issued in the Eastern District of New York. [Smith Aff. ¶2].

DISCUSSION

The government argues that defendant has not demonstrated that the witnesses were "unavailable" and their expected testimony is not "material" under Rule 15.

1.   Unavailability of Witnesses

Defendant argues that all three foreign-national witnesses have made clear that they are willing to provide testimony but none is willing to travel to the United States despite Ionia's good faith effort to secure their presence.[10] Citing United States v. Drogoul, 1 F.3d 1546, 1553 (11th Cir. 1993), defendant asserts that "[a] potential witness is unavailable for purposes of Rule 15(a) . . . whenever a substantial likelihood exists that the proposed depondent will not testify at trial." Ionia contends that the showing of "unavailability" "need not be conclusive before a deposition can be taken," 1 F.3d at 1553. Based on this record, defendant argues that its is "irrefutable that the witnesses are 'unavailable.'" [Doc. #90 at 3].

The government argues that defendant fails to show that it has made a good faith effort to secure the attendance of

_____

[10]Ionia contends in its motion that it "offered to pay [the witnesses'] travel, lodging and food expenses in addition to a wage for the time they would [be] away from home and otherwise be engaged in this matter to testify at trial." [Doc. #90 at 3 n.4 (emphasis added)]. However, both Katsaneris and Arriesgado stated that Ionia offered to pay all of their travel costs, reasonable expenses and to pay for all of food and lodging if they were to travel to the United States to testify at trial." [Katsaneris Decl. ¶9; Arriesgado Decl. ¶10].

Katsaneris, Arriergado and Rivera at trial and has unnecessarily delayed in seeking to obtain depositions of these individuals.[11] [Doc. #101 at 5]. The Court is inclined to agree. Ionia was certainly on notice that their employees Katsaneris, as Chief Engineer, and Arriesgado, as Chief Officer, might provide potentially valuable testimony for the defense.[12] Ionia fails to explain why Katsaneris was not contacted earlier.[13] Defendant's counsel has represented that Katsaneris' deposition cannot take place at the same time as the other depositions in which the government voluntarily agreed to participate, scheduled for August 13 and 14, 2007, in Athens.[14]

---

[11]The engine department of the M/T Kriton was "headed by a Chief Engineer, assisted by a Second Assistant Engineer, Third Assistant Engineer, Fourth Assistant Engineer, Cadet Engineer, fitter, and Electrician, all of whom are assisted by unlicensed engine department crew members known as 'Oilers' and 'Wipers'" . . . [Indict. ¶5]. Katsaneris was a Chief Engineer, Assiesgado was a Chief Officer and Rivera was a Fitter on the Kriton.

[12]On May 3, 2007, defendant provided the government with Katsaneris' personnel records that showed his dates of employment on the Kriton.

[13]Katsaneris does not state when he retired; however, he resides in Greece, where defendant is headquartered, and counsel represented that he returned home after his last service on Kriton in 2006.

[14]At oral argument, defense counsel stated that Katsaneris was on vacation and unavailable for deposition during the month of August. He also stated that Katsaneris would be unwilling to come to the U.S. Embassy for the deposition without assurances that he would not be taken into custody. Counsel did not state when or where Katsaneris would be available for deposition in Greece. When asked by the Court whether defense counsel considered Katsaneris a target, defense counsel responded that while Katsaneris was not a target, in these cases the Chief Engineer is usually a subject of investigation. While not discussed in this hearing, government counsel has previously

Similarly, Ionia has not explained why it delayed seeking the testimony of Arriesgado, who was Chief Officer of the Kriton when the boat was boarded by the Coast Guard on March 20, 2007. The Kriton was in New Haven from March 20 through April 5, 2007. According to the statements by Cadet Engineer Dario Calubag, company representatives boarded the ship and began interviewing crew members. Moreover, defendant obtained Arriesgado's affidavit while he was still employed by the company on August 1, 2007. Finally, defendant cannot state when Arriesgado would be available for deposition in the Philippines, in light of his wife's surgery and his other family obligations.

Rivera was present in New York from June 4 to July 26, 2007. Certainly, Ionia was on notice that Rivera, a former Fitter on the Kriton, worked in the Kriton's engine department on the Kriton from May 2005 to May 2006 and might provide useful testimony for the defense. Defendant has known since the June 7th indictment that Rivera was employed on the Kriton during the time frame of the alleged conspiracy. The government notified defendant on July 19, 23, and 25, 2007, that defendant might want to speak to Rivera, who was still in New York. [Doc. #64, Attach. 1-7]. On July 26, the government filed an emergency motion with the Court, seeking to determine the appropriate action with

_____

explained on the record to Judge Arterton the difficulties involved in obtaining clearance to take depositions in Greece. The already approved depositions are being conducted at the U.S. Embassy to obviate the need for clearances.  See Judge Arterton July 30, 2007, Tele. Status Conf. Tr. at 40-43].

respect to Rivera's plans to depart the United States.  In a telephone conference held that day, Judge Arterton instructed defense counsel to speak to Rivera prior to Rivera's departure that night.[15]  Finally, Attorney Smith fails to address in his affidavit, dated August 1, 2007, whether Rivera will be sufficiently recovered from chicken pox to travel to the United States for trial on August 21, 2007, or state that he would be unwilling to do so.

Defendant has not adequately explained why, having access to these individuals as its employees and former employees for five (5) months since the ship was boarded, or during the two months since this case was indicted on June 7, it was not able to interview these witnesses and make a timelier motion to obtain their testimony.[16]  "Unavailability is to be determined according to the practical standard of whether under the circumstances the [party seeking to take the deposition] has made a good-faith effort to produce the person to testify at trial."  Johnpoll, 739

---

[15]"The United States maintains that it did not and does not believe Rivera's testimony to be actually exculpatory under Brady, but as a courtesy and in an abundance of caution notified Attorney Chalos that Rivera might have information relevant in that case." [Doc. #64 at 5].  The United States stated it was "willing to exercise its authority to apply for a material witness warrant for Rivera if Attorney Chalos and/or the Court deem[ed] him a necessary trial witness or it [was] necessary to allow Attorney Chalos to determine whether Rivera is a necessary trial witness." [Doc. #64 at 5].  Defense counsel made no request that the Government seek a material witness warrant to prevent Rivera's departure from the United States.

[16]Witness statements were provided to defendant on June 18, 2007.  The grand jury transcript was provided to defendant on July 20, 2007.

F.2d at 709; see Oudovenko, 2001 WL 253027, at *1 (E.D.N.Y. Mar. 7, 2001); Drogoul, 1 F.3d at 1556 ("There can be no question that both the moving party's diligence and the timing of the prospective depositions are relevant considerations to be weighed under Rule 15(a)." "Denial of a Rule 15(a) motion for untimeliness is not an abuse of discretion." United States v. Aggarwal, 17 F.3d 737, 742 (5th Cir. 1994) (citations omitted) (motion filed a month after deadline for pretrial motions). "Motions to conduct depositions in criminal cases must be made promptly and certainly are denied properly where the depositions sought would delay the trial." United States v. Chusid, No. 00CRIM.0263, 2000 WL 1449873, at *1, (S.D.N.Y. Sept. 27, 2000) (citing 2 Charles Alan Wright, Federal Practice and Procedure: Criminal 2d §242 at 12 (1982))(motion filed six months after case was pending and with less than five weeks before trial); United States v. Gragg, 145 F.3d 1334, 1998 WL 246019, *5 (6th Cir. May 7, 1998) (motion filed four months after deadline for pretrial motions. "The Court found that the existence and significance of the proposed deponents had been known for some time . . . .").

Defense counsel represents that he is devoting all his time to the case and has simply not had enough time to do all that needs to be done to prepare the case for trial. However, all parties knew, based on the Surety Agreement's time limits, that the case was on a fast track to trial in August; and that the dates imposed by the Surety Agreement were negotiated by the defendant. It was the defendant's responsibility to provide

adequate resources to prepare its defense, including assistance
for counsel where necessary.

Defendant's initial motion, lacking the proper support, was
filed three weeks before trial and within days of the scheduled
jury selection. The renewed motion is untimely and may be denied
on the grounds of unexcused delay.

2.  <u>Materiality of Witnesses' Testimony</u>

Based on this record, the Court also finds that defendant
has failed to make a sufficient showing of materiality for any of
the three witnesses located outside the United States. "Absent
materiality, Rule 15(a) cannot apply." <u>U.S. v. Hajbeh</u>, 284 F.
Supp. 2d 380, 384 (E.D. Va. 2003). "The principal consideration
guiding whether the absence of a particular witness's testimony
would produce injustice is the materiality of that testimony to
the case." <u>Drogoul</u>, 1 F.3d at 1552 (citations omitted). Courts
have assessed the materiality aspect of the "exceptional
circumstances" test in a variety of ways, asking whether the
testimony is essential or critical to the defense, <u>Id.</u>, 1 F.3d at
1554 (testimony "lies at the very core of the charges in the
indictment and its refutation the heart of the defense");
exculpatory, <u>United States v. Kelley</u>, 36 F.3d 1118, 1125 (D.C.
Cir. 1124) ("Moreover, there is some showing, beyond
'unsubstantiated speculation,' that the evidence exculpates the
defendant.") (citations omitted); or capable of negating an
element of the government's case, <u>United States v. Ismaili</u>, 828
F.2d 153, 161-62 (3rd Cir. 1987) ("if the testimony of witnesses

in a criminal case could not negate the crux of the government's indictment . . . the district court cannot be held to have abused its discretion in denying authority to permit depositions of such witnesses under Rule 15(a)); or is instead cumulative or merely corroborative.  Gragg, 1998 WL 246019, *5 (finding that the depositions would have been cumulative in light of the other testimony and evidentiary documents admitted at trial); United States v. Thomas, 62 F.3d 1332, 1340 (11th Cir. 1995) ("it appears that the testimony sought to be elicited is cumulative to testimony that can be otherwise obtained at trial.").  In Hajbeh, the Court held that the meaning of "material" in the Rule 15(a) context is the same as its meaning under Brady v. Maryland, 373 U.S. 83, 87 (1963).  Hajbeh, 284 F. Supp. 2d 385 ("This two pronged Brady materiality standard should also apply under Rule 15(a) given that both Brady and Rule 15(a) are aimed at ensuring that an accused receives, not a perfect trial, but a fundamentally fair one.").

To be sufficiently material to justify a Rule 15 deposition, the proffered testimony must be exculpatory or go directly to negating an essential element of the government's case. Relevance is not enough.  On this record, the defendant has not shown that its defense will be impacted significantly by the unavailability of any of the three witnesses' testimony, or that the fundamental fairness of the trial will be undermined by its absence.  The motions are therefore denied.

CONCLUSION

Based on the foregoing, defendant's Motion for an Order Directing the Parties to Take Rule 15 Depositions of the Eight (8) Crewmembers who are Presently in Connecticut **[Doc. #79]** and Emergency Application for an Order Deeming the Eight (8) Crew Members Who Are Presently in Connecticut as "Material Witnesses" and for an Order Directing the Parties to Take Rule 15 Depositions of the Eight (8) Foreign National Crewmember Witnesses **[Doc. #85]** are **DENIED.**

Defendant's Motion for an Order Directing the Parties to Take Rule 15 Depositions of the Three (3) Former Crewmembers Who are Presently in Greece and the Philippines and Renewed Motion for Continuance of Trial. **[Doc. #90]** is **DENIED.**

Judge Arterton will consider defendant's renewed Motion for Continuance of Trial [Doc. #93] in light of these rulings.

ENTERED at Bridgeport this 8th day of August 2007.


___/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE