## UNITED STATE DISTRICT COURT
## DISTRICT OF CONNECTICUT

---

**UNITED STATES OF AMERICA,**

       **Criminal No.: 3:07-cr-134 (JBA)**

    **v.**

**IONIA MANAGEMENT, S.A.**

---

## DEFENDANT IONIA MANAGEMENT, S.A.'s
## MEMORANDUM IN AID OF SENTENCING AND OBJECTION TO
## PRESENTENCE REPORT

**COME NOW,** Ionia Management, S.A., (hereinafter "Ionia"), by and through

undersigned counsel, who hereby files this Memorandum in Aid of Sentencing and

Objection to Presentence Report.

## INTRODUCTION

On September 6, 2007, the jury found Ionia guilty of eighteen (18) counts

(contained within four (4) Indictments, which were consolidated before this Honorable

Court). Ionia accepts the jury's verdict and fully appreciates the serious nature of both

the offenses it has been convicted of and the underlying illegal conduct of shipboard

staff.[1] For the reasons set forth below, Ionia respectfully requests that the Court be

advised by the relevant provisions of Federal Sentencing Guidelines; group all counts

pursuant to Chapter 3 of the Sentencing Guidelines; determine an appropriate fine range;

---

[1] As a result of the detention of the M/T KRITON at New Haven, and subsequent prosecution and
conviction, Ionia has incurred significant costs and expenses as well as suffered major business disruption
and losses, which, in and of themselves, have proven to be punitive. In spite of these costs, Ionia has
supplemented and improved its shoreside supervision of shipboard staff and their management of waste-
streams generated on each of the vessels that it manages with a view towards eliminating, to the extent
humanly possible, any chance of future violations.

follow the guidance of the Third Circuit in the *Abrogar* decision and sentence Ionia to a fine in the range of $153,000 to a maximum of $306,000.

## IONIA MANAGEMENT, S.A.

Ionia is a Liberian Corporation, which conducts business from its principal and only office, located at No. 12 on Laskou Street in Piraeus, Greece. The Company provides commercial and technical management services to owners of ocean-going cargo vessels. The commercial management and technical management services involve the day-to-day running and operations of the vessels. Presently, Ionia manages seven (7)[2] ocean-going vessels for several ship-owning clients. All of the vessels managed by Ionia are either oil or chemical tankers.

As for shoreside employees, Ionia currently employs twenty-six (26) shoreside staff members, with a variety of disciplines and titles. In brief, the Company's employees can be described as: chartering personnel, (who assist Ionia's ship-owning clients with finding the employment for the vessels); superintendents, (who attend to the technical aspects of operating the vessels); and accounting personnel.

In addition to those persons employed in the Piraeus office, Ionia also employs nine (9) Greek citizens as Ship's Captains, Chief Officers, and Chief Engineers, who are assigned to serve on board the vessels Ionia manages.[3] Apart from these Greek senior officers, Ionia does not employ any of the other officers or crew members who serve onboard the vessels under Ionia's management. Rather, Ionia simply manages these shipboard crewmembers on behalf of the owners of the various vessels within the Ionia-

---

[2] At the time the M/T KRITON was detained in New Haven, Ionia managed ten (10) vessels. But since such time, Ionia has lost thirty percent (30%) of its customers and now manages only seven (7) vessels.
[3] In total, Ionia employs a total of thirty-five (35) employees.

2

managed fleet.  In exchange for the services it provides to its clients, Ionia earns a modest management fee from the owners of the vessels it manages.  As more fully set forth below and attached (*See* Exhibit "I"), Ionia earned a net profit of $125,000 for the year ending December 31, 2006.  As a result of significant lost business following the detention of the M/T KRITON and subsequent prosecution (and conviction), Ionia is expecting to earn less in 2007.

### THE VESSEL – M/T KRITON

The M/T KRITON is a 28,933 gross ton tanker, built in 1991.  As noted above, the vessel is owned by Kriton Maritime, S.A., and has been managed by Ionia since May 15, 2003.  *See* Ship's Particulars, attached hereto as Exhibit "A."  She is registered and operates under the sovereign authority of the Bahamas Maritime Authority.  At all relevant times, the vessel's classification society was (and is) Bureau Veritas.

### RELEVANT FACTS

On or about March 20, 2007, the M/T KRITON arrived in the port of New Haven, Connecticut.  Upon arrival, the vessel's Electrician, Alexander Guevarra, called the local Coast Guard Marine Safety Office to report what he believed to be illegal practices occurring onboard the vessel.  While the Government will, no doubt, argue that Mr. Guevarra's phone call was an important element to enable their investigation and subsequent successful prosecution of Ionia, Mr. Guevarra's actions were wholly self-serving; were in direct contravention of his shipboard job responsibilities and obligations; and completely disregarded Ionia's established and well-publicized environmental compliance program, practices and procedures onboard the M/T KRITON (as well as all other vessels that Ionia managed).  As each of the crewmember witnesses who testified at

3

trial consistently and repeatedly confirmed, Ionia was (and is) *extremely* serious about pollution prevention, protection of the marine environment and its environmental stewardship obligations. *See* August 30, 2007 trial testimony of Second Engineer Mercurio at pages 26 through 43; August 24, 2007 trial testimony of Oiler Ricky Lalu at pages 36 through 38 and pages 50 through 53; August 27, 2007 trial testimony of Wiper Elmer Senolay at pages 26 through 41; and August 28, 2007 trial testimony of Engine Cadet Dario Calubag at pages 66 through 74.

Nevertheless, instead of reporting the allegations of illegal by-passing to the Captain, the Chief Engineer, Ionia's DPA ("designated person ashore"), or any of Ionia's port captains/superintendent engineers who attended onboard the M/T KRITON for immediate corrective action, (as he and all other crewmembers working onboard the M/T KRITON were required and promised to do as a condition of their employment on the M/T KRITON), Mr. Guevarra chose to disregard his obligations to Ionia and called the U.S. Coast Guard in hopes of obtaining a big reward.[4] As LCDR Blume, CWO Kavanagh and Petty Officer Vannata each testified at trial, Mr. Guevarra's motivations and expectations clearly centered around the prospect of obtaining a reward and returning to the Philippines financially secure and not an altruistic endeavor to protect the sea. In fact, Wiper Senolay confirmed at trial that Guevarra, himself, told his shipmates that his actions were motivated by his recognition that he was getting too old to work at sea; that he had significant expenses to support his family; and that he knew from prior ships about the Coast Guard's program of giving rewards to seafarers who report MARPOL

---

[4] It is telling that the Electrician, Mr. Guevarra, never made any such allegations to any of the many other Port State Control and/or Flag State authorities who attended on board the M/T KRITON.

4

violations.  *See* Testimony of Wiper Elmer Senolay, at pages 56-58, a copy of which is attached hereto as Exhibit "B."

As the Court will also recall, Wiper Elmer Senolay further testified that during the course of the Coast Guard's investigation and various attendances onboard the vessel, Mr. Guevarra made several approaches to him and other crewmembers requesting that they change what they had said to the Coast Guard in order to support his allegations of illegal conduct.  *Id.*   In fact, Mr. Senolay testified that Mr. Guevarra had "done this before," and even offered "to split" his reward with him and with any other crewmember who would change their testimony to assist him to obtain a reward.  *Id.*  Specifically, Mr. Senolay testified to the following:

> Q.      *Now, the electrician – after you spoke to the electrician, the electrician – strike that.  During the course of the discussion, the topic of a reward was discussed when you were in Matugas's cabin, right?*
>
> A.      *Yes.*
>
> Q.      *And, in fact, he didn't come to talk to you and Matugas one time, he came a couple of days later again, right?*
>
> A.      *Yes, again.*
>
> Q.      *And did he say anything about why he wanted you and Matugas to say something to support his story?*
>
> \* \* \*
>
> A.      *Yes.*
>
> Q.      *What did he say?*

* * *

Q.      Can you tell us, Mr. Senolay?

A.      He told me that there was going to be a reward and that if he
receives a reward that we will receive also a reward.  And then he said
that he was kind of old, that he will not be able to support his family in the
school anymore, his family.

Q.      Okay.  Now, do you know whether the electrician worked on a
prior ship for a different company where some of the crew received a
reward when they came to the United States and told the story about a
magic pipe?

A.      Because it was news on the ship, together with the people that I
work with, that in a previous company that he had done the same, that he
had reported something.  That's what I heard from the other people in the
ship.

See Id.

Despite the Government's repeated interviews[5] of Mr. Senolay and other

crewmembers who shared similar experiences in their dealings with Mr. Guevarra, (all of

whom the Government detained in New Haven for nearly six (6) months, but perhaps not

unsurprisingly, chose not to call at trial), the Government has taken no action against this

individual for his efforts to corruptly influence crewmember testimony.  Rather, the

Government chose to house Guevarra far away from his shipmates who denied any

---

[5] The Government had access and did interview the ship's crew many times, both on board the vessel and
later at the U.S. Attorney's office in New Haven.

illegal conduct had taken place on board the ship and placed him in the same hotel with

two (2) individuals who ultimately (and, given Guevarra's promise of a 'split' of his

reward), would later be the Government's "star witnesses" (and other crewmembers

to testify on behalf of the Government), at trial, Oiler Ricky Lalu and Engine Cadet Dario

Calubag.[6]

## IONIA HAS A LONG HISTORY OF EFFECTIVE ENVIRONMENTAL COMPLIANCE

As noted above, Ionia has been in the ship management business since 1992.

During the course of the last fifteen-plus (15+) years, Ionia has had a near perfect track

record of managing and operating many, many vessels without incident.  During the

course of pre-trial motion practice, as well as during various discussions/arguments

before the Court, the Government has attempted to paint a disparaging picture of the

company.  In fact, as the Court will recall, the prosecutors were "chomping at the bit" for

an opportunity to introduce to the jury otherwise highly prejudicial evidence of the prior

plea-bargained conviction of Ionia arising out of conduct occurring on board the M/T

ALKYON in 2002.  Such attempts, no doubt, were intended to support later argument

that Ionia is a repeat offender and otherwise a bad actor.  However, the facts and

crewmember testimony show that nothing could be further from the truth.

As the Court is aware, Ionia has been convicted, ostensibly, under principles of

*respondeant superior* for the acts of Second Engineer Mercurio, Oiler Lalu, and Engine

Cadet Calubag.  During the trial, each acknowledged that they had knowingly failed to

---

[6] Apart from the testimony of these crewmembers, there was absolutely no corroborating physical evidence introduced at trial which indicated that the alleged illegal discharging had ever actually taken place.  *See* Port State Control Report, attached hereto as Exhibit "C."  *See also* Testimony of LCDR Blume, at page 131, line 22 to page 132, line 1.

follow Ionia's rules; failed to live up to Ionia's expectations; failed to follow the express orders of the Captain and effectively disregarded Ionia's environmental protection policies. Again, although Ionia accepts the jury's verdict, it must be noted that it was Second Engineer Mercurio who was instructing the crew to lie to the Coast Guard, company representatives and Ionia's counsel concerning the nature and substance of his shipboard practices. Neither Captain Chritis, Chief Engineer Renieris, nor any member of Ionia's staff ever acted in such manner.

### IONIA'S PRIOR CONVICTION INVOLVING THE M/T ALKYON

Back on May 7, 2002, Ionia, along with the Chief Engineer of the M/T ALKYON, Christos Kostakis, appeared before Judge Allyne R. Ross in the U.S. District Court in the Eastern District of New York. At that time, both Ionia and Mr. Kostakis waived indictment and voluntarily pled guilty to a one (1) count information charging each with a violation of 18 U.S.C. § 1001. In that matter, Ionia promptly, completely and voluntarily accepted criminal liability for the unauthorized acts of the vessel's chief engineer, Christos Kostakis, (which arose out of an unreported breakdown at sea of the vessel's oily water separator,)[7] and voluntarily agreed to pay (and did pay) for the cost and expenses of the Government's investigation. During the course of the plea hearing, the Court asked Mr. Kostakis to state, in his own words, what he did that made him guilty of the charge presented. In this regard, the following exchange took place:

THE COURT: *What happened between December and January?*

---

[7] As discussed during the trial of this matter by the crewmembers who testified and the Government's own marine engineering expert, it is not uncommon for machinery to breakdown on board ships during long voyages.

*THE DEFENDANT:   The Oily Water Separator broke down and that's why we put false statements.*

*THE COURT: Okay, you yourself were responsible for placing the false statements in the Oil Record Book indicating that in fact the separator had been used during that period?*

*THE DEFENDANT:   Yes.*

*See* Transcript of "ALKYON" Plea Hearing at page 22, a copy of which is attached hereto as Exhibit "D."

## ENVIRONMENTAL COMPLIANCE ON BOARD THE M/T KRITON

The M/T KRITON has been undergoing Port State Control Inspections since at least June of 1998. *See* Exhibit "E," Equasis list of Port State Controls between June 1998 and February 27, 2007. Since the beginning of Ionia's management tenure, (*i.e.*, May 15, 2003) through the vessel's call at New Haven, the vessel underwent at least thirteen (13) Port State Control inspections of which ten (10) were conducted by U.S. Coast Guard personnel. *See* Exhibit "E." None of those inspections ever resulted in a detention of the M/T KRITON.

Additionally, as the Court is aware, the M/T KRITON has been operating pursuant to an Environmental Compliance Program since 2004. The Environmental Compliance Program was supervised by a third-party auditor, Gallagher Marine Systems.[8] Until the time of the March 20, 2007 boarding, neither the KRITON's

---

[8]-David Barry of Gallagher Marine Systems testified on behalf of the Government at trial and confirmed that the M/T KRITON was well maintained; in excellent condition; and otherwise had fully operational pollution prevention equipment; and was, despite repeated inspections, unable to detect the intentional and secretive criminal conduct of shipboard staff.

shipboard staff, Gallagher Marine Systems personnel nor the Coast Guard ever found or reported any deficiencies regarding the vessels pollution prevention equipment or the relevant record keeping on board.  Similarly, the vessel was routinely inspected by representatives of both the "Classification Society" and the Bahamas Maritime Authority (*i.e.*, the vessel's Flag State), both of whom also repeatedly found the vessel to be in full compliance with all pollution prevention equipment in good working order.

Additionally, when the Master of the Vessel, Captain Mamas Chritis joined the vessel in January of 2007, one of his first orders of business was to hold an Onboard Safety Committee Meeting.  As set forth in the minutes of that January 22, 2007, meeting, Captain Chritis specifically:

> "reminded . . all officers and crew how the oil discharging separator and oil discharging monitor protecting the environmental also refreshed and explained [sic] the Marpol's rules regarding the disposals ex engine room or deck departments, and everybody instructed to inform the Master or Ch Eng if they see/find illegal and/or unauthorized disposal."

*See* Minutes of Meeting attached hereto as Exhibit "F."[9]

Additionally, during trial, Captain Chritis confirmed the following:

*Q.  Captain, can you tell the jury what Ionia's policy was about protecting the environment?*

* * *

*A.  No illegal discharging, no illegal  discharging, no illegal discharging without using the oil pollution prevention protection equipment.*

---

[9] Captain Chritis testified that he continued to remind the crew of their environmental obligations each week thereafter during the Saturday shipboard training sessions and again during monthly staff meetings. *See* Transcript of Captain Chritis Testimony at page 33, line 18 through page 34, line 10.

*Q. Okay, Captain. Now, during the time that you were on board the*

*KRITON, did you yourself ever see any illegal discharges?*

*A. No, I've never witnessed any illegal dischargings.*

* * *

*Q. Now, Captain, if you were told that an illegal discharge took place*

*during one of these voyages, what were you required to do, as captain of*

*the vessel, under Ionia's environmental protection policy?*

*A. The first thing I was to do was to immediately stop, put an end to this*

*illegal discharging, then I should notify the company for further actions to*

*take place having to do with the relevant regulations.*

*See* Transcript of Captain Mamas Chritis testimony at page 49, lines 6 through 23
and page 50, lines 13 through 22, attached hereto as Exhibit "G."

Similarly, there can be no dispute that when the vessel initially arrived in New

Haven, the oily water separator was tested as part of the Coast Guard's initial Port State

Control Inspection and found to be well maintained and in good working order. *See*

Exhibit "C." Additionally, the crew was found to have good knowledge and ability to

operate the pollution prevention equipment. By all objective standards, there was no

reason for the crew to disobey Ionia's environmental compliance practices and

procedures.

## IONIA HAS FULLY AND COMPLETELY COOPERATED WITH THE GOVERNMENT'S INVESTIGATION

From the Coast Guard's first boarding (of the M/T KRITON) through all

subsequent boardings of the various vessels managed by Ionia, Ionia fully and completely

11

cooperated with the Government to ensure that should any problems be found, they would be constructively solved.  Ionia's cooperation included, but certainly is not limited to, the following:

a.  Ionia agreed to and did arrange for the housing and payment of wages for all crewmembers that the Government wished to, and did, detain as part of its investigation, [even though those crewmembers would no longer (and never did) provide any service on board the M/T KRITON and had agreed to cooperate with the Government in their prosecution of Ionia];

b.  Ionia readily made all shipboard officers, independent contractors (such as Gallagher Marine Systems), and all crewmembers from the M/T KRITON repeatedly available for interviews;

c.  Ionia, Captain Chritis and Chief Engineer Renieris readily ensured that the Government, at all times, had complete and immediate access to the vessel's books and records, while the vessel was at New Haven;

d.  The ship's crew assisted the Coast Guard in taking samples and conducting operational tests of the ship's equipment during the Coast Guard's various attendances on board;

e.  Ionia arranged for <u>all</u> of the detained crewmembers to be repatriated after the trial and after the U.S. Attorney's office and/or the Court granted them permission to leave;

f.  Ionia has agreed not to take any adverse employment action against the crewmembers cooperating with the Government's investigation and prosecution of Ionia, despite learning during the course of the

investigation, that these crewmembers violated Ionia's policies, the laws

of the Bahamas (*i.e,* the vessel's Flag State), and the laws of the United

States while serving on board the M/T KRITON; and

g.    The M/T KRITON was not, after the March 20, 2007 detention at New

Haven, ever suspected, investigated, charged or convicted of any other

MARPOL, APPS or other criminal or civil violation, even though the ship

subsequently has called at numerous ports.

## IONIA MAY NOT BE PUNISHED FOR EVENTS THAT OCCURRED OUTSIDE THE UNITED STATES

A central issue throughout this case has been whether the prosecution is, in part,

beyond the Court's jurisdiction to the extent it seeks to punish Ionia for events that

occurred on the high seas.  Despite the voluminous briefing and argument conducted

before the Court, the Government has not cited, and Ionia is not aware of, any case

holding that a sentencing court, in punishing a foreign defendant, may take into account

pollution events that occurred or may have occurred outside this country merely because

the defendant possessed or presented inaccurate records of those events while inside this

country.  Certainly, no case has ever allowed such punishment under APPS.[10]

Rather, in *United States v. Abrogar,* 459 F.3d 430, 437 (3rd Cir. 2006),[11] the Third

Circuit held that with respect to an APPS record keeping violation "the improper

---

[10] In fact, in *United States v. Kun Yun Jho,* 465 F.Supp.2d 618 (E.D. Tex. 2006), the District Court for the Eastern District of Texas held that federal courts do not have jurisdiction even to impose criminal liability on foreign nationals associated with possession on a foreign ship *inside* U.S. waters of an Oil Record Book that failed to accurately document events occurring on the high seas.

[11] During the sentencing of co-defendant Second Engineer Mercurio, the Court both adopted "the reasoning of the Third Circuit in *Abrogar*" and grouped the four (4) felony counts from the four (4) separate Indictments to which he pled guilty.  *See* Mercurio sentencing transcript at page 12, line 22 through page 14, line 3.

discharges [occurring on the high seas] are not 'relevant conduct,' they cannot be considered part of the 'offense' under the guidelines, and therefore the 'offense' did not 'result [] in' repeated discharges of a pollutant." *Abrogar,* 459 F.3d at 436-437. The Third Circuit made clear that the overarching consideration which compelled that result was not the textual provisions of the guidelines, but instead, the *jurisdictional limits contained within APPS itself*. Thus, the court explained that any policy concerns implied by the Guidelines (that might militate in favor of punishing arguably related conduct) must be subordinated to the scope of liability and applicability explicitly set forth by Congress as part of the substantive statute at issue.

In this matter, the Government has consistently and expressly recognized the jurisdictional limitations imposed by APPS, and as the Court keenly noted, took "great pains to say that this is not a case about the pollution that took place." *See* Transcript of Telephonic Status Conference conducted on July 30, 2007, at page 8, line 1, through page 9, line 23. As the Government, itself, has repeatedly characterized this case to the Court as one involving "recordkeeping" violations, Ionia respectfully submits that it should be sentenced as such.

Additionally, attached hereto as Exhibit "H," is the sentencing transcript in *United States v. Ntais,* CR-06-5661 RBL (W.D. Wa., December 12, 2006). The court addressed precisely the issue presented here and agreed that it had no jurisdiction to impose any exacerbated punishment for alleged pollution occurring on the high seas.

The Ninth Circuit also provides support for the position that Ionia's convictions cannot be considered "environmental crimes," nor can this action be considered a "pollution" case. In *United States v. Ferrin,* 994 F.2d 658, 663-64 (9th Cir. 1993), the

14

Ninth Circuit held that in order for the United States Sentencing Guideline for environmental crimes to apply, there would have to be a showing that some amount of a contaminate,[12] in fact, polluted the environment.[13] Thus, unless a contaminate reaches the environment, the crime cannot be considered an "environmental crime" for the purposes of sentencing. *See Id.* at 664; *see also United States v. Technic Services, Inc.,* 314 F.3d 1041 (9th Cir. 2002)(holding the term "environmental damage" as used in U.S. sentencing laws means damage to the waters, air or land "*of the United States.*")(Emphasis added.)  As there is no evidence that any alleged pollution occurred within the United States or its waters,[14] there is no basis to increase Ionia's sentence on the grounds that this is a "pollution" case.

## THE SENTENCING GUIDELINES SHOULD BE UTILIZED TO DETERMINE THE APPLICABLE FINE RANGE

Chapter 8 of the sentencing guidelines, for fines against organizational defendants, applies only to those counts similar to those numerated in § 8C2.1.  The guidelines applicable to APPS counts, § 2Q1.3, the conspiracy count, § 2X1.1, as well as the 18 U.S.C. § 1505 and 18 U.S.C. § 1519 counts, § 2J1.2, are not so listed.  However, it does not follow that the guidelines should be disregarded for all purposes.  Ionia respectfully submits that the guidelines and policy statements of the Sentencing

---

[12] "Contaminate" is defined as "'to soil, stain, or infect by contact or association' or 'to make. . . impure by admixture.'" *Ferrin* 994 F.2d at 664.

[13] "'Environment' means 'surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.'" *See United States v. Technic Services, Inc.*, 314 F.3d 1031, 1047 (9th Cir. 2002)(quoting 42 U.S.C. § 9601(8))

[14] *See United States v. One Big Six Wheel*, 166 F.3d 498, 499 (2d Cir. 1999) (citing Presidential Proclamation 5928 of December 27, 1988, 43 U.S.C.A. § 1331 (West Supp. 1998), which set the 12 mile jurisdiction limit for U.S. territorial seas; *see also* P.L. 104-132, Title IX, § 901(a), 110 Stat. 1317 (providing, "the Congress declares that all the territorial sea of the United States, as defined by Presidential Proclamation 5928 of December 27, 1988, 3 C.F.R. § 547 (1988), for purposes of Federal criminal jurisdiction is part of the United States, subject to is sovereignty, and is within the special maritime and territorial jurisdiction of the United States for the purposes of title 18, United States Code).

15

Commission ought to be considered to provide context to any sentence.  Indeed, 18

U.S.C. §3553, which controls sentencing, includes the following sentence:

> In the absence of an applicable guideline in the case of an offense other
> than a petty offense, the court **shall have** due regard for the relationship of
> the sentence imposed to sentences prescribed by guidelines applicable to
> similar offenses and offenders, and to the applicable policy statements of
> the Sentencing Commission.

18 U.S.C. §3553(b)(1) [emphasis added]

In the instant matter, the guidelines merely specify that Chapter 8 does not control

the calculation of a fine in this case.  Prior to *United States v. Booker*, 543 U.S. 220

(2005), the guidelines of course were mandatory and certain offenses were exempted

from the guidelines precisely to avoid that mandatory treatment.  But section 3553(b)(1)

made clear that even when no mandatory guideline existed, analogous guidelines must be

consulted.  Thus, as this case involves an organizational defendant, a complete guideline

analysis ought to be completed and given "due regard" regardless of whether, pre-

*Booker*, that analysis would have been "mandatory."

Although the Sentencing Guidelines have become advisory rather than

mandatory, determining the correct Guideline Sentencing Range remains an appropriate

"benchmark or a point of reference or departure" for constructing a defendant's sentence.

See *United States v. Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006)(quoting *United States v.

Rubenstein,* 403 F.3d 93, 98-99 (2d Cir. 2005); *see also United States v. Jimenez-Beltre*,

440 F.3d 514, 519 (1st Cir. 2006)(holding that a high degree of deference should be given

to guideline analysis).  Under 18 U.S.C. § 3553(a)(4), sentencing courts must weigh the

applicable Guidelines range as the Guidelines provisions are more than just "another

factor" among those in § 3553(a).  *See United States v. Rattoballi,* 452 F.3d 127, 133 (2d

Cir. 2006). Once the sentencing court has established the Guideline Sentencing Range (including a consideration of any applicable departures), it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a), along with any other relevant considerations. *See United States v. Crosby*, 397 F.3d 103, 112-13 (2d Cir. 2005). Finally, it must determine, in light of that assessment, whether a sentence above, within, or below the Guidelines Sentencing Range is warranted. *See Crosby,* 397 F.3d at 113 – 14. The goal is to fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing. *See* 18 U.S.C. § 3553(a).

For example, in *United States v. Chen*, 476 F. Supp.2d 120 (D. Conn. 2007), this Court utilized the sentencing procedures set forth in *Crosby* when it reviewed the defendant's sentence and denied his motion to be re-sentenced. The Court first calculated the defendant's Guidelines Sentencing Range and considered whether there was a ground for a departure. It then permitted the parties to offer arguments for imposing a sentence outside the Guidelines Sentencing Range. After considering these arguments, the district court determined that neither side had offered a persuasive reason for imposing a non-guidelines sentence, and that a sentence at the low end of the Guidelines Sentencing Range was warranted. *See Chen,* 476 F. Supp.2d at 124; *see also United States v. Rivera,* 448 F.3d 82, 85 (1st Cir. 2006) (utilizing the same approach to sentence the defendant).

A guideline analysis is appropriate in this case for at least the following reasons:

a.      The analysis will give the Court some basis to compare this offense to similar offenses;

b.     The Commission excluded APPS counts involving organizations from mandatory guideline fine analysis because APPS convictions were expected to be pollution cases, whereas this is purely a record keeping case;

c.     As the jury was not asked and did not return a special verdict setting forth any claimed "value" and "gain" allegedly realized by the defendant, there is no more logical method for evaluating an appropriate penalty than by referring to the guidelines;

d.     Chapter 8 of the guidelines has been employed in at least some cases for offenses not listed in section 8C2.1.  *See, e.g., United States v. Patient Transfer Services, Inc.,* 413 F.3d 734, 744-746 (8th Cir. 2005)[15]; and

e.     All scholars and commentators who have reviewed the question agree that a guideline analysis is important to affording a "navigational" fix in addressing an appropriate fine in each individual case, including cases allegedly involving pollution.

We, on behalf of Ionia, respectfully suggest the following analysis will assist the Court in determining the appropriate sentence.

## IONIA'S PROPOSED GROUPING, ADJUSTED OFFENSE LEVEL, CULPABILITY SCORE AND FINE RATING

Ionia respectfully submits that all eighteen (18) counts should be grouped together pursuant to Chapter 3 of the Sentencing Guidelines.  During the sentencing of co-

---

[15] The Eighth Circuit held that the utilization of the Sentencing Guidelines to set a fine range permitted the district court to determine a reasonable sentence, even though the organizational defendant was not convicted of an offense listed by U.S.S.G. § 8C2.1.

defendant Second Engineer Mercurio, the Court grouped the four (4) felony counts[16] to

which he pled guilty and adopted "the reasoning of the Third Circuit in *Abrogar.*" *See*

Mercurio sentencing transcript at page 12, line 22 through page 14, line 3. Although the

Presentence Report contains a heading for "multiple count computation," the Probation

Department fails to group the counts pursuant to Chapter 3 of the Sentencing Guidelines.

The Presentence Report begins the grouping process pursuant to U.S.S.G. § 3D1.3

by identifying the "Obstruction of Justice" count as having the highest offense level. *See*

Presentence Report at ¶ 22. A base fine calculation and culpability score is then

determined. *See Id.* at ¶ 26 - 34. However, instead of calculating a fine for all counts

pursuant to U.S.S.G. § 3D1.5, the Presentence Report suggests, over objection by Ionia, a

fine range of $350,000 to $700,000 for each count. *See Id.* at ¶ 35. There is absolutely

no legal support for this fine range calculation on a "per count" basis and in practical

terms, completely disregards Ionia's financial condition and historical annual earnings.[17]

Instead, Ionia submits that the calculation represents what would be the aggregate total

fine for all counts if the Probation Department followed, as it stated in its Report its

intention to do so, the procedures set forth in Chapter 3 of the Sentencing Guidelines for

establishing a fine for all eighteen (18) counts. *See Id.* at ¶ 22.

When a defendant is convicted of multiple counts, the Sentencing Guidelines

require that counts involving substantially the same harm be grouped. *See* U.S.S.G. §§

1B1.1(d), 3D1.1(a), 3D1.2; *United States v. Patterson*, 962 F.2d 409, 417 (5th Cir. 1992).

This is so that a single offense level that encompasses all the counts of which the

---

[16] As the Court will recall, Mr. Mercurio pled guilty to one (1) count from each of the four (4) Indictments that were pending against him.
[17] The Second Circuit Court of Appeals has held that, "it is an incorrect application of the guidelines to impose a fine that a defendant has little chance of paying." *United States v. Drinkwine*, 133 F.3d 203, 204 (2d Cir. 1998)(citing *United States v. Walker*, 900 F.2d 1201, 1206 - 07 (8th Cir. 1990)).

defendant is convicted can be determined.  Counts that involve the same acts or transactions connected by a common scheme or plan, or involve the same harm, as is the case in the instant action, should be grouped for purposes of determining the applicable offense level.  *See* U.S.S.G. § 3D1.2(b).  Again, this is precisely the calculation that was employed by the Court in connection with the sentencing of co-defendant, Edgardo Mercurio.  *See* Transcript of Mercurio Sentencing, at page 12.

In the instant matter, the Government filed four (4) separate Indictments in four (4) separate districts which contained eighteen (18) counts arising from exactly the same conduct, namely the maintenance of an oil record book on board the M/T KRITON that contained false entries and/or omissions.  As set forth in the first count of the District of Connecticut Indictment, (*i.e.,* the count charging conspiracy in violation of 18 U.S.C. § 371), the Government alleged that between January 1, 2006 and March 20, 2007, the vessel maintained a false and misleading Oil Record Book, falsified records and obstructed justice.  The other seventeen (17) counts of the Indictments that originated in the District of Connecticut, Eastern District of New York, Southern District of Florida and District of the Virgin Islands, alleged substantive offenses for the overt acts contained within the conspiracy count.  By necessity, the factual basis for these charges are the alleged commission of the same acts as part of a common scheme or plan which involved the same harm, the maintaining of a false record book.  As all four (4) Indictments arise from the same charged conduct, they are intertwined and should be grouped together pursuant to U.S.S.G. § 3D1.2.[18]

---

[18] During the Mercurio sentencing, the Court and Government addressed this precise issue and agreed that the appropriate sentencing guideline is to be determined by grouping under 3D1.2.  *See* Transcript of Mercurio Sentencing at page 12.

20

To group the counts, a combined offense level is determined by utilizing the offense level of the most serious offenses. *See* U.S.S.G. § 3D1.3. The combined offense level is then used to adjust the defendant's final offense level. *See* U.S.S.G. § 3D1.4. The final offense level is utilized to determine the appropriate sentence in accordance with the provision of Chapter Eight of the Sentencing Guidelines. *See* U.S.S.G. § 3D1.5. In the instant matter, the offenses with the highest base offense levels are 18 U.S.C. § 1505 and 18 U.S.C. § 1519, both of which have a base offense level of fourteen (14).

### A.   Combined Adjusted Offense Level

| | |
|---|---|
| Base Offense Level (2J1.2) | 14 |
| Adjustments[19] | n/a |
| Final Combined Adjusted Offense Level | 14 |

### B.   Base Fine

Pursuant to U.S.S.G. § 8C2.4 , the base fine corresponding to a final combined adjusted offense level of 14 is $85,000.00.[20]

### C.   Culpability Score

| | |
|---|---|
| Initial Culpability Score (8C2.5(a)) | 5 |
| Prior Criminal Adjudication (8C2.5(c)(2)) | +2 |
| Violation of Probation (8C2.5(d)(1)) | +2 |
| Obstruction of Justice (8C2.5(e)) | +3 |
| Compliance Program  (8C2.5(f)) | -3 |

---

[19] An adjustment pursuant to U.S.S.G. § 3C1.1 is inapplicable in the instant matter as the defendant was convicted of offenses covered by U.S.S.G. § 2J1.2. *See* U.S.S.G. § 3C1.1 Commentary at 7. Furthermore, the Probation Department has no basis in fact to claim that a "substantial number of records, documents or tangible objects" were destroyed, altered or fabricated by Ionia, as the convictions stemmed from a small number of documents, an Oil Record Book and compliance checklists. *See* Presentence Report at ¶ 23. As such, a two level increase is not warranted.

[20] For the reasons stated in footnote 13, the offense level for the group is 14, not 16. Accordingly, Ionia respectfully submits that the fine range determine by the Probation Department is incorrect.

Total Culpability Score                                    $9^{21}$

**D.**     **Multipliers**

Based on a culpability score of 9, the minimum multiplier is 1.80 and the maximum multiplier is 3.60. *See* U.S.S.G. § 8C2.6. The fine range for all eighteen (18) counts should be a minimum of $153,000.00 and a maximum of $306,000.00.[22]

Accordingly, Ionia respectfully requests that the Court accept the above calculations in determining the appropriate fine to be imposed in this matter.

## THE STATUTORY SENTENCING FACTORS MILITATE IN FAVOR OF THE FINE RECOMMENDED BY THE GUIDELINES

The sentence to be imposed upon Ionia must be consistent with the requirements of sections 3553 and 3572 of Title 18. The guiding principle is that the fine shall be "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [section 3553(s)]. 18 U.S.C. § 3552(a). The relevant factors include the following:

**1.     The Nature and Circumstances of the Offense and the Characteristics of the Defendant**

This case involves, as detailed above, recordkeeping offenses arising from practices that existed on the M/T KRITON and were consciously concealed from Ionia. As confirmed by the testimony of the Coast Guard officers and third party auditors who

---

[21] As stated above, Ionia has less than fifty (50) employees, thus a culpability score increase of two (2) points is inapplicable pursuant to U.S.S.G. § 8C2.5(b)(3)(B). Additionally, Ionia had an effective Compliance Program in place to detect violations of APPS on board its vessels. As the evidence introduced at trial conclusively established that no "high-level personnel" of Ionia was involved in the instant conduct, there is no basis to deny a three (3) point reduction pursuant to U.S.S.G. § 8C2.5(b). Rather, the violations were conducted in secret by the Second Engineer (or at the instruction of the Second Engineer) and hidden from Port State Control authorities, Ionia's shoreside staff and superintendents who visited the vessel, the third-party auditor, Gallagher Marine Systems, and the various Classification Society and Bahamas Flag State surveyors who attended on board.

[22] It must be noted that a fine, even at the lowest end of this range would be well in excess of Ionia's US$125,000 net profit for the entire year ending December 31, 2006.

attended on board the ship, the M/T KRITON was otherwise excellently maintained. From all reports and inspections, the ship's pollution control equipment was regularly tested and maintained in good working order. In fact, it had been regularly tested by both the Flag State and Classification Society inspectors and certified to be in good working order.

### 2.  Seriousness of the Offense, Respect for Law and Just Punishment

Again, this is a recordkeeping offense for which Ionia essentially has been held strictly liable. No senior official within Ionia's office ever knew about, and certainly did not condone any inaccurate recordkeeping. In fact, each of the crewmembers who testified at trial stated that they were well aware that Ionia certainly would never condone or accept any intentional discharges of oil into the sea. Rather, Ionia trained shipboard staff and demanded their complete compliance with its "zero-tolerance," anti-pollution policy. Moreover, the only reason Ionia did not immediately dismiss and "put ashore" each of the crewmembers who admitted that they had participated in illegal conduct, (and had lied to Ionia, the Coast Guard and the prosecutors (and arguably lied again before the Court)), was because the Government insisted that those crewmembers not be dismissed and that, instead, they continue to be housed, fed and otherwise maintained in and around New Haven so that the Government could continue to have the benefit of their cooperation in its prosecution of Ionia.

### 3.  Adequate Deterrence

The fine suggested by the guidelines, together with the substantial expenses Ionia has incurred and paid as a result of this prosecution, are more than adequate deterrents to encourage Ionia (and other ship managers) to take additional necessary steps to insure

that the crews serving aboard the ships they manage will obey the law and maintain

accurate record books.  Indeed, this prosecution has been very burdensome and costly to

Ionia.  Additionally, as a result of the detention of the M/T KRITON at New Haven and

subsequent conviction, Ionia has lost thirty percent (30%) of its ship-owning clients.

### 4.  Protecting the Public from Further Crimes of the Defendant

There is no reason to fear future misconduct from Ionia, as they have

implemented substantial remedial measures, many of which have been included in the

Presentence Report.  Notwithstanding, it must be noted that although Ionia previously did

reasonably rely (albeit to its detriment) on reports received from shipboard staff, third-

party auditors, Flag State inspectors, and Classification Society surveyors, that the ship

was being well run and well maintained, it has now instituted policies which mandate

real-time, contemporaneous shoreside monitoring and recording of the use of the

pollution prevention equipment on board each of the vessels it manages.

Additionally, all crewmembers seeking employment onboard an Ionia managed

vessel are required to attend two (2) full weeks of training on MARPOL, along with a

week long "Pre-Departure Orientation Seminar."  All Greek crewmembers must attend in

person, at Ionia's office in Piraeus, Greece for this training.  During these seminars, each

crewmember is required to study and acknowledge "Company Policies" and promise to

follow and enforce Ionia's "Safety and Environmental Protection" and "Drug and

Alcohol" policies as a condition of their employment.  Thereafter, upon arrival onboard

any Ionia managed vessel, each crewmember must participate in an additional

comprehensive "On Board Familiarization and Training."  Prior to the vessel getting

underway, any crewmember newly joining the vessel is required to receive training and

familiarization with that specific vessel and reminded, once again, of the company's policies and their obligation to follow and enforce same.

Once on board and underway, the Captain of the vessel is required to conduct "Onboard Safety Committee Meetings," which are mandatory for all crewmembers and encompass lectures, videos and discussions about crew safety, pollution prevention and Ionia's company policies regarding same. All common areas onboard the M/T KRITON are outfitted with a placard containing a reminder of Ionia's Safety Quality and Environmental Protection Policy. Additionally, monthly reminders, by way of a written circular or update, are sent to each vessel managed by Ionia.

Finally, Ionia is now requiring all owners of the vessels Ionia manages to upgrade their pollution prevention equipment with state of the art equipment that digitally records all operation/use of the oily water separator equipment. Additionally, Ionia has implemented a program by which all vessels must report to the Ionia office on a weekly basis the quantities of bilge and sludge on board, so as to allow for better oversight of shipboard management of the waste-stream and shoreside accountability for same. In order to ensure effective and timely oversight, Ionia has engaged two (2) additional employees in order to facilitate and accomplish Ionia's internal inspection program.

**5. Providing Defendant with Needed Educational or Vocational Training, etc.**

Ionia respectfully submits that section 3553(a)(2)(D) is not relevant.

**6. The Kinds of Sentences Available**

Based upon the substance of the Preliminary Presentence Report issued by Probation Officer Egan, no punishment other than a fine has been suggested.

### 7.  The Sentencing Guidelines

Ionia's suggested application of the sentencing guidelines is set forth above.

### 8.  Pertinent Policy Statements

We are not aware of any applicable policy statement of the Sentencing

Commission.

### 9.  The Need to Avoid Unwarranted Sentencing Disparity Among Defendants with Similar Records

Co-defendant, Edgardo Mercurio, the Second Engineer on board the M/T

KRITON pled guilty to four (4) separate felony counts for violating APPS and testified,

at trial, that it was he who actually ordered and participated in the underlying illegal

conduct which gave rise to the conviction of Ionia.  On October 12, 2007, Mr. Mercurio

was given a sentence of probation and fined $1,000 (to be paid from wages paid during

the period of time that he was not working on board the vessel, but rather was acting as

the Government's key witness in its prosecution of Ionia).

### 10. Restitution

Here, based upon the substance of the Preliminary Presentence Report issued by

Probation Officer Egan, it appears to be common ground that there are no identifiable

victims.

## IONIA'S ABILITY TO PAY A FINE MUST BE CONSIDERED WHEN DETERMINING THE AMOUNT OF THE FINE

A defendant's financial condition must be considered in determining the amount

of a fine.  *See* 18 U.S.C. § 3572(a)("In determining whether to impose a fine, . . ., the

court shall consider, . . . the defendant's income, earning capacity, and financial

resources"); *see also* U.S.S.G. § 8C3.3 (providing that the amount of a fine may be

reduced if an organization is unable to pay a guidelines range fine). A court should impose a fine in an amount less than otherwise would be required where "the court finds that the organization is not able, and even with the use of a reasonable installment schedule, is not likely to become able to pay the minimum fine." *See* U.S.S.G. § 8C3.3(b). For the purposes of the guidelines, an organization is not able to pay the minimum fine, where, even with an installment schedule, "the payment of that fine would substantially jeopardize the continued existence of the organization." *See* U.S.S.G. § 8C3.3, Application Note 1.

The Second Circuit Court of Appeals has held that, "it is an incorrect application of the guidelines to impose a fine that a defendant has little chance of paying." *United States v. Drinkwine*, 133 F.3d 203, 204 (2d Cir. 1998)(citing *United States v. Walker*, 900 F.2d 1201, 1206 - 07 (8th Cir. 1990)). Furthermore, a sentencing court is required to make specific factual findings on the record demonstrating that it has considered the defendant's ability to pay the fine. *See Walker*, 900 F.2d at 1206.

As more fully set forth in Ionia's financial records, copies of which were provided to the Department of Probation, (a copy of which is also attached hereto as Exhibit "I"), Ionia's net income for the year ending December 31, 2005 was $165,000. Ionia's net income for year ending December 31, 2006, was $125,000. As a consequence of its detention at New Haven and subsequent conviction, Ionia has lost thirty percent (30%) of its ship owning clients. Although Ionia has not yet completed any financial statements for 2007, it is both expected and a logical flowing consequence that Ionia's 2007 net earnings will be significantly less than the 2006 net earnings, (*i.e.*, $125,000).

## CONCLUSION

Ionia fully appreciates the serious nature of the offenses it has been convicted of and the underlying impermissible conduct of shipboard staff. As such, Ionia has taken significant measures to supplement and improve its shoreside supervision of shipboard staff and their management of waste-streams generated on each of the vessels that it manages with a view towards eliminating, to the extent humanly possible, any chance of future violations. Ionia, as a result of the detention of the M/T KRITON at New Haven, and subsequent prosecution and conviction, has incurred significant costs and expenses as well as suffered major business disruption and losses, which, in and of themselves, have proven to be punitive. Accordingly, and for the reasons set forth above, Ionia respectfully requests the Court to seek guidance from the sentencing guidelines in order to determine an appropriate fine range; group all counts pursuant to 3D1.2.; follow the guidance of the Third Circuit in the *Abrogar* decision; consider Ionia's ability to pay a fine; and sentence Ionia to a fine in the range of $153,000.00 to a maximum of $306,000.00.

Dated: November 21, 2007
   Port Washington, New York

Respectfully submitted,

**CHALOS, O'CONNOR & DUFFY**
Attorney for Defendant
Ionia Management, S.A.

/s/George M. Chalos
George M. Chalos (CT-27407)
Michael G. Chalos
Brian T. McCarthy
366 Main Street
Port Washington, New York 11050
Telephone: (516) 767-3600
Fax:   (516) 767-3605
E-mail:  gmc@codus-law.com

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing "Memorandum in Aid of Sentencing and Objection to Presentence Report" has been filed and served via Email and via the District of Connecticut's electronic filing system and rules this 21st day of November, 2007, to the following counsel of record:

Anthony E. Kaplan, Esq.
Supervisory Assistant U.S. Attorney
U.S. Attorney's Office
157 Church Street
New Haven, CT  06510
Fax No.:  203-773-5376
Email: Anthony.Kaplan@usdoj.gov

Lana Pettus, Esq.
Trial Attorney
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Station
Washington, DC 20026-3985
Email: Lana.Pettus@usdoj.gov

William M. Brown, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office
157 Church Street
New Haven, CT  06510
Fax No.:  203-773-5376
Email: william.m.brown@usdoj.gov

CDR Luke Reid, USCG
Judge Advocate
Principal Assistant Legal Officer
First Coast Guard District
408 Atlantic Avenue
Boston, MA 02110
Email: Luke.M.Reid@uscg.mil

/s/ George M. Chalos