**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  3:07CR134 (JBA)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **IONIA MANAGEMENT, S.A.** | : | **November 21, 2007** |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through the undersigned attorneys, respectfully submits this Sentencing Memorandum.  For the reasons stated below, the Court should impose a fine of at least Nine Million Dollars ($9,000,000) and a five-year term of probation during which ships managed and/or manned by Defendant are prohibited from entering U.S. ports.

**I.      Introduction and Relevant Background**

On September 6, 2007, a jury convicted Defendant Ionia Management, S.A., of thirteen counts of violating the Act to Prevent Pollution from Ships ("APPS"), two counts of falsifying records in a federal investigation, one count of obstruction, and one count of conspiring to violate APPS, falsify records, and obstruct justice.  As the facts of this case are fully familiar to the Court, having presided over the trial and observed the testimony of fourteen government witnesses and four defense witnesses, the government will summarize the facts as follows:

Since at least December of 2004, crew members on the *M/T Kriton* have been discharging oil-contaminated wastes from the ship's bilges and sludge tanks.  Lower level crew members – cadet engineers and wipers – were ordered by superiors, usually second engineers, to connect a "bypass hose" from pipes leading to waste tanks to the overboard discharge valve of the boiler

blow-down line.  Oilers on the *Kriton* were ordered by the Chief Engineer, and sometimes the Second Engineer, to make discharges from the *Kriton*'s Bilge Holding Tank, Waste Oil Tank, and sludge tanks directly overboard to the sea through the bypass hose.  The discharges usually occurred at night, on the 8 p.m. to 12 p.m. watch.  Occasionally, in cold weather, the sludge tanks would have to be heated to allow the thick, viscous, sludge to be pumped.   Upon approaching port, crew members were ordered by the Chief Engineer to draw sea water into the waste tanks so that the amounts of liquid in the tanks would approximate the fictitious tank volumes in the Oil Record Book and the equally fictitious entries that had also been made in the *Kriton*'s sounding logs.

The fluid generally found in a Bilge Holding Tank is a mixture of water, lubricating oils, heavy fuel oil residues, and potentially other chemicals. The waste oil tank and sludge tanks contain heavy oil residues and sediments derived from the fuel purification process and other processes on the ship.  According to the crew members who testified at trial and were ordered to participate in the discharges, the Oil Water Separator and incinerator on the ship, equipment designed to prevent oil pollution, were rarely, if ever, operated.  Of the few times the oil pollution prevention equipment was operated, often it was simply for testing purposes.

Edgardo Mercurio, a Second Engineer who pleaded guilty for his role in the offenses, testified that, in addition to learning the discharge method from crew members who preceded him on the ship, he received specific instructions not to use the Oil Water Separator from the first Chief Engineer he worked with on the *Kriton*, Efstratios Tsigonakis.   He also testified that he told Tsigonakis' replacement, Petros Renieris – who has pled guilty to an APPS violation in connection with his conduct aboard the Kriton – that the crew was bypassing the oil pollution

2

prevention equipment and, instead, discharging through the bypass hose.  Renieris indicated to Mercurio that the crew should continue to use the hose.

Despite the full knowledge of the Chief Engineers that the *Kriton*'s Oil Water Separator and incinerator were not being used, they routinely and within the scope of their duties made entries in the *Kriton*'s Oil Record Books indicating that the Oil Water Separator and incinerator were regularly used.  Defendant also submitted false Compliance Plan Checklists to the Coast Guard, indicating that the entries in the Oil Record Book were "completed correctly and truthfully" when, in fact, they were not.   The requirement to submit Compliance Plan Checklists to the Coast Guard arose from Defendant's prior conviction in 2004 for false statements in an Oil Record Book in the Eastern District of New York.

On night of January 30, 2007, officials of the Netherlands captured a Side-Looking Airborne Radar (SLAR) image of the *M/T Kriton* in the North Sea, trailing a five-mile oil slick in its wake.  There were no entries in the Oil Record Book indicating a discharge on that date–a material omission from the Oil Record Book.  According to the testimony of Chief Engineer James Shirley of the Military Sealift Command, for the period from January 1, 2006, to March 20, 2007, at least 968 tons of oily waste were unaccounted for in the *Kriton*'s Oil Record Books.

Defendant's false records allowed the *Kriton* to freely enter and exit United States ports and engage in lucrative trade.[1]  When the Coast Guard began to investigate allegations that

_____

[1] An audit from 2005 shows that Ionia and its associated companies made $21,444,000 and held 176,748,000 in assets in 2005.  See Attachment Q at 4-5.  Chartering invoices show that the *M/T Kriton's* voyages to the United States in 2006 and 2007 alone generated over eight million dollars ($8,000,000).   Finally, in argument before Judge Eginton on March 29, 2007, urging the release of the *M/T Kriton*, counsel for the Defendant detailed the losses and potential losses resulting from the detention of the *Kriton* in New Haven, stating: "Everyday that that vessel's detained alongside, they're incurring – they're not earning freight, losing $20,000-plus a

dumping had occurred and the ship's Oil Record Books were false, Defendant, through its employees engaged in obstructive conduct.  Chief Engineer Renieris and Second Engineer Mercurio instructed the other members of the engine room department to lie to the Coast Guard and deny knowledge of the bypass hose.  Renieris instructed Mercurio to retrieve the bypass hose and its connecting flanges from their hiding places on the ship.  Renieris then cut the hose in half, and gave one-half of the hose to Mercurio to hide.  Renieris kept the other half of the hose and the flanges.  None of the parts of the bypass hose have been seen since and there are indications that all were destroyed and/or disposed of.

## II.    Argument

Defendant's false records and submissions covered up serious intentional misconduct and are serious violations of law.  Defendant, through its employees, further attempted to cover up its misconduct by obstructing the Coast Guard's investigation.  The punishment for these crimes must be sufficient to offset the gains made by Defendant in carrying out its deception and obstruction and sufficient to deter Defendant and other future violators from similar conduct.

The crimes in this case are specifically excluded from the United States Sentencing Guidelines fine calculations, and courts are, instead, guided by the factors in the introductory comments and to impose a fine sufficient to achieve the goals of the sentencing factors at 18 U.S.C. §3553.  Section 3553, in relevant part, names the following factors to be considered in

---

day.  They're incurring costs, daily running costs, wages to their crew, and other expenses plus now they've been put on notice by the vessel charter of Citgo, that they're being charged $200 an hour, every hour the ship sits alongside, plus from their other contract partners, the next company that was supposed to charter the vessel has now cancelled...."  March 29, 2007, Transcript of Proceedings before Judge Eginton at 12.  These are the kind of losses avoided in other ports by falsification of the Oil Record Book.

imposing a sentence:

> 1)   the nature and circumstances of the offense and the history and
>       characteristics of the defendant;
>
> 2)   the need for the sentence imposed–
>
>> A)   to reflect the seriousness of the offense, to promote respect for the
>>       law, and to provide just punishment for the offense;
>>
>> B)   to afford adequate deterrence to criminal conduct;
>>
>> C)   to protect the public from further crimes of the defendant; and
>>
>> D)   to provide the defendant with needed educational or vocational
>>       training...or other correctional treatment in the most effective
>>       manner; ...
>
> 6)   the need to avoid unwarranted sentence disparities among defendants with
>       similar records who have been found guilty of similar conduct; and
>
> 7)   the need to provide restitution to any victims of the offense.

Additional factors for consideration in imposing a fine are found at 18 U.S.C. § 3572.

These factors include, in relevant part:

> 1)   the defendant's income, earning capacity, and financial resources; ...
>
> 5)   the need to deprive the defendant of illegally obtained gains from the
>       offense;
>
> 6)   the expected costs to the government of any imprisonment, supervised
>       release, or probation component of the sentence;
>
> 7)   whether the defendant can pass on to consumers or other persons the
>       expense of the fine; and
>
> 8)   if the defendant is an organization, the size of the organization and any
>       measure taken by the organization to discipline any officer, director,
>       employee, or agent of the organization responsible for the offense and to
>       prevent a recurrence of such an offense.

Applying these factors, and considering the willfulness and wantonness of Defendant's

5

conduct, the serious nature of the offense, the recidivist and unremorseful nature of Defendant, and Defendant's failure to provide reliable financial data to the Court, the Court should sentence Defendant to a fine of at least $9,000,000 dollars, equating to at least $500,000 per count of conviction, and a term of probation of five years, during which time any and all ships managed or manned by Defendant or its successors and assigns be barred from United States ports and waters.

### A.    The Nature, Circumstances, and Seriousness of the Offense Favors a Substantial Fine.

Defendant Ionia Management engaged in serious criminal conduct, notwithstanding counsel for Defendant's early description of the violations as "at worst, a mere record keeping violation."  See "Kriton Maritime's Petition of the Release of the Motor Tanker, *Kriton* or in the Alternative, To Fix Security and Protect the Rights, Liberties and Freedoms of the Vessel's Crew," 3:07-CV-00461-WWE at 4 (emphasis added).  Defendant's conduct involved deliberate, large-scale pollution; a high level of consciousness of guilt; acts of concealment; a significant number of participants; a long duration of conduct; and a risk to the safety and security of United States ports and the environment.  Each of these factors weighs in favor of a substantial fine.

### 1.    The conduct in this case was deliberate and of significant magnitude and the Defendant was highly conscious of its guilt, as illustrated by its attempts at a cover up.

First, the evidence at trial established that the Defendant was engaged in both deliberate and large scale pollution and the attendant extensive falsification of its Oil Record Books.  The deliberate nature of the Defendant's conduct was established by the testimony of the crew members.  Mercurio, Lalu, Senolay, and Calubag each described how the process for dumping

was passed from superior to subordinate and from prior crew to replacement crew over a period

that was over 15 months long.  Lalu and Mercurio testified that on occasion the sludge to be

dumped was so thick that it had to be heated to enable it to be pumped through the hose,

including during the *Kriton*'s trip to New Haven. This dumping of bilge waste and oily sludge

did not occur by accident but as part of a planned and concerted effort to make discharges of oil

contaminated waste without proper treatment through the Oily Water Separator or use of the

ship's incinerator.   The false entries in the Oil Record Book also were made deliberately.  Each

of the Chief Engineers knew that, per their orders, the ship's Oily Water Separator and

incinerator were not being used.  Chief Engineer Tsigonakis even required the other engineers to

sign the pages of the Oil Record Book as a means of ensuring that they would not report the false

entries.  His reasoning, according to Mercurio's testimony, was that with the other engineers'

signatures on the page, "if there was a problem, then we're included."  August 29, 2007,

Transcript at 33.

        The scale of the pollution and magnitude of the falsehoods and omissions in the Oil

Record Books are starkly illustrated by Chief Engineer James Shirley's testimony at trial.  He

testified – assuming few, if any, leaks on the ship and the use of relatively clean fuels – that over

the 15-month period alleged in the indictment, approximately 968 tons of oily waste were

unaccounted for in the ship's Oil Record Books.  The discharges of this waste, as described by

the crew members, occurred between ports in Europe, South America, the Carribean, North

Africa, and North America, including the United States.  Shirley also testified that certain of the

entries made in the Oil Record Book, particularly those pertaining to the use of the incinerator to

burn oily sludge, were incredible.  He described how the rate at which the incinerator burns is

dependent upon the water content and other physical properties of the sludge which are rarely, if ever, uniform.  Yet, the entries related to the use of the incinerator indicate that it burned a nearly uniform amount of sludge, at a uniform rate, over identical periods of time, nearly every day under the command of Chief Engineer Tsigonakis.

Testimony of the crew members further corroborates that the ship's incinerator was not used as described in the Oil Record Book under either Chief Engineer Tsigonakis or Chief Engineer Renieris.  Ricky Lalu described how the valves on the various ship pumps were aligned to allow sludge to be pumped directly overboard from the sludge tanks.  Crew members testified that on the few occasions they say the incinerator burning, it was being tested.  None saw it operated on a daily basis.  Thus, the evidence shows that huge quantities of waste were discharged all over the Atlantic and hundreds of false entries and omissions relating to the operation of the Oil Water Separator and the incinerator permeate the ship's Oil Record Book in a cover up of the discharges.

Not only did Defendant's conduct involve a large amount of waste over a large geographical area and hundreds of falsifications, its conduct was spread over a period of <u>at least</u> fifteen months and directly involved at least thirteen crew members in different roles. Specifically mentioned in testimony were two chief engineers (Renieris and Tsigonakis); three second engineers (Mercurio, Galupin, and Cantillio); two or three wipers (including Senolay, who was also involved as a cadet engineer); Dario Calubag, the cadet engineer; at least two oilers (Lalu and his predecessor); and two fitters (Romeo Arquio and at least one predecessor).  During the investigation both Chief Engineer Renieris and Captain Mamas Chritis[2] encouraged various

---

[2] This is discussed in further detail in part II.C., below.

crew members to withhold information from the Coast Guard, and in the case of Renieris, instructed them to lie.

> **2.     The Defendant's conduct has potentially serious consequences for the safety and security of United States ports, the fairness of the marketplace, and for the environment.**

Both the discharges themselves and the failure to report them have potentially serious consequences for the safety and security of United States ports and the environment. Accurate and full records, such as the Oil Record Book, are an important part of the Coast Guard's effort to secure and protect U.S. ports. See Attachment A, Declaration of Rear Admiral Salerno at ¶¶ 6-7. As the Court heard at trial, and as explained in the Declaration of Rear Admiral Salerno, accurate records are part of an overall port state control and inspection regime implemented by the Coast Guard. Attachment A at ¶¶6-7. A false Oil Record Book such as the one maintained by Defendant can jeopardize the safety of U.S. waters and ports because the Coast Guard is deprived of valuable information from which it can make determinations about the need to restrict a vessel's movement or other actions to safeguard a port. Attachment A at ¶ 6. Furthermore, allowing a company like Defendant to utilize false records, "undermines the entire regulatory scheme, calls into question the rest of the ship's records, and creates an unfair advantage over those ship operators who are complying with the law." Attachment A at ¶ 7.

The competitive advantage of failure to comply with Oil Record Book and MARPOL requirements is derived from time and money savings on maintenance, waste-management, and repairs. By one estimate, illegal waste dumping can save an "unscrupulous operator" between $140 and $1044 per day, which represents a 94% savings of the costs of compliance. See Attachment B, Organization for Economic Cooperation and Development, "Cost Savings

9

Stemming from Non-Compliance with International Environmental Regulations in the maritime Sector," at 46, DSTI/DOT/MTC(2002)8/Final at 46.[3]   The amount saved increases with longer periods of non-compliance and with the frequency of trips to areas where waste disposal is more costly, such as the East Coast of the United States.  Id.  By covering up illegal dumping, false Oil Record Book entries, such as those in the *Kriton*'s Oil Record Books, allow "unscrupulous operators" like Defendant to realize cost savings by allowing them to evade detection.  The jeopardy to U.S. ports of entry and the unfair competitive advantage both underscore the serious nature of the offense.

Routine and deliberate oily waste discharges, like the ones in this case, each year cause eight times the amount of oil pollution as that caused by catastrophic spills such as the Exxon Valdez oil spill.  See Attachment B at 4; Attachment C, Declaration of Dr. Francis K. Wiese at ¶ 3.  Routine operational discharges such as the ones carried out by Defendant are a significant cause of seabird mortality.   A Canadian study has estimated that 300,000 seabirds are killed annually in Atlantic Canada from this type of routine discharge of oily vessel waste.  Attachment C, Wiese Declaration at ¶ 6, citing Wiese, F.K., and Robertson, *Assessing impacts of chronic oil discharges at sea on seabirds: a general oiled seabird mortality model applied to Eastern Canada*, in Journal of Wildlife Management (2004) 68:627-38 (Attachment D).  As this scientific evidence shows, the conduct that Defendant was hiding by creating its false and

---

[3] Also available at: www.oecd.org/dataoecd/4/26/2496757.pdf

fictitious records has a serious impact on the marine environment.[4] [5]

      **B.     The History and Characteristics of the Defendant Favor a Substantial Fine.**

      Defendant Ionia Management is a rogue, unrepentant, and recidivist company whose

actions demonstrate a lack of respect for the law.  Its status as a convicted felon on probation at

the time of the conduct makes this case particularly egregious.  Its very corporate organization

reflects a concerted effort to evade financial accountability and to shield profits.  The Defendant

does have the ability to pay a fine and, as a commercial business, will likely be able to pass some

of the cost of a fine on to its customers through its management contracts.  These factors weigh

in favor of a substantial fine.

          **1.     Defendant Ionia Management has a history of similar conduct that indicates that the making of illegal discharges and creation of false Oil Record Books is an entrenched pattern and practice.**

      Defendant Ionia Management previously pleaded guilty to a false statement count in the

Eastern District of New York for conduct similar to the conduct leading to its present

convictions, but on a different ship, the *M/T Alkyon*.  The conduct included the making of entries

in the Oil Record Books of the ship indicating that the oil-pollution prevention equipment was

being used when, in fact, the ship's crew was routinely bypassing the Oil Water Separator and

_____

    [4] In fact, the January 30, 2007, incident captured on SLAR by the Netherlands Coast Guard occurred during the winter in the North Sea, when seabird deaths from hypothermia, as described by Dr. Wiese, logically would be more likely to occur.

    [5] In the April 1, 2005, sentencing hearing for a case involving the dumping of oil-contaminated grain from a cargo ship in the South China Sea, the District Court for the Southern District of Florida considered the environmental impacts of the defendant's conduct when sentencing individual defendant Rick Stickle to 33 months imprisonment and a $60,000 fine. United States v. Stickle, 1:04CR200072 (S.D. Fla. April 1, 2005).

incinerator.[6]  Similar to the practice onboard the *Kriton*, the crew removed and concealed the

bypass pipe used on the *Alkyon* two to three days before the ship reached port.  See Docket Doc.

#30, Government's Memorandum Addressing Sentencing Issues, August 19, 2002, at 15-20.

On October 27, 2004, the District Court for the Eastern District of New York entered judgement

against the Defendant and imposed a $150,000 fine, payment to the United States Attorney's

Office for the cost of prosecution in the amount of $40,973.22, and a payment of $150,000 to the

National Fish and Wildlife Foundation.  The Court further ordered Defendant to adhere to an

Environmental Compliance Plan.   Clearly, the fine and other payments, totaling $340,973.22,

were insufficient to deter continued illegal conduct by the Defendant.  Even the Compliance Plan

was not enough to prevent continued violation of the law by the Defendant.  Rather than improve

its practices and comply, it simply falsified the documents it was required to submit to the Coast

Guard under the plan, in addition to its Oil Record Books.

Interestingly, in the prior case, one of the subpoenaed crew members of the Alkyon was

an engineer named Delfin Padernal.  See Docket Doc. #30 at 32.[7]  At trial, Defendant argued

---

[6] Defendant and its co-defendant in the prior cases claimed that the Oil Water Separator
on the *Alkyon* was bypassed on a single occasion because of a broken Oil Water Separator and
that a single false statement was made in the *Alkyon*'s Oil Record Book as the basis for the guilty
plea.  See Docket Doc. #30, Government's Memorandum Addressing Sentencing Issues, August
19, 2002, at 11.  Defendant has repeated that claim in correspondence with the probation office.
That version of the facts was contested by the Government in that case and the evidence indicates
that there were more false entries involved.  The co-defendant employee's own allocution in the
prior case admits to three false Oil Record Book entries.  See Docket Doc. #30 at 15.
Information from the records and other witnesses in the case indicate that the bypassing was
actually routine.  See Docket Doc. #30 at 15-20.  It appears that Defendant made no attempt to
actually investigate what happened in the prior case, but instead adopted a version of events it
believed minimized its liability.

[7] Padernal was among those crew members who failed to appear before the Grand Jury, as
required by the subpoena, after transferring to another vessel managed by Defendant.  See Docket

strenuously that, under company policy, any crew member found to be involved in illegal discharges would be removed from the ship immediately and their employment with Defendant terminated.  However, Defendant's own records, it appears that Padernal has continued in the employ of the Defendant on ships that have made port calls to the United States, including the *Kriton*.  See Attachment E, Personal Card of Delfin Padernal.  Thus, it appears that Defendant's threats of swift punishment for those involved in illegal discharging are hollow.  As Defendant apparently failed to conduct any internal investigation to determine what actually happened on the *Alkyon*, if Padernal, as an oiler, was involved in the dumping in that case, he has continued in his employment with the company.  Further, he has continued in his employment with the company for three years after his failure in 2002 to comply with Defendant's alleged request to return to the United States and comply with the subpoena that had been issued to him.  See Docket Doc. #30 at 42.

Nor does dumping and falsification of Oil Record Books appear to be isolated to the *Kriton* and the *Alkyon*.  Edgardo Mercurio reported in an interview that he had also witnessed bypassing on another Defendant operated ship, the *M/T Prikonissos*.  After discharging was complete, the Chief Engineer instructed Mercurio to clean the overboard discharge valve.  See Attachment F, Mercurio Report of Interview, July 12, 2007.

This Defendant is not a company that "wants to protect the environment" or is "environmentally-friendly" as claimed by Defendant's counsel in his opening statement.  Instead,

---

Doc. #30 at 39.  After Padernal's departure along with eight other subpoenaed crew members, Defendant's counsel in that matter, a partner in the firm currently representing Defendant, pressured the Government to drop the case claiming that the government was "making a mountain out of a mole hill," "on a wild goose chase," and had no evidence.  Id.

it is a company that routinely and repeatedly flouts the law and has disregarded previous legal

sanctions, to the detriment of the environment and U.S. port security and safety.

> **2.      Ionia Management has shown a complete lack of respect for the rule of law and the justice system and continues to portray itself as a victim, even in light of the jury's verdict.**

In an interview conducted during jury deliberations by a reporter from Trade Winds, a

shipping industry periodical, Ekaterini "Katy" Therapiotis, "head" of Ionia Management S.A. and

owner of Kriton Maritime, S.A., said the following:

> This is an absurd case. Shipowners are being unfairly treated in the US and we are at the mercy of whistle-blowers.
>
> Shipowners should be treated better than this now. We have no motive to break the law so why do we deserve to be treated like this? Our instructions to the crew are specific: nothing must be thrown overboard.
>
> But the crew are stuck on the ship all the time. When they go to the US, they cannot even go ashore and they sit on board dreaming of getting rich.

Attachment G, "Ionia Boss Slams US for 'Raw Deal.'"  Counsel for the Defendant also used an

interview after the verdict with Trade Winds to continue Defendant's attempt to portray itself as

a victim.  He stated, "Ionia was very courageous in standing up to these money-grabbing whistle

blowers and the US government prosecutors who have made a practice of enabling their

schoolyard-level shakedowns in these magic-pipe cases."  Attachment H, "Bloodied but

Unbowed" at 1.  He further stated, "We're obviously disappointed with the jury's verdict, but we

won on some other issues along the way that aren't as obvious, and now we're going to find out

what this case is really worth." Id.

Statements like these, attempting to paint as extortionists low level and modestly paid

foreign crew members who testified only after being granted immunity and compelled to testify, show the Defendant's total and utter failure to comprehend and accept responsibility for the seriousness of its conduct. They also illustrate a lack of respect for the laws and the judicial system of the United States.

Whistle-blower provisions and protections serve an important function in the United States. They are designed to protect employees who become aware of wrongdoing by their employers and report it to authorities from retribution by their employers. This has the beneficial societal effect of bringing to light wrongdoing that might otherwise remain undiscovered. These types of provisions are used in many contexts outside of the Act to Prevent Pollution from Ships. See, e.g., Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A; Labor Management Relations Act, 29 U.S.C. § 301; Family and Medical Leave Act, 29 U.S.C. § 2615; False Claims Act, 31 U.S.C. § 3730; Federal Water Pollution Control Act, 33 U.S.C. § 1367; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000; Energy Reorganization Act, 42 U.S.C. § 5851; Clean Air Act, 42 U.S.C. § 7622; Connecticut Whistleblower Statute, Conn. Gen. Stat. § 35-51m. In the APPS context, many of the employers and employees aboard vessels are foreign entities or individuals and, but for their contacts with the United States at port and in United States waters, are outside United States jurisdiction. Since the United States has no ability to control what these employers might do with respect to the job status of an employee who provides information or testifies, willingly or by force of court order, the award provision acts as some insurance against possible termination, demotion, blacklisting, or other negative consequences of the employee's report to the Coast Guard.

To equate the testimony of the witnesses in this case to a "schoolyard-level shakedown"

is not only crude and offensive, but completely ignores the facts of the case, the verdict of the

jury, and the legitimate and laudable purposes of the APPS "whistleblower" provision.   In fact,

the comments of Defendant's representative and attorney suggest that Defendant, in fact, may be

exactly the type of employer the award provision in APPS was designed to protect seafarers

against.[8]

The facts are that most of the crew member witnesses, including those who testified at

trial were reluctant to come forward, until confronted with evidence of their involvement, granted

immunity, and compelled to testify.  Counsel for Defendant even raised their initial reluctance to

provide complete information to the Coast Guard on cross examination.  This is hardly conduct

suggestive of "money-grabbing whistle blowers" who "sit on board dreaming of getting rich."

Further, Lalu, Senolay, and Calubag all indicated that they either were unaware of the APPS

award provision or thought that it was just a rumor at the time that they spoke to the Coast

Guard.  Mercurio, who pleaded guilty, and whose testimony was consistent with that of the other

crew members can hardly be said to have participated in making up a story that could have

landed him in jail.  Indeed, Defendant's post-trial scape-goating of its employees stands in stark

contrast to Defendant's repeated pre-trial protestations on the behalf of the crew members' "core

human rights, civil liberties, personal freedoms and principles of fair treatment" and its claimed

concern for "matters of human decency" and the "hardship" and "difficult situation faced" by the

witnesses.  See "Kriton Maritime's Petition of the Release of the Motor Tanker, *Kriton* or in the

Alternative, To Fix Security and Protect the Rights, Liberties and Freedoms of the Vessel's

_____

[8] Oiler Ricky Lalu indicated, when recalled to testify in Defendant's case-in-chief, that he
was concerned about physical retaliation by representatives of the company.

Crew," 3:07-CV- 00461-WWE at 7; Docket Doc. # 79, Ionia Management S.A.'s Motion for an

Order Directing the Parties to Take Rule 15 Depositions at 1; Docket Doc # 85, Ionia

Management S.A.'s Emergency MOTION for an Order Deeming the Eight (8) Crewmembers

Who Are Presently in Connecticut as "Material Witnesses at 2.

Such a dramatic shift suggests that Defendant was cynically concerned about the welfare

of its employees only in so far is it could utilize those concerns to its own advantage (i.e., getting

the ship released from port and obtaining a trial continuance).  Now that the crew members are

no longer useful tools to Defendant, it apparently feels free to drag them through the mud and

impugn their integrity.  Indeed, it suggests that the crew members' fears regarding the

consequences of their testimony are far from unfounded.

These statements from Defendant also cry out for the need for a substantial fine in this

case.  In particular, Defense counsel's observation that "now we're going to find out what this

case is really worth" suggests that Defendant is unlikely to see this case as a reason to alter its

illegal conduct unless a substantial fine is imposed.  In other words, for Defendant, the

conviction on eighteen felony counts alone is not sanction enough and the seriousness of this

matter is proportional only to the amount of a fine and the impact of that fine on Defendant's

financial bottom line.

> **3.     Reliable and information on Ionia Management's corporate structure
> and financial status is unavailable because Ionia Management has
> failed to provide it and Ionia Management's nation of incorporation is
> known for lack of oversight of and disclosure requirements for
> corporate entities and the flag of the *Kriton* is similarly known for
> lack of disclosure of corporate ownership interests.**

According to the corporate documents it provided pursuant to a subpoena, Defendant was

incorporated in Liberia in 1992.  It has a registered office at 80 Broad Street, Monrovia, Liberia, and an operational headquarters at 12, Laskou Street, Piraeus, Greece.  Christos Magiras is listed as the sole shareholder of the company and Ekatirini "Katy" Therapiotis is listed in various sources as the president and/or financial director.  See Attachment I, International Business Information Report at 2; Attachment J, "We Love What We are Doing!" BEACON, April 2007 at 7.  No records of meetings of the directors after 1992 were produced by the Defendant in response to the subpoena request for any and all documents referring or relating to ownership and/or control of Kriton Maritime S.A. and/or Ionia Management S.A.

Also provided pursuant to a subpoena request were documents indicating that Kriton Maritime S.A., which ostensibly owns the *Kriton*, was incorporated in Liberia in 2003.  Those documents indicate that Ekaterini Therapiotis is the sole director and officer of Kriton Maritime. See Attachment K.  Kriton Maritime shares the same registered office as Defendant and has no separate corporate headquarters.  Therapiotis also controls all of the other ships operated by Ionia Management.  See Attachment Q at 9.  Public statements by Therapiotis suggest that Ionia and the ship-owning corporations are simply alter egos.  Therapiotis, when asked "[w]hat makes Ionia unique" in April 2007 by a reporter for Skuld, an industry organization, noted that "We like to concentrate on tankers and retain control, handling all aspects of our vessels."  Attachment J at 6.  At the time, Defendant and/or Therapiotis, either owned or operated 10 ships, including the *Kriton*, with "9 new builds" expected to join the fleet between 2007 and 2009.

In the years that Ionia and Kriton Maritime were incorporated in Liberia, the country was in the middle of a 14-year period of civil war and civil and political instability.  The Liberian corporate registry was documented to be a substantial source of funding for former Liberian

President Charles Taylor, who is now awaiting trial for crimes against humanity that he allegedly

directed, aided, and funded in Sierra Leone[9] and who was a major source of instability in that part

of the world.  See Attachment L, "Liberia: Ruling the Waves from Virginia;" Attachment M,

Excerpt of the Report of the Panel of Experts on Liberia, October 2001, at 94;[10] Attachment N,

Excerpt of the Report of the Panel of Experts on Liberia, April 2002, at 33-35;[11] Attachment O,

Report of the Panel of Experts on Liberia, October 2003, at 21-22.[12]  Ionia and Kriton Maritime's

Liberian registered office at 80 Broad Street, Monrovia, was shared by thousands of other

companies but as of 2003 when Kriton was incorporated there "contained little furniture and

[had] been looted of all workable office equipment."  Attachment L, "Liberia: Ruling the Waves

from Virginia."  The Liberian corporate registry does not require disclosure of financial

information or information regarding "beneficial ownership."  See Attachment I, International

Business Information Report at 2; Attachment L, "Liberia: Ruling the Waves from Virginia."

Similarly, the Bahamian ship registry does not require owners to disclose any details of their

company when they register and guarantees owners that company details will not be accessible

through public records.  See Attachment P, "Bahamas: Hiding Behind the Flag."  That these are

the places and circumstances in which Defendant chooses to do its business is further evidence of

---

[9] See Prosecution's Second Amended Indictment, Prosecutor v. Charles Taylor, Special
Court for Sierra Leone, accessible at http://www.sc-sl.org/Documents/SCSL-03-01-PT-263.pdf.

[10] Also available at
http://daccessdds.un.org/doc/UNDOC/GEN/N01/605/64/IMG/N0160564.pdf?OpenElement.

[11] Also available at http://www.un.org/Docs/sc/committees/Liberia2/470e.pdf.

[12] Also available at
http://daccessdds.un.org/doc/UNDOC/GEN/N03/543/25/IMG/N0354325.pdf?OpenElement.

Defendant's lack of concern for the consequences of its actions and emphasis on avoiding accountability.

Defendant, and its closely associated business partner, Kriton Maritime, chose to incorporate in a country, Liberia, that requires little or no corporate reporting. One of the consequences of this choice is the lack of publicly available information about Defendant's corporate structure and finances. Defendant has compounded this issue by providing corporate records that do not fully or completely reveal its corporate structure or finances.

Despite the lack of reliable information on Defendant's finances, the information that has been provided, as noted in the Pre-Sentence Report at paragraph 21, does indicate an ability to pay a substantial fine. Moreover, the financial statement provided to the probation office are internally prepared documents which cannot be independently verified. See Attachment to the Pre-Sentence Report. Audited statements are more reliable, but the last audited statements involving the Defendant apparently were prepared for the year 2005. See Attachment Q.

Interestingly, the 2005 audited statement provided by the Defendant pursuant to subpoena does not contain much information specific to Ionia Management, S.A., as it is the "Combined Financial Statements" for the "Shipping Companies Managed by Ionia Management S.A." and owned by Ekaterini Therapiotis. It does not detail the expenses accrued by Ionia Management alone. However, Note 3 of the "Notes to Combined Financial Statements" indicates that the management fees collected by Defendant for the year 2004 was $2,301,000 and for the year 2005 was $2,281,000. See Attachment Q at 16. This information was not provided to the probation office. However, in its internally prepared "Income Statement," that was provided to probation, Defendant indicates that it collected $868,000 in management fees in 2005. See Attachment to

20

the Pre-Sentence Report.  This is a discrepancy of $1,413,000 from the 2005 audited statement.

There is no independent check or supporting documentation supplied for the figures in

Defendant's "Income Statement."  Nevertheless, using the management fees figure from the

audited statement and the operating expense figures from Defendant's "Income Statement"

Defendant's profit from the year 2005 was $1,553,000, not $140,000.  A discrepancy of this size

and the selective provision of documents to the probation office calls into doubt the accuracy of

Defendant's representations about its assets and earnings for the years 2006 and 2007.[13]

The fact that Defendant has had months and at least two opportunities to provide

accurate, reliable, and/or independently verifiable information regarding its finances and has

failed to do so weighs in favor of the Court concluding that Defendant is unwilling to provide

accurate financial data and warrants a presumption by the Court that Defendant has the financial

ability to pay a substantial fine.

### C.   The Defendant Engaged in Obstructive Conduct During the Course of the Investigation.

In this case, there was considerable obstructive conduct by Defendant.   It was charged in

the Connecticut Indictment with obstruction of justice for directing lower level crew members to

lie to and withhold information from the Coast Guard and for concealing and destroying the

bypass hose.  The jury convicted Defendant beyond a reasonable doubt on this charge.

In addition to the charged obstruction, other obstructive behavior came to light during

---

[13] Defendant apparently also plans to move to a new, more spacious building in Piraeus that it is constructing itself and is adding nine newly-built ships to its fleet.   See Attachment J at 6-7.  Recent press reports, citing Katy Therapiotis as "Ionia head," indicate that Ionia Management paid $44 million for two new ships from the shipbuilder STX Shipbuilding – hardly imaginable for a company making only $140,000 a year.  See Attachment U, "Malaysian and Greek orders stack up at STX shipyard."

testimony at trial.  Mercurio testified that as the result of a conversation with Superintendent

Apostolados, it was Mercurio's understanding that despite the fact that he had initially lied to the

Coast Guard, the Superintendent wanted him to adhere to his original story.  Further, Mercurio

recounted a conversation with the *Kriton*'s captain, Mamas Chritis, in a hotel after being

removed from the *Kriton*.  Captain Chritis talked to Mercurio "about this problem that we have,

that if I [Mercurio] told the truth, the company will have a big problem."  See Attachment R,

Mercurio Tr. at 97:3-5.

Finally, there is reason to believe that Defendant misrepresented the completeness of the

documents provided by Defendant to the government in response to the Grand Jury subpoena in

this case.  The subpoena to Defendant requested "For all those serving in the engine department

of the *M/T Kriton* since October 1, 2004, the personnel files, including performance evaluations,

disciplinary actions, and records relating to environmental and/or MARPOL training."  See

Attachment S, Subpoena Response Letter and Table of Contents dated May 8, 2007 at 3

(emphasis added).  In response to the subpoena request, Defendant produced documents bearing

Defendant's Bates stamp numbers in the range of 000110 - 000199.  See Attachment S at 3, 6-7.

[14]  No more than three or four pages of documents were provided for any crew member.  No

further documents were provided in relation to the subpoena.  Id.  However, at trial, Defendant

produced a number of documents relating to crew member training that had not been previously

produced to the United States or the Grand Jury.  See, e.g., Defendant's Trial Exhibits 12, 13, 15,

17, 16, 18, 19, 22, 23, 24, 33, 63, 64, 67, 68, 69, 70. This indicates an attempt to sandbag the

---

[14] The documents produced by Defendant can be made available for inspection if desired
by the Court.

22

United States for trial advantage and begs the question of other relevant documents and information that may not have been produced as required of Defendant.  It also further speaks to Defendant's lack of respect for the law and the rules of our judicial system, as discussed previously.

      D.      **A Substantial Fine is Needed to Provide for General and Specific Deterrence and to Protect the Public from the Effects of the Defendant's Conduct.**

In instances such as this, where a defendant is engaged in violations as part of its business, and where that business involves trade and profits worth multiple millions of dollars, the fine for the guilty defendant's conduct must be sufficiently high to deter the defendant specifically, and high enough to deter others in the same industry from future violations.   The need for specific deterrence is especially marked when, as here, the Defendant has a previous conviction for the same type of conduct.  Defendant's previous fine and other payments totaling $340,973.22 clearly was not enough to deter Defendant from continuing to engage in dumping and falsifying its Oil Record Books to cover it up.  The government submits that a fine of $9,000,000, or $500,000 per count, may better provide both specific and general deterrence and protect the public.

In addition, the Court should send a strong message to the maritime community that contaminating the ocean, falsifying records destroying evidence, and lying to the Coast Guard will not be tolerated.  Similar violations have reached epidemic proportions with new cases being referred to the Department of Justice nationally on a regular basis.[15]  Defendant's criminal

---

[15] *See United States v. MSC Ship Management et al.* (D. Mass. 2006) (APPS conviction of corporation and individuals); *United States v. Fairdeal Group Management, SA* (S.D.N.Y. 2005) (same); *United States v. Panagiotis Kokkinos et al.* (E.D.N.Y. 2005) (same); *United States v. Boyang (Busan) Ltd., et al.* (D. Alaska 2005) (same); *United States v. DST Shipping, et al.*

conduct undermines the Coast Guard's ability to fulfill its mandate both under domestic and

internal law.  A decade's long initiative by the United States to root out vessel pollution has

failed to stem the tide of deliberate vessel pollution, despite increasing penalties and punishment

imposed.  *See generally*, "Industry Pays Big Price for Oily Sins," *Trade Winds*, December 22,

2005.  The criminal actions taken by the United States have included business enterprises that

own or operate virtually every type of vessel including cruise ships, oil tankers, bulk carriers,

container ships, and tugs and barges.  And yet, violations have continued.[16]

A substantial fine should be imposed by this Court for the Defendant having maintained

the False Oil Record Books and submitting false Compliance Checklists, without which they

---

(C.D. Calif. 2005) (APPS conviction of corporation); *United States v. MMS Company Ltd., et al.*
(D. Oregon 2004) (APPS conviction of corporation and individual); *United States v. Rodolfo
Esplana Rey* (C.D. Calif. 2006) (APPS conviction of individual); *United States v. OMI* (D. N. J.
2004) (APPS conviction of corporation); *United States v. Wallenius Ship Management, Pte.,
Ltd., et al.* (D.N.J. 2006) (APPS conviction of corporation and individual); *United States v. First
Marine Service Company* (D. Oregon 2005) (APPS conviction of corporation); *United States v.
Oilmar Company Limited, Inc.* (D.S.C. 2005) (same); *United States v. Bottiglieri di Navigazione*
(S.D. Ala. 2005) (same); *United States v. Evergreen International, S.A.* (C.D. Calif., D. N. J., D.
Ore., D.S.C, W.D. Wash. 2005) (same); *United States v. Schlussel Reederei KG* (D. Hawaii
2004) (same); *United States v. Fujitrans Corporation of Japan* (D. Oregon, C.D. Calif. 2005)
(same); *United States v. Sabine Transportation Company* (N.D. Iowa 2004) (same); *United States
v. Marmaras Navigation Ltd.* (W.D. Wash. 2004) (same); *United States v. Fairmont Shipping
(Canada) Ltd. et al.* (D. Oregon 2003) (APPS conviction of corporation and individuals); *United
States v. Ta Tong Marine* (W.D. Wash 2003) (APPS conviction of corporation).

[16]  In a recent publication within the maritime industry, five major industry groups issued
a widely-distributed pamphlet urging "zero tolerance" for MARPOL violations and warning that
"[e]very seafarer should be made fully aware of the severe legal consequences, both for the
company and the seafarers themselves, of even minor non-compliance with environmental rules."
The pamphlet specifically stresses the importance of insuring the accuracy of ship records. See
www.marisec.org/ows, "Shipping Industry Guidance on the Use of Oily Water Separators –
Ensuring Compliance with MARPOL", Endorsed by Baltic and International Maritime Council,
Intercargo, International Champer of Shipping, International Shipping Federation, Intertanko, and
Oil Companies International Marine Forum (2006).

would not have been able to continue to travel to and from the United States.  A substantial fine is also needed to deter others in the maritime industry, who may contribute to this cumulative damage to the marine environment, and to demonstrate that lying to cover up this type of conduct in order to do business in U.S. ports will not be tolerated.

### E.      A Substantial Fine is Needed to Avoid Unwarranted Sentencing Disparities.

As detailed above, cases involving deliberate vessel pollution and the falsification of documents to cover up this type of conduct have become increasingly common over the last decade in the United States.  Given the high mobility of the offending vessels, the frequent involvement of multiple ports in multiple Federal judicial districts around the country, and the involvement of foreign nationals and corporations in perpetrating these crimes,[17] the United States has taken a necessary national focus in its enforcement efforts to combat this illegal activity.  While there have been many prosecutions for this type of violation, and many sentences negotiated as part of plea agreements around the country, this case is one of  the first of its kind to go to a jury trial, and will be among the first to be sentenced by a Federal Court following a guilty verdict by a jury.[18]  It is also one of few to involve a repeat offender.  It is, therefore, important for the Court to be aware of some of the agreed to sentences in order to try to avoid disparities with sentences in cases where a corporate defendant has admitted its conduct and agreed to plead guilty, and also usually in those cases, to also enter into detailed compliance plan to help prevent future conduct.   Here, even after the jury's verdict, Defendant fails to

---

[17] Ninety-five percent of passengers and dried goods carried, and 75% of crude oil imported through U.S. ports is carried on foreign flag ships.  Attachment A at ¶ 3.

[18] Sentencing is expected to occur in the first such case to go successfully to trial, United States v. Petraia Marine, on November 28, 2007, in the District of Maine.

acknowledge the full nature and extent of its actions, rather blaming the crew members for making the whole thing up.

In similar cases around the country, sentences routinely involve fines and restitution in excess of a million dollars per count for violation of APPS.[19]   While this data includes cases where there were both fewer and more counts of conviction, and companies that were in some instances larger, it makes clear that the combined fines and restitution that cooperating and guilt-accepting companies pay for their conduct routinely exceeds a million dollars per count.  In this case, where there are eighteen counts of conviction for multiple port entries in four districts spanning at least fifteen months, a sentence that imposes a fine of $9,000,000 dollars is necessary to account for the circumstances of this offense and sentencing, and to avoid disparity with other similar defendants who have admitted to and accepted responsibility for their conduct.

> **F.     "Grouping" Counts is Inappropriate in this Case and the Fine Imposed Should Reflect the Maximum Fine per Count.**

Defendant has previously raised the issue of "grouping" in correspondence with the probation office and the Pre-Sentence Report includes a brief discussion of grouping.  Defendant is a corporate defendant.  The United States Sentencing Guidelines fines guidelines do not apply to the counts of conviction in this case and, therefore, the "grouping" provisions of Chapter Three of the United States Sentencing Guidelines are irrelevant.  The Chapter Eight Fine Provisions do not apply to counts for which the applicable guideline offense levels are determined under § 2Q1.3 (APPS) or § 2J1.2 (obstruction and falsification of documents). See U.S. Sentencing Guidelines Manual §8C2.1 cmt. background (2006) ("The fine guidelines of this

---

[19] See Attachment T, Spreadsheet of various recent corporate penalties in APPS cases.

subpart apply only to offenses covered by the guidelines sections set forth in subsection (a) above.  For example, the provisions of §§8C2.2 through 8C2.9 do not apply to counts for which the applicable guideline offense level is determined under Chapter Two, Part Q (Offenses Involving the Environment)").  For counts excluded from the Chapter Eight Fine Provisions, the Court is directed by the Guidelines to apply the sentencing factors in 18 U.S.C. § 3553 and 18 U.S.C. § 3572.  To apply the grouping provisions of Chapter Three would render Chapter Eight's exclusion of counts calculated under § 2Q1.3 and § 2J1.2 from the Fine Provisions meaningless. Grouping is not required or even mentioned under the statutory sentencing factors found at 18 U.S.C. § 3553 and 18 U.S.C. § 3572.  Consequently, the Court may impose a fine of up to $500,000 per count, the statutory maximum, for a total of $9,000,000 in this case.

### G.    Other Terms of the Sentence

In addition to a fine, the United States requests that Defendant be placed on probation for a period of five years and that any and all ships managed or manned by Defendant or its successors and assigns be banned from entering U.S. ports and waters during some or all of the term of probation.

A five-year term of probation is permitted under 18 U.S.C. §3561 and merited given the facts and circumstances of this case.  The conduct of conviction in this case occurred nearly three years after Defendant's prior conviction suggesting a need for long-term monitoring and/or restraints of the Defendant to protect the public from further crimes of the defendant and to ensure adequate time for the imposition and efficacy of corrective measures.  See 18 U.S.C. §3553(a)(2).  The Sentencing Guidelines suggest that a probation should be ordered for corporate defendants when the defendant "within five years prior to sentencing engaged in similar

27

misconduct, as determined by a prior criminal adjudication, and any part of the misconduct

underlying the instant offense occurred after that adjudication."  U.S.S.G. § 8D1.1(a)(4).

Probation is also appropriate where it "is necessary to ensure that changes are made within the

organization to reduce the likelihood of future criminal conduct."  U.S.S.G. § 8D1.1(a)(6).

      Banning ships managed or manned by Defendant from U.S. ports and waters for the term

of probation would provide additional specific and general deterrence and protects the public.

This Court has the authority to impose such a ban under 18 U.S.C. § 3563(b)(22) which allows

the Court to order, as a condition of probation, "such other conditions as the court may impose."

Probation is a "conditional liberty" with an aim to providing for rehabilitation and "protecting the

public."  See United States v. Beech Nut Nutrition Co., 925 F.2d 604, 068 (2d Cir. 1991).  The

court has "broad authority" to create conditions that would "alleviate the danger to society"

posed by the possibility that the defendant will "repeat similar offenses."  Id. at 608-609 (quoting

Fiore v. United States, 696 F.2d 205, 207 (2d Cir. 1982)); see also, United States v. Turner, 44

F.3d 900, 903 (10th Cir. 1995)(analyzing 18 U.S.C. § 3563(b)(6) and upholding district court's

decision to enjoin an abortion protestor convicted of obstruction of a court order from entering

the property of any facility which provided gynecological services because the defendant "might

not be able to restrict her activities within lawful parameters" and the ban "insure[d] that the

criminal conduct was not repeated.").  In Beech Nut, the Second Circuit upheld the district

court's imposition of a travel restriction that prevented the defendant from seeking job

opportunities overseas, reasoning that this would "promote his rehabilitation, if only by

reinforcing his perception that misdeeds do result in constraints on freedom."  925 F.2d at 608.

Other Circuits have also upheld occupational restrictions that prohibit defendants from engaging

in certain occupations or limit the ways in which defendants may participate in those

occupations.  In United States v. Choate, 101 F.3d 562, 566 (8th Cir. 1996), the Eighth Circuit

upheld a broad prohibition preventing the defendant from being self-employed in any capacity

because he had repeatedly demonstrated a propensity for fraud that "tend[ed] to creep up in

business after business."  Also, in United States v. Mills, 959 F.2d 516, 518 (5th Cir. 1992), the

Fifth Circuit held that it was a reasonable condition of probation to prohibit the defendant from

working in auto sales because that occupation "obviously bears a direct relationship to his

offense of tampering with odometers."

A ban of ships managed or manned by the Defendant is reasonably related to the factors

and purposes set forth in 18 U.S.C. § 3553 and is well within the court's authority.  First, it

directly addresses Defendant's motive for the illegal conduct in this case – reaping the benefits of

trade with the United States without bearing the costs in money and manpower of complying

with United States and international law.  It would help to protect the public from a direct

repetition of the criminal conduct that occurred in this case, which, like the conduct in Choate,

tends to creep up in ship after ship in Defendant's course of business.  Given the ease and

brazenness with which Defendant circumvented its previous Environmental Compliance Plan, it

is questionable whether Defendant can be effectively rehabilitated or the public adequately

protected from this Defendant through such a program.[20]  Because of the regularity with which

Defendant rotates employees among ships and because illegal conduct has occurred on at least

_____

[20] If a new compliance plan is to be imposed, it would need to be far more stringent that
Defendant's prior compliance plan.   It would need to include stronger requirements, better
checks and balances, and more intensive oversight.  The United States is prepared to propose
specific terms for an Environmental Compliance Plan should the Court wish it to do so.

two ships – the *Kriton*, the *Alkyon*, and likely the *Prikonissos* – a ban on all ships managed by Defendant will best ensure that Defendant's conduct is not repeated in United States ports. Unlike a fine, the cost of a ban could not be passed on to the Defendant's customers, business partners, and/or consumers.  See 18 U.S.C. § 3572(a)(7).  It would address and perhaps rectify some of the unfair competitive advantage Defendant gained over its competitors through its conduct.  Further, it would send a strong and needed message, both to the Defendant and to others in the maritime industry that if they are not willing to follow the laws and rules of the United States, they will not be welcome to do business here.  If companies like Defendant know that their conduct will bar them from the lucrative United States market, it will remove their incentive to circumvent APPS.[21]

## III.    CONCLUSION

For all the foregoing reasons, the Court should sentence Defendant to a total fine of at least Nine Million Dollars ($9,000,000) for the eighteen counts, with $500,000 for each count. This is the maximum fine available without calculating Defendant's gain from the illegal conduct.  In light of the potentially huge gains Defendant and others in the industry are capable of making by engaging in such illegal conduct, such a fine is necessary to ensure that Defendant does not profit from its criminal course of conduct, and that there is adequate specific and general deterrence.  Such a fine reflects the serious nature of the offense, the obstructive conduct by Defendant, the danger that the offense posed to U.S. ports, the potential environmental harm caused by the concealed conduct, and the complete recalcitrance, lack of acceptance of

---

[21] Also, banning ships managed or manned successors and assigns will prevent Defendant from simply dissolving, reforming, and continuing to sail with all the same personnel, procedures, and problems.

responsibility, and ethos of lawlessness demonstrated by Defendant.  Additionally, the Court

should impose a five-year term of probation and bar ships managed or manned by Defendant and

its successors and assigns from U.S. ports during that time.  As part of its order, the Court should

order the fine amount to be due and payable immediately.


Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


_____/S/_____
WILLIAM M. BROWN, JR.
Assistant United States Attorney
915 Lafayette Blvd, Room 309
Bridgeport, CT 06604
Federal Bar No.: ct20813
Telephone:  (203) 821-3811
William.m.brown@usdoj.gov


_____/S/_____
LANA N. PETTUS
Trial Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Lana.Pettus@usdoj.gov


_____/S/_____
CDR LUKE M. REID
Special Assistant U.S. Attorney
Judge Advocate
First Coast Guard District
U.S. Coast Guard
luke.m.reid@uscg.mil


31

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on November 21, 2007, a copy of the foregoing United States'
Sentencing Memorandum was filed electronically and served by mail upon anyone unable to
accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of
the Court's electronic filing system or by mail to anyone unable to accept electronic filing as
indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's
CM/ECF System.

_____/S/_____
_____ WILLIAM M. BROWN, JR. (ct20813)
ASSISTANT UNITED STATES ATTORNEY

32