| | | |
|---|---|---|
| United States of America | : | |
| | : | |
| v. | : | Case No. 3:07cr134(JBA) |
| | : | |
| Ionia Management S.A., et al. | : | |

### RULING ON DEFENDANT IONIA'S POST-TRIAL MOTIONS

On September 6, 2007, at the conclusion of a jury trial, Defendant Ionia Management S.A. ("Ionia") was convicted on eighteen counts: thirteen counts of violating the Act to Prevent Pollution from Ships ("APPS") and associated regulations, 33 U.S.C. § 1908(a); three counts of falsifying records in connection with a federal investigation in violation of 18 U.S.C. § 1519; one count of obstructing justice in violation of 18 U.S.C. § 1505; and one count of conspiring to commit these offenses in violation of 18 U.S.C. § 371. These charges were the product of four initially separate indictments returned in the District of Connecticut, the Southern District of Florida, the Eastern District of New York, and the District Court of the Virgin Islands. The latter three were transferred to this district to be consolidated with the Connecticut indictment. Following the guilty verdict, Ionia filed two motions which are now the subject of this ruling: Motion for a Judgment of Acquittal, or in the Alternative, a New Trial [Doc. # 176]; and Motion for a Judicial Interview of Juror #2 to Investigate

1

Potential Juror Bias [Doc. # 186]. For the reasons detailed below, the relief Ionia seeks is denied; a general familiarity with the facts of the case is presumed.[1]

## I. Motion for Judgment of Acquittal or a New Trial

### A. Standards

A judgment of acquittal pursuant to Rule 29 is proper "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, [the Court] concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002). Taking care to "avoid usurping the role of the jury," "the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quotation marks omitted).

Rule 33, which permits the Court to "vacate any judgment and grant a new trial if the interest of justice so requires," allows

---

[1] The Court has previously issued several rulings in connection with this prosecution. See United States v. Ionia Mgmt. S.A., 499 F. Supp. 2d 170 (D. Conn. 2007); United States v. Ionia Mgmt. S.A., 499 F. Supp. 2d 166 (D. Conn. 2007); United States v. Ionia Mgmt. S.A., No. 07-134, 2007 WL 2298570 (D. Conn. Aug. 3, 2007); United States v. Ionia Mgmt. S.A., 498 F. Supp. 2d 477 (D. Conn. 2007).

"broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992).  In making this assessment, the Court "must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury."  <u>United States v. Ferguson</u>, 246 F.3d 129, 133 (2d Cir. 2001) (quotation marks omitted).  The Second Circuit explains that, when faced with such a motion,

> the judge must examine the totality of the case.  All the facts and circumstances must be taken into account. An objective evaluation is required.  <u>There must be a real concern that an innocent person may have been convicted.</u>  It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice."

<u>Sanchez</u>, 969 F.2d at 1414 (footnote omitted and emphasis added).

**B.   Vicarious criminal liability**

Ionia argues that the guilty verdict should be set aside because the jury failed to apply proper principles of agency: "the government failed to introduce sufficient evidence to establish that Ionia could be held vicariously liable for the acts of its employees and agents."  (Def.'s Mot. J. Acquittal at 4.)  Specifically, Ionia relies on the testimony of four members of the M/T Kriton's crew "that Ionia had a strict policy against the improper discharge of oily waste and bilge water, and they were each trained and promised to abide by this policy.  Thus, any illegal activities undertaken by these crewmembers were not

within the scope of their employment or for the actual benefit of Ionia." (Id. at 4-5.)  In addition, Defendant contends that the Government failed to prove that the crew's illegal conduct provided any actual benefit to Ionia.  (Id. at 7.)  The Government, disputing Ionia's conception of agency, responds that the evidence was sufficient to impose vicarious criminal liability on Ionia.  (Gov't's Opp. J. Acquittal [Doc. # 188] at 17.)

### 1.  Legal principles

The issue of how to properly define corporate criminal liability was the subject of much discussion by the parties in preparation for and during the trial.  The Government's proposed jury instructions included language substantially the same as the Court's final charge to the jury (which is quoted in relevant part below).  In comparison, Ionia argued that there could be no vicarious liability if the corporation had neither specifically authorized its agents to commit the criminal acts nor reaped an actual benefit as a result of the agents' conduct.

In the Second Circuit, "[i]t is settled law that a corporation may be held criminally responsible for [criminal] violations committed by its employees or agents acting within the scope of their authority."  United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 660 (2d Cir. 1989).  In an earlier, classic formulation, the court explained:

4

> The corporate defendant makes a separate contention
> that the guilt of its salesman is not to be attributed
> to it.  But the Supreme Court has long ago determined
> that the corporation may be held criminally liable for
> the acts of an agent within the scope of his
> employment, <u>New York Cent. & H.R.R. Co. v. United
> States</u>, 212 U.S. 481, and the state and lower federal
> courts have been consistent in their application of
> that doctrine.

<u>United States v. George F. Fish, Inc.</u>, 154 F.2d 798, 801 (2d Cir.

1946).  Whether an agent is acting within the scope of his

employment can then be measured by whether he or she is acting

with authority and with an intent to benefit the employer.

<u>United States v. Koppers, Inc.</u>, 652 F.2d 290, 298 (2d Cir. 1981)

(approving jury instruction that "a corporation could be held

criminally liable for the acts of its managerial agents done on

behalf of and to the benefit of the corporation and directly

related to the performance of the duties the employee has

authority to perform").

An agent need not have conferred an actual benefit, however;

it is sufficient that there was an intent, at least in part, to

benefit the employer.  <u>J.C.B. Super Markets, Inc. v. United

States</u>, 530 F.2d 1119, 1122 (2d Cir. 1976) (concluding that the

defendant "was clearly acting within the scope of her authority,

receiving food stamps for the benefit of her employer").  The

panel in <u>J.C.B. Super Markets</u> addressed the flaw in Ionia's

position that there must be an actual benefit, rejecting the

argument that "the respondeat superior principle is not

applicable where the agent is advancing his own rather than the corporation's interest."  530 F.2d at 1122.  To this the court responded:

> The suggestion that the employee's wrongful act did not advance the interests of the employer and therefore should not be imputed to it entirely overlooks the basic concept of respondeat superior.  Presumably no tortious act by an agent redounds to the benefit of the principal where the latter is held responsible for the damage which results.  Yet if this reasoning were followed no principal would ever be liable.

Id.  Clarifying the relationship between authority and illegality, the court continued, "[i]f the fact that [the defendants here] were not authorized to make illegal sales would exculpate the employer, it would be practically impossible to impose any penalties."  Id.

The cases relied on by Ionia offer no additional support for its misconception about the "benefit" element.  In United States v. DeMauro, 581 F.2d 50, 54 n.3 (2d Cir. 1978), the Second Circuit reaffirmed the general rule that "a corporation is liable for the criminal acts of its employees if done on its behalf and within the scope of the employees' authority."  The First Circuit in United States v. Cincotta explained that

> criminal liability may be imposed on the corporation only where the agent is acting within the scope of employment.  That, in turn, requires that the agent be performing acts of the kind which he is authorized to perform, and those acts must be motivated — at least in part — by an intent to benefit the corporation.

689 F.2d 238, 241-42 (1st Cir. 1982).  And in United States v.

6

Beusch, the Ninth Circuit approved a jury instruction which read, in part:

> The acts of a corporate agent or corporation's employee are within the scope of his authority if those acts are done on the corporation's behalf or for its benefit in the performance of the agent's general duties. . . . In order to be acting within the scope of his authority, the employee must be found to be acting on behalf of the corporation with the purpose of benefitting the corporation or serving some corporate purpose.

596 F.2d 871, 877 (9th Cir. 1979).  In their varying formulations, these three cases confirm the view that scope of employment is the operative element, with corporate purpose, authority, and/or benefit providing context for that term.

As to the relationship between an employer's official policies, informal instructions, illegal conduct, and the imputation of vicarious liability, Judge Sand has offered a useful instruction:

> If you find that the agent was acting within the scope of his employment, the fact that the agent's act was illegal, contrary to his employer's instructions, or against the corporation's policies will not relieve the corporation of responsibility for it.  However, you may consider the fact that the agent disobeyed instructions or violated company policy in determining whether the agent intended to benefit the corporation, or was acting within this authority.

1 Leonard B. Sand, et al., Modern Federal Jury Instructions-Criminal ¶ 2.01, Instr. 2-7 (2007); see also Seventh Circuit Pattern Criminal Jury Instructions 5.03 (1999) (providing that a corporation "is not relieved of its responsibility because [an agent's] act was illegal, contrary to [its] instructions, or

7

against its general policies").

## 2. The jury charge

Applying these guiding principles, the Court's charge to the jury included the following general instruction about vicarious criminal liability:

> As a legal entity, a corporation can only act vicariously through its agents; that is, through its directors, officers, and employees or other persons authorized to act for it. A corporation may be held criminally liable for the acts of its agent done on behalf of and for the benefit of the corporation, and directly related to the performance of the duties the employee has authority to perform.

(Jury Instructions [Doc. # 164] at 10.) Later, when describing the specific elements of each of the charges, the Court explained that, to convict Ionia of violating the Act to Prevent Pollution from Ships, the Government must prove, in part:

> that Ionia, through its agents, was in charge of operating the oil pollution prevention and discharge equipment for the M/T Kriton, including the Oily Water Separator and Oil Content Monitor; [and] that for the M/T Kriton, Ionia, through its agents, knowingly, meaning intentionally or voluntarily, failed to fully and accurately maintain an Oil Record Book in which the required disposal and discharge operations were recorded.

(Id. at 17.) Following this instruction, the Court elaborated on the meaning and scope of agency in the criminal context:

> The second element that the Government must prove beyond a reasonable doubt is that Ionia, through its agents, was in charge of operating the oil pollution prevention and discharge equipment for the M/T Kriton. You have been instructed that Ionia, as a corporate entity, is legally responsible for the acts or omissions of its agents or employees under certain

8

circumstances. You must find that the Government has proven beyond a reasonable doubt that acts attributable to Ionia were acts or omissions of its agents performed "within the scope of their employment" with Ionia as I will now define that term.

An act or omission that was specifically authorized by the corporation would be within the scope of the agent's employment. Even if the act or omission was not specifically authorized, it may still be within the scope of an agent's employment if (1) the agent acted for the benefit of the corporation and (2) the agent was acting within his authority. It is not necessary that the Government prove that the corporation was actually benefitted, only that the agent intended it would be.

If you find that the agent was acting within the scope of his employment, the fact that the agent's act was illegal, contrary to his employer's instructions, or against the corporation's policies will not necessarily relieve the corporation of responsibility for the agent's act. You may consider whether the agent disobeyed instructions or violated company policy in determining whether the agent intended to benefit the corporation, and/or was acting within his authority.

In determining whether an agent was acting for the benefit of the corporation, you are instructed that the Government need not prove that the agent was only concerned with benefitting the corporation. It is sufficient if one of the agent's purposes was to benefit the corporation.

(Id. at 19-20.) The Court then incorporated this language by reference when explaining the elements of other substantive charges. (Id. at 23, 29, 38.)

### 3. Discussion

Ionia's position is that the actions of the Kriton's crew cannot be imputed to the company because they were acting illegally and violating company environmental policy without

authorization.  Moreover, Ionia contends that there was no actual benefit to be gained from illegally discharging oil waste, for the vessel's pollution prevention equipment obviated the need to make illegal discharges or shoreline disposals.

First, the Government introduced evidence that the putative agents of Ionia were acting under direct orders from their superiors.  According to Second Engineer Edgardo Mercurio, Chief Engineer Efstratios Tsigonakis specifically instructed him not to use the oily water separator and to pump the oily waste overboard without utilizing the oil pollution prevention equipment; Tsigonakis and Mercurio then directed the engine room crew to connect the bypass hose and dispose of the waste directly into the ocean.  (Trial Tr. Aug. 29, 2007, at 23–26.)  Mercurio testified he spoke with the subsequent chief engineer, Petros Renieris, about these instructions, and was told to continue. (Id. at 51–52.)  The chief engineers, who were specifically charged with maintaining the oil record books, recorded entries which falsely indicated that the pollution prevention equipment was functioning normally and was being utilized.  These record books were required to be available upon entry at U.S. ports, and were presented to the Coast Guard when the Kriton was boarded in New Haven Harbor.  Together, this evidence provides sufficient basis to hold Ionia liable under a specific-authorization theory of agency.

Second, there was evidence that the crew acted within their authority and with an intent to benefit their employer when they committed the acts for which Ionia was ultimately held liable. Each agent who participated in the events giving rise to liability was both following instructions and carrying out the type of work for which he was employed: the chief engineers had authority to manage the engine room crew and to maintain the oil record books; the engine room crew had authority to operate the pollution prevention equipment as well as the pumps and valves used to connect the bypass hose. The Government also presented evidence from which one could infer that these employees were acting, with an intent to benefit Ionia. The jury could reasonably have concluded that the crew participated in the pump-outs and records falsification with the intention of, for example, (1) following orders and maintaining the chain of command aboard the Kriton; (2) saving Ionia the time and expense of properly maintaining and using the oil pollution prevention equipment; and (3) enabling the Kriton to continue to dock at U.S. ports despite having false records.

Finally, that Ionia had official policies prohibiting the conduct by the crew which formed the basis for this prosecution does not change the conclusion that imposing vicarious criminal liability was proper. As the Court explained in instructing the jury, the existence of contrary company policies is not by itself

a defense to criminal liability; whether Ionia had an official position on the course of conduct undertaken by its agents is merely one factor to be considered by the jury when assessing whether to impose vicarious liability. In this case, reasonable jurors could have concluded that, notwithstanding company policies, training, and general instructions, the actions of the Kriton's crew attributable to Ionia were actions by agents of Ionia performed within the scope of their employment.

For these reasons, relief pursuant to Rule 29 or 33 is unwarranted. Applying the agency principles described above to the facts of this case, a rational trier of fact could have found Ionia guilty beyond a reasonable doubt through the acts of its employees, and there is no basis for granting a new trial in the interest of justice. Insofar as Ionia's Motion for a Judgment of Acquittal, or in the Alternative, a New Trial rests on the jury's misapplication of agency principles, it is denied.

### C. Records falsification counts

Ionia also seeks relief targeted more specifically at two of the three records falsification counts on which it was found guilty. Count four of the New York indictment and count four of the Florida indictment charge Ionia with violating 18 U.S.C. § 1519 by falsifying records with the intent to impede an investigation by the U.S. Coast Guard, specifically by failing to maintain an oil record book in connection with the compliance

program imposed as a condition of probation.  Ionia previously

moved to dismiss these counts on the ground that "these alleged

violations of probation are within the jurisdiction of the

judicial branch and cannot form the basis of an alleged violation

of 18 U.S.C. § 1519."  (Def.'s Mot. Dismiss [Doc. # 131] at 1.)

The Court denied this motion without prejudice, and the parties

have now incorporated by reference their earlier briefing on the

issue.

### 1.   Background

On October 27, 2004, Ionia was sentenced to a three-year

term of probation in the Eastern District of New York for

violating 18 U.S.C. § 1001.  United States v. Ionia Management

S.A., No. 02-530 (E.D.N.Y. Nov. 17, 2004).  Judge Ross imposed

the standard conditions of probation in addition to special

conditions, including that Ionia adhere to the terms of a

compliance program.  This compliance program was intended

> to augment the requirements of existing law by
> increasing inspections and audits of all Ionia vessels
> that call upon any Port in the United States or sails
> into any waters under the jurisdiction of the United
> States, increase training of all Ionia Management S.A.
> personnel and require periodic reports to the United
> States Coast Guard to ensure that they are following
> this Compliance Program, and that all Ionia Management
> S.A. vessels will not pose a threat of injury to life,
> property, or the marine environment.

(Compliance Program at 1-2, Ex. 2 to Gov't's Opp. J. Acquittal.)

The program required Ionia to designate a corporate compliance

manager; retain an outside auditing firm, specifically Corbett &

13

Holt/Gallagher Marine Systems; permit the firm to conduct regular inspections of Ionia vessels; undertake an internal review of corporate safety measures; establish an "effective planned maintenance system"; comply with all governing maritime and environmental laws and regulations, including MARPOL and APPS; establish internal training programs; make all relevant documentation and records available for inspection by Gallagher Marine, the Coast Guard, and Class Societies; notify Gallagher Marine of any instances of non-compliance; make various reports to the Coast Guard; notify Gallagher Marine before any Ionia vessels are to arrive at a U.S. Port; and accurately complete and disclose to the Coast Guard a "Compliance Checklist for the Proper Care and Disposal of Oily Waste." (Id. at 2-8.) In establishing Ionia's obligations with respect to outside audits, the program further provided that

> [r]epresentatives of the United States Probation Department, the United States Coast Guard, and Coast Guard Investigative Services have the right to contact the Compliance Program Auditor during the term of Ionia's probation to assure Ionia's compliance with the Compliance Program.

(Id. at 3.) As part of the compliance checklist, Ionia must certify the accuracy and proper operation of the Oil Record Book, Oily Water Separator, Stern Gland, and Incinerator for each vessel. (Compliance Checklist at 1-2, Ex. B to Compliance Program.)

This compliance program now forms the basis for two counts

14

of falsifying records in a federal investigation. In the Florida

indictment, the grand jury charged in Count Four that, from on or

about January 19, 2006 through on or about January 23, 2006,

Ionia violated 18 U.S.C. § 1519, specifically alleging

> [that] a document entitled "Compliance Program
> Checklist for the Proper Care and Disposal of Oily
> Waste" ["CPC"] . . . was falsified and contained
> materially false assertions and entries, in that it
> represented that [Ionia] was maintaining an Oil Record
> Book for the M/T Kriton in which all entries were
> completed correctly and truthfully,

by making false entries in the oil record book which failed to

account for all relevant discharges and disposals. (S.D. Fla.

Indictment, No. 07-176, at 6-8.) The indictment further alleges

that the

> CPC was in relation to an investigation and the proper
> administration of a matter within the jurisdiction of
> the U.S. Coast Guard, to wit: a court-ordered
> Environmental Compliance Program, a condition of
> Ionia's probation for a prior conviction in the
> [E.D.N.Y.] for making false statements to the U.S.
> Coast Guard.

(Id.)

The New York indictment charges in count four that, from on

or about March 2, 2006 through on or about March 7, 2006, Ionia

further violated 18 U.S.C. § 1519, in that

> [Ionia] did knowingly falsify and make a false entry in
> . . . a Compliance Program Checklist, with the intent
> to impede, obstruct and influence the proper
> administration of a matter, [specifically] the
> monitoring of Ionia's environmental compliance program,
> within the jurisdiction of . . . the U.S. Coast Guard
> and the United States Department of Justice[.]

(E.D.N.Y. Indictment, No. 07-174, ¶ 19.)  The indictment alleges that the CPC was falsified in two ways, by

> (a) representing that [Ionia] was maintaining an Oil Record Book for the vessel M/T Kriton in which all entries were completed correctly and truthfully [and] (b) reporting that all oil-contaminated waste was incinerated or discharged through required pollution prevention equipment known as an Oily Water Separator, when in fact, as Ionia well knew, oil-contaminated waste was discharged directly into the ocean through a bypass hose, and without the use of a properly functioning Oily Water Separator and Oil Content Monitor.

(Id.)

## 2.   Discussion

Ionia now contends that these two counts must be dismissed because the information contained in the compliance checklists was "submitted solely for the purpose of satisfying a condition of probation imposed by the Court, [and] cannot be utilized . . . as a basis for" violating § 1519.  (Def.'s Reply Mot. Dismiss [Doc. # 142] at 1.)  Ionia argues that, by overseeing certain terms of the compliance program, the Coast Guard took on the role of probation supervisor, thereby functioning as an arm of the court rather than as a branch of the military within the Department of Homeland Security.  (Id. at 2-3.)  These charges, then,

> ignore[] the very purpose for imposing a term of probation, which is to offer a defendant an opportunity to rehabilitate itself under the tutelage of a probation official, and under the continuing jurisdiction of the court, which may impose institutional punishment for the original offense in

16

the event that a defendant abuses the opportunity it is given.

(Id.)  Under this view, only the court and the probation department have the authority to institute proceedings against Ionia for violating conditions of the 2004 probation sentence. (Id. at 3.)

In response, the Government advances two points: (1) a defendant's violation of a condition of probation may give rise to either (or both) a new criminal proceeding or an adjudication of the probation violation itself, (Gov't's Opp. Mot. Dismiss [Doc. # 140] at 3-4); and (2) there is no authority for the novel proposition that for the purpose of the compliance program the Coast Guard ceases to be an executive branch entity and instead becomes an arm of the judicial branch (id. at 6).  According to the Government,

> the defendant's argument [here] is similar to arguments
> it advanced in earlier pleadings and motions, implying
> that because the Oil Record Books it is charged with
> having falsely maintained were document[s] it was
> legally required to maintain, [Ionia] should not be
> subject to criminal penalties for falsifying [such
> documents].

(Id. at 7.)

Congress enacted § 1519 as part of the Sarbanes-Oxley Act of 2002.  Codified within the obstruction of justice chapter of title 18, the provision reads in full:

> Whoever knowingly alters, destroys, mutilates,
> conceals, covers up, falsifies, or makes a false entry
> in any record, document, or tangible object with the

> intent to impede, obstruct, or influence the
> investigation or proper administration of any matter
> within the jurisdiction of any department or agency of
> the United States or any case filed under title 11, or
> in relation to or contemplation of any such matter or
> case, shall be fined under this title, imprisoned not
> more than 20 years, or both.

18 U.S.C. § 1519. Characterized by its principal drafter as a "new general anti shredding provision," § 1519 was "meant to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct" an investigation or matter within U.S. jurisdiction, or in anticipation of such a matter. 148 Cong. Rec. S7418-19 (daily ed. July 26, 2002) (statement of Sen. Leahy).[2] In comparison to other obstruction statutes, § 1519 by its terms does not require the defendant to be aware of a federal proceeding, or even that a proceeding be pending. Cf. 18 U.S.C. § 1505.

The textual basis for Ionia's contention would then be that the Coast Guard, in its capacity relative to the compliance program, is not undertaking an "investigation or . . . matter within the jurisdiction of any department or agency of the United States." As to the meaning of "department or agency," 18 U.S.C.

---

[2] The commentary has focused in part on the statute's exceptional breadth, particularly the "in relation to or contemplation of" language seemingly encompassing not only pending investigations or matters, but future ones as well. E.g., Note, Anticipatory Obstruction of Justice: Pre-Emptive Document Destruction under the Sarbanes-Oxley Anti-Shredding Statute, 18 U.S.C. § 1519, 89 Cornell L. Rev. 1519, 1560-61 (2004).

18

§ 6 provides:

    As used in this title:

    The term "department" means one of the executive departments enumerated in section [101] of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government.

    The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

The relevant section of title 5 then enumerates the several executive departments, among them the Department of Homeland Security. 5 U.S.C. § 101. As to the meaning of "jurisdiction," the Supreme Court has provided guidance in an opinion interpreting an earlier version of 18 U.S.C. § 1001 which used the same language:

    The most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department. . . . A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation. Understood in this way, the phrase "within the jurisdiction" merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body.

United States v. Rodgers, 466 U.S. 475, 477, 479 (1984) (citations omitted).

    Under this framework, when the Coast Guard, an entity within the scope of § 6, engages in a vessel inspection or

investigation, it is simply carrying out its "official, authorized functions," and therefore implicating the type of federal action contemplated by § 1519. Thus, the third § 1519 count charged in the District of Connecticut indictment — premised on falsification of the oil record books standing alone, not in conjunction with the court-mandated compliance program (see Indictment [Doc. # 1] at 11–12) — is indisputably premised on an investigation or matter within the Coast Guard's jurisdiction, for its duties include protecting the marine environment and investigating violations of MARPOL, APPS, and related regulations, see generally 6 U.S.C. § 468(a); 14 U.S.C. § 89(a). By comparison, in the counts originating in New York and Florida, the matter alleged to have been obstructed was the Coast Guard's role with respect to Ionia's compliance program. But the Defendant has not demonstrated why this duty is not also within the extremely broad coverage of § 1519. An investigation into possible noncompliance with statutes and treaties affecting the marine environment — whether undertaken pursuant to its general mandate or pursuant to a compliance program — is within the Coast Guard's jurisdiction as an official, authorized function.

Although the Defendant's argument — that the Coast Guard had intruded into the realm of the courts in treating a condition of probation as its own investigation — has perhaps superficial

20

appeal, Ionia has failed to confront how federal law already contemplates the role of executive agencies and other entities in supervising certain terms of probation. Even the precedents relied on by Ionia confirm the cooperative role that the courts and probation department enjoy with other federal bodies in order to pursue their separate objectives. See, e.g., United States v. Reyes, 283 F.3d 446, 463-64, 471 (2d Cir. 2002) (noting that "the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined," and that "the law permits cooperation between [them] so that they may work together and share information to achieve their objectives").[3]

Consequently, these two disputed records falsification counts fall within the broad scope of § 1519, and there is no reason to set aside the jury's guilty verdict nor to grant a new trial. Ionia's Motion for a Judgment of Acquittal, or in the

---

[3] As one example, courts have sentenced defendants convicted of federal income tax offenses to probation with the special condition that the defendants file federal tax returns for the probationary years. E.g., United States v. Merritt, 639 F.2d 254, 256 (5th Cir. 1981). More directly on point, the federal sentencing guidelines recommend as a condition of organizational probation that the court require the defendant-corporation to develop a compliance and ethics program. U.S. Sentencing Guidelines Manual §§ 8B2.1, 8D1.4(c) (2007). In commentary, the Commission advises that "the court should consider the views of any governmental regulatory body that oversees conduct of the organization relating to the instant offense," and that "[p]eriodic reports submitted in accordance with [this section] should be provided to any [such] governmental regulatory body." Id. § 8D1.4 cmt. n.1.

21

Alternative, a New Trial, is denied.

## II.  Motion to Interview Juror #2

Ionia also seeks to have the Court interview a juror based
on a letter sent by the juror which, according to Ionia, "evinces
a potential 'pro-Government' bias."  (Mot. Jud. Interview of
Juror #2 at 2.)  The letter, sent by e-mail to counsel for the
Government shortly following the conclusion of the trial, reads:

> Subject: Ionia Mgmt trial
>
> Congratulations on all of your efforts in the recent
> federal trial of Ionia Management SA.  I was proud to
> have been a part of the jury and to witness the
> effectiveness of our legal system.
>
> [Juror's name]
> Juror #2

Ionia contends that the "uncommon" and "personally
congratulatory" nature of this message suggests that this Juror
was sufficiently biased to warrant further inquiry.

Under the Federal Rules, a post-verdict inquiry may properly
concern "(1) whether extraneous prejudicial information was
improperly brought to the jury's attention, (2) whether any
outside influence was improperly brought to bear upon any juror,
or (3) whether there was a mistake in entering the verdict onto
the verdict form."  Fed. R. Evid. 606(b).  But "a juror may not
testify as to any matter or statement" which occurred during
deliberations, nor anything which had an effect on a juror's
"mind," "emotions," or "mental processes."  Id.  According to

Judge Weinstein,

> federal courts are notoriously reluctant to permit
> either informal post-verdict interviews with or
> testimony from discharged jurors.  This approach seeks
> to (1) protect jurors from annoyance and embarrassment,
> (2) preserve jurors' freedom of deliberation, and
> (3) enhance the stability and finality of verdicts.  It
> is these concerns that are the foundation for Rule
> 606(b)'s proscription against the receipt of evidence
> concerning the jury's internal deliberations or any
> juror's thought processes for the purpose of impeaching
> the verdict.

3 Jack B. Weinstein & Margaret A. Berger, <u>Weinstein's Federal Evidence</u> § 606.06 (2d ed. 1997).  In <u>United States v. Moten</u>, 582 F.2d 654, 664-67 (2d Cir. 1978), the Second Circuit concluded that a defendant may conduct a post-trial interview of jurors "when reasonable grounds exist to believe that the jury may have been exposed to [improper] influence," but not "to waste the time of a district judge or inconvenience jurors merely to conduct a fishing expedition."  On significantly more egregious facts involving jury tampering, the court held that such an inquiry was warranted.  <u>Id.</u> at 667.

Discussing post-trial inquiries more broadly, the panel in <u>United States v. Ianniello</u>, 866 F.2d 540, 543 (2d Cir. 1989), explained how such inquiries as to possible bias, among other things, "may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts."  Reasonable

grounds exist to justify a hearing when the party seeking
investigation of the jury offers "clear, strong, substantial and
incontrovertible evidence that a specific, nonspeculative
impropriety has occurred which could have prejudiced the trial of
a defendant." United States v. Moon, 718 F.2d 1210, 1234 (2d
Cir. 1983) (citation omitted); see also Anderson v. Miller, 346
F.3d 315, 326 (2d Cir. 2003) (reviewing question of possible
coercion during jury deliberations, held that "FRE 606(b) broadly
prohibits accepting into evidence juror testimony regarding the
course of a jury's deliberations"); Attridge v. Cencorp Div. of
Dover Techs., Int'l, 836 F.2d 113, 114 (2d Cir. 1987) ("[T]he
sanctity of the jury room is among the basic tenets of our system
of justice.  Inquiries into the thought processes underlying a
verdict have long been viewed as dangerous intrusions into the
deliberative process."); United States v. Crosby, 294 F.2d 928,
950 (2d Cir. 1961) (affirming trial court's refusing to allow
post-verdict examination of jurors "as to their mental
processes").

        The parties also dispute the relevance of Judge Covello's
post-trial ruling in United States v. Dingle, No. 05-290 (D.
Conn. June 5, 2007), which Ionia describes as "wholly and
incontrovertibly supportive of the relief Ionia has requested"
(Def.'s Reply Mot. Jud. Interview [Doc. # 193] at 2).  However
that case involved a juror who, after the guilty verdict,

telephoned the court's deputy twice to express his desire to change his vote from guilty to not guilty.  <u>Dingle</u>, slip op. at 10.  These facts indicate a problem with the jury's deliberative process far more serious than even the most generous reading of Juror #2's note suggests.

In this case, that Juror #2's letter may have been "uncommon" and "congratulatory," but these descriptors fall short of showing the degree of impropriety or misconduct required before an interview of Juror #2 is warranted.  Therefore, Ionia's motion to interview this juror is denied.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for a Judicial Interview of Juror #2 [Doc. # 186] is denied; and Defendant's Motion for a Judgment of Acquittal, or in the Alternative, a New Trial [Doc. # 176], is denied.


IT IS SO ORDERED.



/s/_____
Janet Bond Arterton
United States District Judge


**Dated at New Haven, Connecticut this 12th day of December, 2007.**