# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )        CRIMINAL NO. 3:07-CR-134 (JBA)
                                    )
IONIA MANAGEMENT S.A.,              )
                                    )
                    Defendant.      )

## SPECIAL MASTER'S FIFTH REPORT

### I.       Introduction and Status of Work

This report is made pursuant to the Special Master Appointment and Scope of Work order dated April 18, 2008, in the above matter (the "Special Master Order").

The Special Master Order contemplates special master hearings will be held in the first weeks of December and June each year. However, scheduling difficulties on the part of the parties and the audit schedules of vessels have caused hearings to be scheduled more often on a January/July schedule. The Fifth Special Master's hearing was held on January 12, 2011.

The Fourth Special Master's Hearing was held on July 14, 2010, in New Haven. One of the issues addressed was Ionia Management S.A.'s ("Ionia") request that two of its vessels, the M/T PLOUTOS and the M/T ESTIA, be cleared to call at U.S. ports. However, as of the date of that hearing, no Special Waste Oil Monitoring System ("SWOMS") had been commissioned on either vessel; a recommendation on that issue was deferred pending commissioning of a SWOMS system on the vessels and an initial audit by the Independent Environmental Consultant ("IEC"). Subsequently, a SWOMS was commissioned on the M/T PLOUTOS, an initial audit

was performed by the IEC September 7-11, 2010, a report was provided to the Special Master and to the parties and Ionia renewed its request that the M/T PLOUTOS be cleared to trade at U.S. ports.  The undersigned filed a Supplement Regarding the M/T PLOUTOS to Special Master's Fourth Report on October 11, 2010, which was approved by the Court by order of November 10, 2010 (Docket 34).  The supplement recommended that the M/T PLOUTOS be cleared to call at U.S. ports if certain conditions were met to the satisfaction of the IEC.  The IEC advised that conditions were met by electronic communication dated November 24, 2010.  To date, the M/T PLOUTOS has not called at a U.S. port and Ionia does not anticipate that it will in the near future.

On December 3-4, 2010, the IEC conducted an initial environmental audit of the M/T ESTIA underway Suez to Port Said.  The report of the audit was distributed to the parties on December 17, 2010.

The Special Master's fifth hearing was held on January 12, 2011, in New Haven, Connecticut.  Prior to the hearing, on November 30, 2010, the undersigned provided the parties with a amended list of topics that would be addressed at the hearing.  The parties were invited to suggest additional topics, and no party did so.  The parties complied with all pre-hearing requirements.

Due to severe weather in the New Haven area, the Court facilities were closed on January 12, 2011, but the hearing was held in a conference room at the OMNI Hotel in New Haven.

SPECIAL MASTER'S FIFTH REPORT
PAGE -2-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

II.  **January 12, 2011 Hearing**

        A.  **Summary of proceedings and evidence**

A hearing was held January 12, 2011, at the OMNI Hotel in New Haven, Connecticut. The United States was represented by David O'Connell, Trial Attorney, Environmental Crimes Section, U.S. Department of Justice and Assistant United States Attorney Anthony Kaplan, who participated by telephone.  Ionia was represented by Michael Chalos and George Kontakis.  Also present were United States Coast Guard Lieutenant Commander Channing D. Burgess; IEC Captain Richard Wiggar; and Independent Corporate Consultant ("ICC") James Sanborn.  United States Probation Officer Patrick Norton participated by telephone.  Also present on behalf of Ionia was George Karagiorgis, Ionia's Technical Manager and Corporate Compliance Manager ("CCM"), Krystyna Tsochlas, Ionia's Safety and Quality Manager, Environmental Management Representative ("EMR") and Designated Person Ashore participated by video conference, due to her inability to travel for medical reasons.

Evidence at the hearing consisted principally of the testimony of Ms. Tsochlas, supplemented with the testimony by Mr. Karagiorgis, directed to the issues set out in the amended schedules for consideration at the Special Master's hearing in January 2011.  (Attached as Appendix A).

As has been usual in the Special Master's hearings in this case, the testimony was taken in a somewhat informal manner.  Ms. Tsochlas was placed under oath and allowed to testify in a narrative with the assistance of a PowerPoint, but questions were interposed during her narrative by the Special Master, the IEC, the ICC, the government representatives, and Ionia's counsel. Mr. Karagiorgis was also placed under oath and testified as necessary to supplement Ms. Tsochlas' testimony or in response to questions from the parties.  The IEC and the ICC also

SPECIAL MASTER'S FIFTH REPORT
PAGE -3-

*United States of America vs. Ionia Management S.A.*

Criminal No. 3:07 CR 134 (JBA)

stated their views on issues raised at the hearing. A transcript of the hearing is attached as Appendix B.

Due to a dispute between the parties on the issue of whether the SWOMS, as currently configured, met the requirements of the Special Master Order, the Parties were requested to submit their positions on the issue by letter. Ionia submitted a letter on January 28, 2011; the government responded on February 4, 2011; Ionia replied on February 7, 2011, the Government further responded on February 8, 2011. (Copies of the parties' letters are attached as Appendix C, D, E, and F respectively.)

**B.** **Findings**

Based on the testimony at the hearing, the documents presented and the reports of the initial audit of the M/T ESTIA, I make the following findings by preponderance of the evidence:

1. <u>General</u>

a. Krystyna Tsochlas continues to serve as Ionia's Safety and Quality Manager, Environmental Management Representative and Designated Person Ashore. She has been directly and substantially involved in Ionia's efforts to comply with the terms of probation and the requirements of the Special Master Order. She reports directly to Ionia's Managing Director.

b. Georgios Karagiorgis is head of Ionia's Technical Management Department and Corporate Compliance Manager. He began his employment with Ionia on January 2, 2009. Mr. Karagiorgis is familiar with the duties of the CCM under the Special Master Order and has been directly and substantially involved in carrying out Ionia's efforts to comply with the terms of probation and the requirements of the Special Master Order. He reports directly to Ionia's Managing Director.

SPECIAL MASTER'S FIFTH REPORT
PAGE -4-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

c.     An initial audit of the M/T ESTIA was conducted while the vessel was underway Suez to Port Said December 3-4, 2010.  The IEC's report of the audit is attached as Appendix G and is adopted as a finding, except as specifically discussed below.  Ionia's response to the audit is attached as Appendix H.

d.     The M/T THEO T is currently trading between South America and U.S. ports.  Ionia does not anticipate its other vessels are likely to call in the U.S. during the next several months as their trading patterns are currently elsewhere in the world.

e.     Since the Special Master's hearing in January, 2010, Ionia has submitted records relevant to waste oil generation and management and processing aboard the M/T FIDIAS and the M/T THEO T (the "Covered Vessels") on a monthly basis.  The records have been submitted within forty (40) days of the end of the month in which the records were generated.  Given the trading schedule of the vessels and the necessity of transmitting many of the records by post from ports of call, the time for transmission to the required recipients has been reasonable.  Ionia has also submitted records relevant to the waste oil generation and management and processing aboard the M/T PLOUTOS and the M/T ESTIA since the SWOMS was commissioned in each of those vessels.  The IEC and the ICC have communicated with Ionia management periodically on topics related to progress in implementing the SWOMS, training issues and document production.

2.     Progress in Fully Implementing The SWOMS

a.     Current operational status.  The SWOMS are functioning as designed without significant problem and have been transmitting SWOMS data on a daily basis on the M/T THEO T and the M/T FIDIAS, the vessels initially covered by the

SPECIAL MASTER'S FIFTH REPORT
PAGE -5-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

Special Master's Order.  The SWOMS became fully operational on the M/T PLOUTOS

in September 2010; calibration difficulties were resolved by the technicians in October

2010.  Currently, the SWOMS on the M/T PLOUTOS is functioning as designed and data

is being transmitted daily.  The SWOMS was installed and commissioned on board the

M/T ESTIA in November 2010.  However, as of January 2011, the vessel was

encountering difficulty in transmitting data.  The M/T ESTIA will be calling at Singapore

around January 22, 2011, at which time technicians will board the vessel and install

replacement parts in an effort to solve the data transmission problem.

        b.     <u>The hourly recording data</u>.  The Special Master Order, at p. 5,

requires that the SWOMS

> . . . must have the capacity to record, and the data be electronically
> sent, to Ionia's shoreside offices.  The data shall be electronically
> recorded by the SWOMS at least hourly.

The SWOMS, as currently configured, continuously monitors the volumes of bilge water

and oily residue tanks.  Each day at 00:00 GMT the SWOMS device (denominated the

"Enviro-Logger" by Vigilant Marine, its designer and manufacturer) automatically

transmits to Ionia shoreside offices:  (1) the bilge and tank levels as of 00:00 GMT; (2)

the minimum and maximum tank level soundings during the previous 24 hours; (3) the

times and duration of operation of the oil water separator; (4) the times and duration of

operation of the incinerator; (5) the times and duration overboard discharge valves were

open; (6) the times and duration bilge pumps were run; and (7) the times the Enviro-

Logger is powered off or on.  If the vessel's satellite transmission is interrupted at 00:00

GMT due to the vessel's location or other problem, the data is transmitted when

SPECIAL MASTER'S FIFTH REPORT
PAGE -6-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

communication is reestablished with Ionia's shoreside office. After the daily data is transmitted, the Enviro-Logger does not retain the monitored data.

At the Special Master's third hearing on January 20, 2010, the issue was raised whether the Enviro-Logger could be modified so as to record and retain hourly tank sounding data. Ionia stated that Vigilant Marine had advised that the memory capacity of the Enviro-Logger is insufficient to allow it to retain continuous, or hourly, data after the data is transmitted to Ionia's shoreside office. Ionia advised it was working with Vigilant Marine to modify the system to allow for hourly sounding data to be retained.

The issue was raised again in the Fourth Special Master's Hearing on July 15, 2010. Ionia again advised Vigilant Marine still had not come up with a solution, but that it was continuing to work with them.

As of the Fifth Special Master's Hearing on January 12, 2011, Ionia advised that Vigilant Marine had been unresponsive to its request for modification of the Enviro-Logger to allow for the retention of hourly sounding data. The documents submitted by Ionia do not reflect active efforts by Ionia to obtain responses from Vigilant Marine, but Ms. Tsochlas testified not all communications with Vigilant Marine were included. Ionia stated that its management and its counsel would redouble efforts to get Vigilant Marine to modify the hardware and/or software on the Enviro-Logger so that hourly sounding data would be preserved.

Ionia maintains that the current capabilities of the Enviro-Logger meet the above-quoted requirements of the Special Master Order, even without further modification, because the tank sounding data is monitored continuously. Currently, the

SPECIAL MASTER'S FIFTH REPORT
PAGE -7-

*United States of America vs. Ionia Management S.A.*

Criminal No. 3:07 CR 134 (JBA)

data is "recorded" only to the extent to allow the Enviro-Logger to transmit the daily

00:00 GMT soundings, the daily maximum and minimum soundings for each tank, and

the daily operations of waste oil generation and processing equipment and certain pumps

and valves. After the 00:00 GMT data transmission, the memory of the device is

overwritten with new data. Ionia maintains this fulfills the requirement that soundings be

recorded at least hourly. The government maintains the Enviro-Logger as currently

configured does not comply with the above-quoted language of the Special Master Order,

which the government reads as requiring hourly sounding data to be recorded and

transmitted hourly.

I believe the quoted requirement must be read in the context of its purpose.

The Special Master Order provides:

> The intent of this [SWOMS] special condition of probation is to
> ensure this monitoring system creates an independent record which
> can be sent to the company and reviewed by company officials
> who can detect anomalies. In addition, when analyzed, this
> independent record can be compared with the records kept by
> shipboard personnel in order to account for the oily bilge waste
> and waste oil in the engine room and ultimately ensure compliance
> and accurate shipboard records.

Special Master Order, pp. 4-5. The IEC opined that the current SWOMS gives his

organization and Ionia sufficient data to analyze ship operations and detect potential

MARPOL violations.

Ionia's shoreside technical managers perform a daily review of the

transmitted Enviro-Logger data from each vessel. They record transmitted values on a

spreadsheet which allows them to identify unusual deviations and to monitor trends. The

Enviro-Logger data is compared with manual soundings and engine room alarm print-

outs which are received from the vessel monthly. Presently, to monitor the accuracy of

SPECIAL MASTER'S FIFTH REPORT
PAGE -8-

*United States of America vs. Ionia Management S.A.*

Criminal No. 3:07 CR 134 (JBA)

the Enviro-Logger soundings, the Chief Engineer is required each day to compare the daily manual soundings as recorded in the vessel's sounding log with the Enviro-Logger readings taken at the time of the manual sounding.[1] The Chief Engineer must affirm that he has made the comparison of the manual and Enviro-logger data by checking off the item on Ionia's "Enviro-Logger Check List," a form devised in collaboration with Vigilant Marine. (In the event of a discrepancy of more than 5%[2] between the contemporaneous manual and Enviro-Logger sounding data, the Chief Engineer is required to immediately report the discrepancy to shoreside managers as a defect in a critical piece of equipment.) Thus, it is possible, although admittedly inconvenient, for an auditor or other person coming aboard the ship to compare Enviro-Logger readings printed on the tape with shipboard logs of contemporaneous manual tank soundings.

The relevant language in the Special Master Order requires that soundings be recorded hourly, and because it makes no sense to suggest that something be recorded and then quickly deleted, it is implicit that the recording be preserved for a reasonable period of time. Therefore, the current arrangement in which Enviro-Logger data (except for 00:00 GMT soundings, maximum and minimum values and manual queries) is not retrievable, is not fully consistent with the letter of Special Master Order requirement that hourly data be recorded. However, I do not interpret the Special Master Order to require hourly transmission of the data. Daily transmissions as currently done are sufficient to allow Ionia shoreside personnel to detect anomalies. A major transfer to or from one of

---

[1]  The Enviro-Logger prints out on a continuous tape the data transmitted each day to Ionia's shoreside office at 00:00 GMT as well as the current readings at any time the device is queried. The tapes are maintained onboard the vessel.

[2]  The 5% figure is Vigilant Marine's statement of the margin of error of the Enviro-Logger monitors.

SPECIAL MASTER'S FIFTH REPORT
PAGE -9-

*United States of America vs. Ionia Management S.A.*

Criminal No. 3:07 CR 134 (JBA)

the monitored tanks will be reflected in the maximum-minimum data and machinery operations data transmitted daily. The government asserts that hourly transmission of data would allow for real-time monitoring of shipboard operations, but given the substantial volume of data generated by the hourly soundings of each tank on the four vessels fitted with a SWOMS, it is unrealistic to suppose anomalies would be detected any more often than under the current transmission practice. Indeed, hourly transmissions may well result in "information overload" resulting in less efficient review of the vessels' data.[3]

By its submission of January 28, 2011 (Appendix C, hereto), Ionia advised that Vigilant Marine now states it can modify the Enviro-Logger to generate hourly transmissions of sounding and waste oil machinery data to Ionia shoreside offices, and Ionia has engaged them to do so. On February 7, 2011, Ionia advised that the Enviro-Logger on the M/T THEO T had been reconfigured to transmit Enviro-Logger data hourly. Ionia requests, however, that the other vessels subject to the Special Master Order not be required to make the same adjustments until the IEC and Ionia can assess the value of hourly transmissions (Appendix E).

In sum, it appears that current Enviro-Logger configuration on board the M/T PLOUTOS, the M/T FIDIAS and the M/T ESTIA fulfills the purpose of the SWOMS requirement in the Special Master Order, in that it allows for Ionia shoreside managers to monitor the waste oil management on board the vessels on a daily basis and allows for detailed comparisons of shipboard records with SWOMS data on a monthly

---

[3] Both the IEC and the ICC were consulted on this issue and both expressed concern that hourly transmission of data would impair efficient monitoring by causing "information overload."

SPECIAL MASTER'S FIFTH REPORT
PAGE -10-

*United States of America vs. Ionia Management S.A.*

Criminal No. 3:07 CR 134 (JBA)

basis.[4]  However, I am not free to ignore that recording of the Enviro-Logger hourly data

is required by the letter of the Special Master Order and that requirement is not now

strictly met except on the M/T THEO T, where soundings are being transmitted hourly

and presumably preserved at Ionia's shoreside offices.[5]  But, the concern that an hourly

transmission arrangement on the other vessels will result in less efficient monitoring is

real and must be addressed.  The value of hourly transmissions, which as stated above is

modest, must be balanced against the loss of efficiency caused by the receipt of a daily

deluge of data-heavy email transmissions and the cost of data-heavy satellite

communications.  I find the most sensible solution is to allow Ionia ninety (90) days in

which to implement on the other vessels (none of which are expected to call on U.S. ports

in the immediate future) either (1) hourly data transmission as on the M/T THEO T, or

(2) an arrangement whereby hourly Enviro-Logger readings can be stored on board

(electronically or in hard copy print-outs) and shipped to Ionia's office monthly with

other required documents.  If option (1) is chosen, Ionia should work with the IEC to

design and implement a procedure to deal with the substantial volume of hourly

transmissions in a manner that maximizes efficient review of the vessels' waste oil

management systems.[6]

---

[4]  I note that the IEC's audits of Ionia vessels to date have been favorable, see Paragraph II.B.8, infra, and the IEC
believes the current Enviro-Logger allows him to appropriately monitor the vessels.  I also note that a U.S. Coast
Guard expanded MARPOL I port state inspection was conducted on the M/T THEO T on January 30, 2011, in
Gravesend Bay, New York, and no deficiencies were noted related to MARPOL Annex I compliance systems.
(Report attached as Appendix I.)

[5]  It seems at present the memory functions of the Enviro-Logger device is insufficient to preserve an electronic
record onboard the transmitting vessel.  The record does not cast any light on whether the device can be
reconfigured to automatically print out hourly readings on board or download data hourly to an on-board device,
rather than transmit the data via email to Ionia's office.

[6]  Of course, Ionia could also move the court to modify the Special Master Order to eliminate the requirement for
hourly recording in lieu of some other arrangement that meets the Order's goals.

SPECIAL MASTER'S FIFTH REPORT
PAGE -11-

*United States of America vs. Ionia Management S.A.*

Criminal No. 3:07 CR 134 (JBA)

c. <u>M/T PLOUTOS SWOMS</u>. A supplement to the Special Master's Fourth Report recommended that the M/T PLOUTOS be authorized to trade at U.S. ports, provided certain conditions were met to the satisfaction of the IEC. Among the conditions was assurance that the Enviro-Logger aboard the M/T PLOUTOS was appropriately calibrated, such that discrepancies between manual soundings and Enviro-Logger readings were within an acceptable level. The IEC testified that in his opinion sufficient documentation has been provided, in the form of technicians' reports, that satisfied that condition. In find the IEC's determination to be reasonable and justified.

d. <u>Verification of Manual Soundings</u>. Based on the recommendation of the IEC, the undersigned recommended in the Special Master's Fourth Report that Ionia should institute a procedure whereby manual tank soundings are verified by additional manual soundings during the sounding process. Ionia has amended its Environmental Management Manual to require that each tank sounding shall be taken three times and the average of the three readings shall be recorded in the Tank Sounding Log.

e. <u>Feedback Regarding the SWOMS</u>. Ionia instituted a survey of its seafaring and shoreside personnel regarding the effectiveness of the SWOMS. The results indicated near unanimous agreement seafarers and shoreside personnel using the SWOMS that the readings recorded by the SWOMS were accurate, the operation of the SWOMS was trouble-free, is not possible to tamper with the SWOMS, it is not possible to contravene MARPOL regulations with the SWOMS and that the SWOMS prevents MARPOL violations.

SPECIAL MASTER'S FIFTH REPORT
PAGE -12-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

3.    Training.

a.    Ionia continues to train its seafarers and shoreside personnel on environmental matters by external training carried out ashore, internal training carried out ashore, computer-based training carried out ashore and on board, and weekly training sessions carried out on board using DVDs, technical publications and manuals.

b.    Ionia has devised key performance indicators to monitor the impact of its environmental training. Ionia analyses deficiencies recorded during port state control inspections, flag state inspections, internal audits, and vetting inspections. Because the evaluation of the training program has only been fully implemented within a little more than a year, the data is not sufficient to determine the effectiveness of the training program. However, preliminary data does not indicate a reduction in noted non-conformities attributable to environmental issues. Ionia presented information indicating the percentage of non-conformities attributed fleet-wide to environmental issues is trending downward, but that percentage is marginally helpful because it does not reflect the number of actual non-conformities found.[7]

c.    Pretraining/Environmental Training. Before joining an Ionia vessel, seafarers must go through a pre-joining familiarization process. That process includes training on environmental issues, environmental impacts, environmental programs/targets, environmental legislation, the EPA Vessel General Permit and the Ionia Environmental Management Plan. Computer-based training is used in the pre-joining familiarization process. In addition, Ionia conducts in-house seminars, including one on

---

[7] It is worthy of note, however, that the actual number of non-conformities may vary by the number of inspections, not necessarily the quality of Ionia's performance.

SPECIAL MASTER'S FIFTH REPORT
PAGE -13-

*United States of America vs. Ionia Management S.A.*

Criminal No. 3:07 CR 134 (JBA)

shipboard environmental management systems. Seafarers also attend training at external organizations in the Philippines or Greece. Pre-joining training is mandatory, including training on the details of Ionia's Environment Management Plan and terms of probation in this case. Ionia does not require seafarers to complete all in-house seminars before joining a vessel if a seminar was not available during the period between the time the seafarer was hired and the time the seafarer boarded the vessel, but the seafarer must attend the missed seminar before a subsequent tour of duty. The IEC pointed out in the audit of the M/T ESTIA that four seafarers had not attended the in-house seminar entitled "Shipboard Environmental Management Systems." However, the seafarers in question had attended courses at external organizations on MARPOL Annex I, IV, V and VI, and had attended the pre-joining familiarization program where they were trained on the requirements of Ionia's Environmental Management Plan and the terms of probation in this matter. The seafarers will be required to complete the Shipboard Environmental Management Systems course before joining their next Ionia vessel.

        d.     <u>M/T ESTIA Chief Engineer Knowledge Deficit</u>. The audit of the M/T ESTIA indicated that Chief Engineer Stoumpos Theodoros, was seriously deficient in his knowledge of the maintaining of the oil record book and other logs and checklists associated with Ionia's Environmental Management Plan. This was the Chief Engineer's first employment on board an Ionia vessel. The Chief Engineer's deficiency with regard to environmental recordkeeping was first noted in an Ionia internal audit in November, 2010, and again referenced in the IEC's audit in December, 2010. As a result of the observations in Ionia's internal audit and the IEC's audit, Ms. Tsochlas advised that Mr. Theodoros was scheduled to be removed when the vessel reached Singapore on January

SPECIAL MASTER'S FIFTH REPORT
PAGE -14-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

22, 2011.  The Chief Engineer will be retrained on environmental recordkeeping

obligations to see whether Ionia will be able to improve his performance and his attitude

toward compliance.  At that time, management will decide whether he will be eligible to

be reassigned to an Ionia vessel.  Inasmuch as other audits of Ionia vessels have not

found similar deficiencies in knowledge by the engineering staff, this is not seen as

indicating a marked deficiency in Ionia's training program with regard to environmental

recordkeeping, but does indicate a weakness in assessing the fund of knowledge and

attitude toward compliance of new hires.

      4.     <u>Fleet Engineering Survey</u>.  Ionia continues to implement the Revised Fleet

Engineering Survey.  Engineering seafarers are required to complete the survey during their

contract on board a vessel.  So far, 13 complete responses to the revised survey have been

received.  The responses have not always been informative.  As of yet, no changes to Ionia's

policies or practices have resulted from information learned in the Fleet Engineering Survey.  In

order to obtain more informative responses, Ionia has undertaken on the pre-joining

familiarization process to encourage seafarers to think about new ideas and to overcome any

culture of complacency.

      5.     <u>Internal Audits</u>.  Each department and vessel in Ionia is audited at least

annually pursuant to a detailed audit checklist and protocol.  The audit involves interviewing key

personnel, reviewing and evaluating records and recording objective evidence of the status of the

implementation of Ionia's Environmental Management Plan.  Upon completion of the audit, the

auditor holds a closing meeting with the person responsible for the area being audited and any

other persons deemed necessary.  During the closing meeting, the auditor presents the audit

results and findings and agrees with the responsible person on immediate actions to be taken in

SPECIAL MASTER'S FIFTH REPORT
PAGE -15-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

order to address any noted deficiencies or non-conformities.  The auditor then submits a report to Ms. Tsochlas, the EMR, within ten (10) days.  Ms. Tsochlas reviews the report and upon completion of the review, circulates the report to the managing director and the heads of relevant departments.  Ms. Tsochlas monitors the implementation of established corrective and preventative actions.  She insures that internal audit results are included in the agenda of the Environmental Management Review meeting.

In addition to the annual audit, each vessel is attended by an Ionia technical superintendent twice per year.  During the attendance, the superintendent stays on the vessel while underway and reviews all areas of safety, navigation and environmental policies and procedures.

The M/T ESTIA was the subject of an internal audit in November 2010, and several non-conformities were noted, the most serious of which was the Chief Engineer's failure to appropriately maintain the oil record book and other logs and checklists associated with Ionia's Environmental Management Plan.  As stated above, the Chief Engineer was to be removed from the vessel for additional training.  Should the additional training not satisfy Ionia that the seafarer has the knowledge and attitude sufficient to fully implement Ionia's obligations under external regulation and internal policy, the Chief Engineer will not be re-employed by Ionia.

Ionia has provided a schedule of audits for 2011.  The M/T THEO T is scheduled for audit in February, M/T PLOUTOS in March, the M/T ESTIA in April and the M/T FIDIAS in May.

SPECIAL MASTER'S FIFTH REPORT
PAGE -16-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

6. <u>EPA Vessel General Permit</u>. It appears Ionia has complied with the requirements of the EPA Vessel General Permit with regard to its vessels that may call at U.S. ports.

7. <u>Oil Transfer Procedures</u>. Ionia's Safety Management System was amended on November 1, 2010, to include cargo transfer procedures compliant with 33 C.F.R. §§ 155.790.

8. <u>M/T ESTIA Audit</u>. The IEC conducted an ongoing environmental audit of the M/T ESTIA underway Suez to Port Said, December 3-4, 2010. The IEC concluded:

> The overall condition of the vessel and waste management were very good. This vessel has recently come under the Scope Of Work as management intends to trade the vessel on U.S. routes in the future. The scope of work and EMM requirements are well-implemented onboard. <u>Having audited two [sic] vessels, namely M/T THEO T, FIDIAS and PLOUTOS previously, it is noteworthy to record that all the recommendations from the previous audits have been implemented and the Environmental Management Manual and other relevant documentation have been revised to reflect the same</u>. All the personnel onboard cooperated fully during the audit and were sincerely interested and positive in complying with the Environmental Procedures. (Emphasis in original.)

The principal deficiency noted in the audit was the failure of the Chief Engineer to accurately carryout the recordkeeping duties for the Oil Record Book and other logs and checklists associated with Ionia's Environmental Management Plan. As found above, the Chief Engineer will be replaced and repatriated when the vessel reaches Singapore on or about January 22, 2011.

Other issues involving the preservation and logging of SWOMS data are discussed above.

9. <u>Former KRITON seafarers</u>.

SPECIAL MASTER'S FIFTH REPORT
PAGE -17-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

None of the seafarers who were on board the KRITON who were either involved in the violation giving rise to this action or testified as witnesses are currently employed by the company. None of those seafarers have ever sought re-employment after the expiration of their contracts. Persons who engaged in the wrongdoing leading to the convictions are not eligible for re-employment. All other seafarers, including "whistleblowers" are fully-eligible for re-employment; they simply have not chosen to apply. Three KRITON seafarers, Ricky Lalu, Alexander Gueverra and Dario Calarbag have filed motions seeking rewards under 33 U.S.C. § 1908. No other KRITON seafarers or other witnesses have sought a reward.

## III.   Conclusion

A.      Ionia continues to make progress in achieving a high level of compliance with the United States and international industry on environmental standards. Ionia's EMR and its CCM both demonstrate well-considered, systematic approaches to ensure acceptable standards of environmental accountability.

B.      Ionia has installed a SWOMS in substantial compliance with the material requirements and terms and conditions of its probation and the Special Master Order, but modifications are necessary for Ionia to achieve strict compliance.

C.      Ionia has instituted an Environmental Management Plan pursuant to the recommendations of the IEC. Ionia has demonstrated a commitment to implement the EMP and training of shoreside and seagoing personnel in its operation. Ionia has established and implemented a comprehensive training program, including computer-based training.

SPECIAL MASTER'S FIFTH REPORT
PAGE -18-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

**D.**     Ionia has submitted it shipboard records as required in Paragraph 4(a) of the Special Master Order.  Ionia has requested that an additional vessel, the M/T ESTIA, be cleared to trade at U.S. ports.  While the IEC's audit of the M/T ESTIA was generally positive, verification of the accuracy and capability of the SWOMS has been delayed, because of a problem with the transmission of data from the M/T ESTIA to U.S. shoreside offices as of December 29, 2010.  The M/T ESTIA will be calling in Singapore around January 22, 2011 and a technician is scheduled to board the vessel to address the problem.

## IV.     <u>Recommendation</u>

**A.**     Ionia should provide within thirty (30) days evidence satisfactory to the IEC that the Enviro-Logger on board the M/T THEO T is transmitting required data hourly (as satellite communications allow) and the same is being recorded onboard or shoreside.  For the M/T FIDIAS, the M/T PLOUTOS and the M/T ESTIA, Ionia should within ninety (90) days:  (1) implement hourly transmission of SWOMS data as on the M/T THEO T; or (2) arrange for electronic or hard copy storage of hourly Enviro-Logger readings on board the vessels to be submitted to Ionia's office monthly with other required documents.  In the meantime, if option (1) is chosen, Ionia should work with the IEC to design and implement a procedure to deal with hourly transmission in a manner to maximize efficient review of the vessels' waste oil management systems, before the vessels call at U.S. ports.

**B.**     Ionia should continue to conduct internal audits as specified in its Environmental Management Plan and to address properly any weaknesses or non-conformities identified in the course of the audits.

SPECIAL MASTER'S FIFTH REPORT
PAGE -19-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

**C.**     Ionia should provide the Special Master, the ICC and the IEC with copies of reports of its training managers' reports relating to training facilities and procedures in the Philippines.

**D.**     Ionia should conduct a formal inquiry into the reasons the M/T ESTIA Chief Engineer Stoumpos Theodoros, was able to join the vessel despite a demonstrated deficiency in his knowledge of the proper procedures for maintaining the oil record book and other logs and checklists associated with Ionia's Environmental Management Plan.  If Mr. Theodoros is reemployed aboard an Ionia vessel covered by the Special Master Order, Ionia shall notify the IEC, the ICC and the government representatives appearing in this case.

**E.**     The M/T ESTIA be authorized to call at U.S. ports as a vessel covered by the Special Master's Order, subject to Ionia providing documentation satisfactory to the IEC that the SWOMS on board the vessel is operating such that discrepancies between manual soundings and SWOMS data are within tolerances considered reasonable by the IEC, considering the manufacturer's specifications.  This Recommendation is in addition to Recommendation A, above.

**F.**     Ionia should give the IEC reasonable notice before any of its vessels calls at a U.S. port.

SPECIAL MASTER'S FIFTH REPORT
PAGE -20-

*United States of America vs. Ionia Management S.A.*
Criminal No. 3:07 CR 134 (JBA)

**G.**     Because the last three hearings have occurred on a January-July schedule, it is recommended that the next in-person hearing should be held in New Haven, Connecticut, during the month of July, 2011.

Respectfully submitted this 9th day of February, 2011.

/s/ Robert C. Bundy
Robert C. Bundy, Special Master

SERVICE LIST

(a)     US Attorney's Office
        District of Connecticut
        Connecticut Financial Center
        157 Church Street, Floor 23
        New Haven, CT 06510

        ATTN:  Mr. Anthony Kaplan, Esq.
        Email:  anthony.kaplan@usdoj.gov


(b)     U.S. Department of Justice
        Environmental Crimes Section
        601 "D" Street, NW
        Washington, D.C. 20004

        ATTN:  Ms. Lana Pettus
               David E. O'Connell
        Email:  lana.pettus@usdoj.gov
                david.oconnell@usdoj.gov

(c)     U.S. Coast Guard
        Commandant (CG-543)
        Office of Vessel Activities
        Foreign Vessel/Offshore Activities Div.
        2100 Second St., S.W.
        Washington, D.C. 20593-0001

        Attn:  LT Chaning D. Burgess
        Email:  Chaning.D.Burgess@uscg.mil

(d)     U.S. Probation Department
        District of Connecticut
        157 Church Street, 22nd Floor
        New Haven, CT  06510

        Attn:  Mr. Patrick Norton
        Email:  Patrick_Norton@ctp.uscourts.gov


(e)     Chalos, O'Connor & Duffy, LLP
        366 Main Street
        Port Washington, NY 11050

        Attn:  Mr. Michael Chalos, Esq.
        Email:  mchalos@codus-law.com